ORIGINAL

1   MARVIN WEXLER
    LAWRENCE C. FOX
2   KORNSTEIN VEISZ & WEXLER, LLP
    757 Third Avenue
3   New York, New York 10017
    (212) 418-8600/fax (212) 826-3640
4
    DENNIS A. KENDIG (SBN #66402)
5   EVE TRIFFO (SBN #61819)
    KENDIG & ROSS
6   1875 Century Park East
    Watt Plaza - Suite 2150
7   Los Angeles, California 90067-2799
    (310) 556-8100/fax (310) 556-8140
8
    ATTORNEYS FOR PLAINTIFFS
9
                    UNITED STATES DISTRICT COURT
10                 FOR THE CENTRAL DISTRICT OF CALIFORNIA

11  CONNECTICUT GENERAL LIFE INSURANCE COMPANY,
    EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED     **99-08197 AHM**
12  STATES, AND CIGNA EMPLOYEE BENEFITS SERVICES, INC.,                **AIJx**
    UNITED HEALTHCARE CORPORATION, HUMANA INC., AETNA
13  LIFE INSURANCE COMPANY, AND AETNA U.S. HEALTHCARE,
    INC.,                                              CASE NO.: _____
14
                                Plaintiffs,
15
                    -against-                          **COMPLAINT FOR**
16                                                     **VIOLATIONS OF THE**
    NEW IMAGES OF BEVERLY HILLS, INC. d/b/a BEVERLY    **RACKETEER INFLUENCED**
17  HILLS OUTPATIENT SURGERY CENTER, PETER M.          **CORRUPT ORGANIZATIONS**
    GOLDEN, M.D., SEAN MICHAEL GOLDEN IRREVOCABLE      **ACT; FRAUD; NEGLIGENT**
18  TRUST, WILLOW GLEN ENTERPRISES, INC. d/b/a MORENO  **MISREPRESENTATION;**
    VALLEY AMBULATORY SURGERY CENTER, JOHN BOHN, SUSAN **TORTIOUS INTERFERENCE;**
19  ALTER, ADVANCED LASER SURGICAL CENTER, INC. d/b/a  **CONSTRUCTIVE TRUST;**
    ADVANCED LASER SURGICAL CENTER, ADVANCED LASER     **VIOLATION OF CAL.**
20  SURGICAL MEDICAL GROUP, INC., THU NGOC PHAM, SAEID **BUSINESS & PROFESSIONS**
    SADIGHI, M.D., MIR JAFFAR SHADJAREH, WEST          **CODE; DEMAND FOR**
21  OLYMPIC SURGERY CENTER & LASER INSTITUTE, INC.     **JURY TRIAL**
    d/b/a WEST OLYMPIC SURGERY CENTER AND LASER
22  INSTITUTE, RONALD W. STRAHAN, M.D., LOS ANGELES
    SURGICAL MEDICAL GROUP, INC., CAL-SURGE, INC.
23  d/b/a WESTWOOD SURGERY CENTER, HERBERT HUDSON, THOMAS
    CLOUD, M.D., WILSHIRE OUTPATIENT SURGERY CENTER, INC.
24  d/b/a WILSHIRE OUTPATIENT SURGERY CENTER, ROLANDO
    A. FERNANDO, M.D., WILSHIRE WEST AMBULATORY SURGERY
25  CENTER, MAMDOUH BAHNA, M.D., ALL-AMERICAN MEDICAL
    GROUP, INC. d/b/a MARINERS BAY SURGICAL CENTER,
26  ATA O. MONTAZERI, M.D., MONROE FAMILY MEDICAL GROUP
    OUTPATIENT SURGERY CENTER, INC. d/b/a MONROE FAMILY
27  MEDICAL GROUP OUTPATIENT SURGERY CENTER, LEMMON
    MCMILLAN, M.D., PROVIDENCE AMBULATORY SURGERY CENTER,
28  INC. d/b/a PROVIDENCE AMBULATORY SURGERY CENTER,

FILED
CLERK, U.S. DISTRICT COURT

AUG 12 1999

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

ENTERED ON ICMS   8/13/99

```
 1 ║ HARRELL ROBINSON, M.D., ABASALI AMIR-JAHED, M.D.,
   ║ HECTOR H. ARNAZZI, M.D., STEVEN A. BURRES, M.D.,
 2 ║ CLIFFORD ERMSHAR, M.D., WILLIAM A. JORGENSEN, M.D.,
   ║ KONG S. KOH, M.D., LEE D. NEWMAN, M.D.,
 3 ║ TEOFILO PO, M.D., ALVIN REITER, M.D., MOHSEN TAVOUSSI, D.O.,
   ║ EZECKIEL ZILKA, M.D., SIM HOFFMAN, M.D., ADVANCED
 4 ║ PROFESSIONAL IMAGING, INC., RONALD GRUSD, M.D., THE OAKS
   ║ DIAGNOSTICS, INC. d/b/a ADVANCED RADIOLOGY OF BEVERLY
 5 ║ HILLS, and DOE DEFENDANTS 1-10,
```

 6                                    Defendants.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

3

I.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . .      1

4

II.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . .      2

5

III.   OVERVIEW OF THE SCHEME . . . . . . . . . . . . . . . . . . . .      5

6

       A.   Advertising and Patient Recruitment  . . . . . . . . .      5

7

       B.   Confessions Of A Patient Recruiter . . . . . . . . . .      9

8

       C.   Patient Clusters . . . . . . . . . . . . . . . . . . .     11

9

       D.   Choosing The "Cover" Symptoms, Diagnosis,
10          And Surgery . . . . . . . . . . . . . . . . . . . . . .     12

11     E.   Fraudulent Radiology . . . . . . . . . . . . . . . . .     14

12     F.   Multiple Surgeries . . . . . . . . . . . . . . . . . .     14

13     G.   Fraudulent Documentation . . . . . . . . . . . . . . .     16

14     H.   Fraudulent Billing . . . . . . . . . . . . . . . . . .     16

15     I.   Patients As Victims  . . . . . . . . . . . . . . . . .     17

16 IV.   THE STRUCTURE OF THIS LAWSUIT  . . . . . . . . . . . . . .     18

17 V.    THE PARTIES  . . . . . . . . . . . . . . . . . . . . . . .     19

18     A. The Plaintiffs  . . . . . . . . . . . . . . . . . . . . .     19

19     B. The Defendants  . . . . . . . . . . . . . . . . . . . . .     22

20        Surgical Clinics and Their Owners . . . . . . . . . . .     22
          Surgeons  . . . . . . . . . . . . . . . . . . . . . . .     26
21        Radiologists  . . . . . . . . . . . . . . . . . . . . .     28
          Doe Defendants  . . . . . . . . . . . . . . . . . . . .     29
22
   VI.   PARTICULARIZED ALLEGATIONS AGAINST ALL DEFENDANTS  . . . .     30
23
       A. The Beverly Hills Outpatient Surgery Center
24        Branch of the Scam . . . . . . . . . . . . . . . . . . .     30

25        1. Ownership -- Peter Golden  . . . . . . . . . . . . .     30
          2. Advertising  . . . . . . . . . . . . . . . . . . . .     32
26        3. Guilty Pleas By Drs. Koh and Newman  . . . . . . . .     33
          4. Other Surgeons at BHOSC  . . . . . . . . . . . . . .     37
27

-i-

28

5. Anesthesiologists at BHOSC . . . . . . . . . . . . 38
6. Radiologists at BHOSC  . . . . . . . . . . . . . . 41
Illustrative Examples of Particular Fraudulent Acts . 42

B. The Moreno Valley Ambulatory Surgery Center
Branch of the Scam  . . . . . . . . . . . . . . . . . 59

1. Ownership -- John Bohn and Susan Alter  . . . . . 59
2. Advertising . . . . . . . . . . . . . . . . . . . 60
3. Moreno Valley Staff . . . . . . . . . . . . . . . 61
4. Patient Recruitment and Exploitation
at Moreno Valley . . . . . . . . . . . . . . . 61
Illustrative Examples of Particular Fraudulent Acts . 62

C. The Advanced Laser Surgery Center Branch of the Scam . 77

1. Ownership . . . . . . . . . . . . . . . . . . . . 77
2. Advertising . . . . . . . . . . . . . . . . . . . 77
3. Advanced Laser Patients, Doctors and Surgeries  . 78
Illustrative Examples of Particular Fraudulent Acts . 79

D. The Wilshire Outpatient Surgery Center
Branch of the Scam  . . . . . . . . . . . . . . . . . 85

1. Ownership -- Rolando Fernando . . . . . . . . . . 85
2. Advertising . . . . . . . . . . . . . . . . . . . 85
3. Doctors and Surgeries at Wilshire Outpatient  . . 86
Illustrative Examples of Particular Fraudulent Acts . 87

E. The Westwood Surgery Center Branch of the Scam  . . . . 93

1. Ownership/Administration -- Herbert Hudson and
Thomas Cloud . . . . . . . . . . . . . . . . . 93
2. Recruitment at Westwood . . . . . . . . . . . . . 94
3. Doctors and Surgeries at Westwood . . . . . . . . 95
Illustrative Examples of Particular Fraudulent Acts . 95

F. The West Olympic Surgery Center Branch of the Scam    108

1. Ownership -- Ronald W. Strahan  . . . . . . . . . 108
2. Doctors and Surgeries at West Olympic . . . . . . 109
3. Guilty Pleas by West Olympic Participants . . . . 110
4. Patients at West Olympic  . . . . . . . . . . . . 113
Illustrative Examples of Particular Fraudulent Acts   113

G. The Monroe Family Outpatient Surgery Center
Branch of the Scam  . . . . . . . . . . . . . . . . .  122

1. Ownership -- Lemmon McMillan  . . . . . . . . . . 122
2. Advertising . . . . . . . . . . . . . . . . . . . 122
3. Connections to Other Clinics  . . . . . . . . . . 123
4. Doctors and Surgeries at Monroe . . . . . . . . . 124

1             Illustrative Examples of Particular Fraudulent Acts    124

2     H.   The Wilshire West Ambulatory Surgery Center
           Branch of the Scam . . . . . . . . . . . . . . . .    130

3

           1. Ownership -- Mamdouh Bahna . . . . . . . . . . . . 130
4            Illustrative Examples of Particular Fraudulent Acts    131

5     I.    The Mariners Bay Surgical Center Branch of the Scam    137

6            1.   Ownership - Ata Montazeri . . . . . . . . . .    137
           2.   Advertising . . . . . . . . . . . . . . . . .    138
7            3.   Patients at Mariners Bay . . . . . . . . . . .    140
           4.   Doctors and Surgeries at Mariners Bay . . . . .    140
8            Illustrative Examples of Particular Fraudulent Acts    142

9     J.    The Providence Ambulatory Surgical Center
           Branch of the Scam . . . . . . . . . . . . . . . .    147
10

           1.   Ownership, Doctors and Surgeries . . . . . . .    148
11            Illustrative Examples of Particular Fraudulent Acts    148

12 CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . .    155

13 DEMAND FOR JURY TRIAL . . . . . . . . . . . . . . . . . . . .    194

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Plaintiffs Connecticut General Life Insurance Company,
2   Equitable Life Assurance Society of the United States, and CIGNA
3   Employee Benefits Services, Inc. (together, "CIGNA"), United
4   Healthcare Corporation ("United"), Humana Inc. ("Humana"), Aetna
5   Life Insurance Company and Aetna U.S. Healthcare, Inc. and their
6   subsidiaries and affiliates (together, "Aetna"), for their
7   Complaint, allege, with knowledge as to their own acts, and
8   otherwise on information and belief:

9
10                    I.   **JURISDICTION AND VENUE**

11          1.   This Court has jurisdiction over this action
12   pursuant to 28 U.S.C. § 1331, because the action arises under the
13   laws of the United States; pursuant to 28 U.S.C. § 1332, because
14   the matter in controversy exceeds the sum or value of $75,000 and
15   is between citizens of different States; pursuant to 18 U.S.C. §
16   1964(c), because the suit concerns violations of the Racketeer
17   Influenced and Corrupt Organizations Act; and pursuant to 28
18   U.S.C. § 1367, because the state and common law claims alleged
19   herein are so related to the federal claims that they form part of
20   the same case or controversy.

21          2.   This Court is the proper venue for this action
22   pursuant to 28 U.S.C. § 1391(b), because a substantial part of the
23   events or omissions giving rise to plaintiffs' claims occurred in
24   this judicial district, or, alternatively, because some of the
25   defendants may be found in this judicial district and there is no
26   district in which the action may otherwise be brought; and
27   pursuant to 18 U.S.C. § 1965(b), because some defendants reside in
28   and/or transact business in this judicial district, and the ends

1  of justice require that other defendants in other districts be
2  brought before this Court.

3

## II.    INTRODUCTION

4

5          3.    This case is about corrupt doctors, cosmetic
   surgery, and large-scale insurance fraud.  The perpetrators of the
6
   fraud are a group of cosmetic surgeons who perform cosmetic
7
   surgeries at outpatient surgical clinics in Southern California,
8
   and their confederates.  As those surgeons well know, insurance
9
   and employee health benefit plans do not cover cosmetic surgery.
10
   To evade that exclusion, to tap a rich supply of otherwise
11
   unavailable insurance benefits, and thereby to enrich themselves,
12
   the surgeons and clinics have devised and implemented a criminal
13
   scheme.
14
           4.    That scheme has one objective: to deceive insurers
15
   into paying for elective cosmetic surgeries by disguising those
16
   surgeries as medically necessary, non-cosmetic surgeries.
17
   To accomplish that deception, the corrupt doctors concoct phony
18
   medical symptoms for their patients, assign those patients bogus
19
   medical diagnoses, and misrepresent the surgeries they perform on
20
   those patients.  For example, as processed through defendants'
21
   fraud machine, cosmetic eye, nose, and other facial surgeries are
22
   falsely documented and billed as procedures to correct deviated
23
   septums and to open blocked airways; breast implant procedures are
24
   fraudulently transformed into biopsies to investigate breast lumps
25
   and to detect breast cancer; and tummy tucks and liposuction
26
   procedures become surgeries to correct hernias and gynecological
27
   problems.
28

2

1          5.   The doctors, the surgical clinics, and their
2  confederates repeat those lies over and over again, in bills they
3  submit to insurers by mail, in fictitious medical records they
4  create to support those bills, and in phone calls and in letters
5  to insurers demanding payment.

6          6.   In November 1998, two of the defendant surgeons, Dr.
7  Lee Newman and Dr. Kong Koh, pled guilty in this Court to having
8  committed mail fraud against insurers in violation of 18 U.S.C. §
9  1341 in connection with surgeries they performed at defendants
10  Beverly Hills Outpatient Surgery Center and Moreno Valley
11  Ambulatory Surgery Center.  More specifically, Drs. Newman and Koh
12  pled guilty (to quote the words of the Information) to

13

14             knowingly [having] caused the submission of
15             false and fraudulent medical claims though the
16             United States mails to various insurance
17             companies.  More specifically, defendant[s]
18             [NEWMAN and KOH] represented to insurance
19             companies that [t]he[y] had performed
20             medically necessary surgeries, when, in truth
21             and fact, [t]he[y] performed only elective
22             cosmetic surgeries, which were not covered by
23             insurance company policies.

24
25  Seven of the counts of mail fraud to which Drs. Newman and Koh
    pled guilty involved patients insured by plaintiff CIGNA.
26
27          7.   More recently, in May and June, 1999, three other
    defendant surgeons pled guilty.  Two of those surgeons, Drs.
28

1 Ronald Strahan and Alvin Reiter, pled guilty to committing fraud
2 in connection with surgeries they performed at defendant West
3 Olympic Surgery Center. The third surgeon, Dr. Teofilo Po, pled
4 guilty to fraud in connection with surgeries he performed at
5 defendants Beverly Hills Outpatient Surgery Center and Advanced
6 Laser Surgical Center.

7        8.    In addition, eight other participants in the
8 scheme -- four anesthesiologists, three patient recruiters, and an
9 administrative assistant who destroyed reams of incriminating
10 documents -- have either pled guilty or agreed to plead guilty to
11 federal criminal charges for their roles in the scheme at various
12 defendant clinics.

13        9.    Defendant surgeons Newman, Koh, Reiter, Strahan and
14 Po, and the other participants who have admitted the fraud, are
15 only the tip of a corrupt iceberg. This scheme has grown and
16 spread over time to include dozens of doctors at surgical clinics
17 across Southern California. In the process, the defendant doctors
18 and clinics have submitted fraudulent bills for surgeries on
19 thousands of patients and have stolen many millions of dollars of
20 insurance benefits.

21        10.   Plaintiffs CIGNA, Aetna, United, and Humana are
22 insurance companies that have been hit hard by defendants' fraud.
23 Together, plaintiffs have paid millions of dollars to the
24 defendants as a result of defendants' fraudulent billings. Those
25 monies consisted both of plaintiffs' own funds and of funds that
26 plaintiffs paid in their capacities as administrators of employee
27 health benefit plans. Plaintiffs therefore bring this action both
28 on their own behalf and, under Rule 17 of the Federal Rules of

4

Civil Procedure, on behalf of the employee health benefit plans they administer. Plaintiffs seek to recover the monies they were defrauded into paying and to enjoin defendants and their confederates from continuing their fraud in the future.

### III.   OVERVIEW OF THE SCHEME

#### A.   Advertising and Patient Recruitment

11. Defendants have operated an aggressive advertising and recruitment program to lure patients into their offices and clinics in Southern California.

12. Defendants advertise for patients in almost every imaginable medium -- in newspapers, on radio, on television, in the Yellow Pages, in brochures, on posted leaflets, at the end of rental videos, and over the Internet. That advertising makes clear that what the defendants offer is cosmetic surgery.

13. Defendants focus their marketing on women of Southeast Asian or Hispanic descent. Cashing in on the desire of some Asian women to "westernize" their appearance, defendants and their recruiters have advertised free cosmetic nose, eye, breast, abdominal, and other surgeries in Asian language newspapers and other media in Southern California and across the country. Defendants have targeted Hispanic patients with similar advertising in Spanish media, and have drawn numerous patients into the scheme through feeder clinics located in Hispanic neighborhoods.

14. Defendants' advertising program has attracted patients to defendants' clinics in droves, not only from Southern California, but also from Northern California and such distant

5

1 states as Georgia, Tennessee, North Carolina, Florida,
2 Connecticut, New Jersey, Texas, Kansas, Illinois and Wisconsin.

3       15.    The only reason patients travel such distances is
4 that defendants offer patients something the patients' local
5 doctors (or any other doctor operating within the law) cannot
6 offer -- free or deeply discounted cosmetic surgery paid for by
7 insurance.

8       16.    The field workers in this illegal scheme are a
9 network of patient recruiters.  Operating out of beauty salons and
10 similar establishments, and using 1-800 telephone numbers to
11 extend their reach, those recruiters direct patients to
12 defendants' offices and clinics.  For every patient they deliver
13 to defendants, the patient recruiters collect a fee.  Those
14 payments violate Section 650 of the California Business and
15 Professions Code and Section 750 of the California Insurance Code,
16 which prohibit doctors and clinics from paying for patient
17 referrals.

18       17.    In return for those illegal fees, the recruiters
19 solicit patients, help to confirm the patients' insurance
20 coverage, and, if necessary, arrange for the patients'
21 transportation to the defendants' offices and clinics.  The
22 recruiters also lay the groundwork for lies to come, coaching
23 patients to describe phony medical symptoms to the surgeons, such
24 as breathing problems, urinary incontinence or breast lumps, so
25 that the doctors, with a wink, can record those symptoms in the
26 patients' medical records.

27       18.    One such recruiter is Julie Vu, who pled guilty
28 last November to mail fraud charges in connection with the

6

criminal scheme at issue here.  Ms. Vu operated out of a beauty salon called Tham My Vien Julie Vu.  One way Ms. Vu drummed up business was through a trailer advertisement that ran at the end of videos featuring popular Vietnamese singers.  The trailer features Ms. Vu interviewing a prospective patient in her office while a voice-over states:

> Want a very beautiful face?
>
> Want a beautiful body with beautiful skin?
>
> Come to Julie Vu or call 1-888-XINH-DEP or 1-888-946-4337
>
> Julie Vu Beauty Center has a group of famous Beverly Hills doctors ready to help obtain a beautiful face and body.
>
> Help you remove unsightly spots on your face and body.
>
> Face lift
>
> Nose job
>
> Remove blemishes
>
> Liposuction
>
> Lose weight
>
> Help you obtain a lean proportional body
>
> Breasts implant and breasts lift
>
> Reduce wrinkles
>
> Treat acne by laser
>
> Special formulated cream created for Asian skin use for facial skin peel or treat acne and have products for mail order.
>
> Contact Julie Vu at 1-888-XINH DEP, 1-888-946-4337

7

1   Insurance accepted in certain cases and monthly payment

2   accepted.

3       Transportation, foods, and lodging are provided free.

4

5       19.   Other recruiters also operated out of beauty

salons, several in the Little Saigon section of Westminster in
6
Orange County.  Lan Thi Xuan Le, who operated out of a beauty
7
salon in Westminster, recently agreed to plead guilty to federal
8
criminal mail fraud charges for her role as a patient recruiter.
9
Patient recruiter Kim Lan operated out of the Kim Lan Beauty
10
Clinic, and patient recruiter Phuong Dung's base of operations was
11
the La Comtesse Beauty Center, both in Westminster.  Patient
12
recruiter Kim Pham operated a salon in Beverly Hills, and patient
13
recruiter Kim Tran did the same in Santa Ana.
14
        20.   One recruiter not based in a beauty salon was
15
Angelique Diem, who originally recruited out of Atlanta but later
16
moved to Orange County.  Ms. Diem recruited both patients and
17
other recruiters.  At the end of one of her ads, Ms. Diem listed
18
four numbers where she could be reached: a phone number in Orange
19
County, another in Georgia, an 800 number, and a beeper number.
20
Next to that information, the ad announced: "Agents Needed
21
Everywhere."
22
        21.   All of those recruiters, and numerous others,
23
advertised in Asian language newspapers and magazines, in Asian
24
Yellow Pages, and in other media throughout California and in
25
areas across the country with large Asian communities.  Through
26
those ads, those recruiters reached countless patients who they
27

28                                  8

then directed to numerous defendant clinics, including Beverly Hills Outpatient Surgery Center, Moreno Valley Ambulatory Surgery Center, Advanced Laser Surgical Center, Westwood Surgery Center, Monroe Family Medical Group Outpatient Surgery Center, Mariners Bay Surgical Center, and Providence Ambulatory Surgery Center.

**B.   Confessions Of A Patient Recruiter**

22.   The guilty plea of recruiter Julie Vu provides a snapshot of how recruiters operate in defendants' scheme.  By her plea, Ms. Vu admitted that, between 1995 and 1997, she referred patients "to a number of cosmetic surgery centers located in Southern California," for which she received a per patient commission from the surgery centers.

23.   Ms. Vu further admitted that she knew that the doctors who performed cosmetic surgeries at the clinics

> often submitted billing statements to
> insurance companies falsely claiming that they
> performed some other procedure covered by
> insurance.  For example, doctors who performed
> blepharoplasty [cosmetic eyelid] surgery would
> falsely claim that they performed a
> septoplasty (a covered procedure performed on
> patients who have chronic sinus problems);
> similarly, doctors who performed liposuction
> surgery would falsely claim that they did a
> colporrhaphy surgery (a covered procedure used

9

to alleviate urinary or fecal incontinence).

Ms. Vu also admitted that, to further the scheme:

[She] informed patients whom she referred to the surgery centers that the patients' insurance companies would pay for their cosmetic surgeries so long as they complained to the surgery center doctors that they had certain medical problems, which were covered by the insurance companies. . . .

For example, if patients wanted cosmetic eye surgery, [she] would tell them to complain that they had sinus problems so that the doctor could justify billing the cosmetic eye surgery as a septoplasty; similarly, if patients wanted liposuction, [she] would tell them to complain about incontinence problems so that the doctor could justify billing for a colporrhaphy.

24. Recruiters Lan Thi Xuan Le and Luis Sandoval also have pled guilty or agreed to plead guilty to recruiting cosmetic surgery patients to Southern California clinics. Sandoval has specifically pled guilty to recruiting patients to defendant West Olympic Surgery Center and Laser Institute. Like Julie Vu, Lan Thi Xuan Le and Sandoval have admitted knowing that the clinics, surgeons and other doctors defrauded insurers by falsely claiming

10

that patients had medical problems requiring surgery, and that they coached patients to "make up" and report phony medical symptoms to assist the doctors in committing the fraud.

## C.   Patient Clusters

25.   Once word got out that defendants provided free or low-cost cosmetic surgery, often with transportation, lodging and other perks included, that word, and the recruiters' and doctors' phone numbers, spread through communities and workplaces.

26.   One fertile source of patients was the City of San Jose and its surrounding communities, where significant numbers of Vietnamese-Americans work in the electronics industry.   Groups of patients have also come from more far-flung locales.   For example, over a six-month period in 1996, a contingent of 13 Laotian-Americans from an automobile plant in Tennessee were recruited for surgeries at defendants Beverly Hills Outpatient Surgery Center ("BHOSC") and Moreno Valley Ambulatory Surgery Center by a former patient who lived in the community.   Likewise, in 1995 and 1996, a group of 19 mostly Asian-American workers or their spouses from two aircraft plants in Kansas, a group of 8 Vietnamese-American women who worked at a poultry plant in Georgia, and a group of 13 Vietnamese-Americans from a manufacturing company in North Carolina, were recruited to have their eyes and noses reshaped, their breasts enlarged, and their tummies tucked and suctioned, at defendants BHOSC and Advanced Laser Surgical Center.

27.   Clearly, significant numbers of workers from the same workplace were not all stricken almost simultaneously with

11

the same nasal problems, breast lumps, hernias and gynecological
problems, requiring the same surgeries to repair them, with all of
them deciding to travel great distances to defendants' clinics for
treatment.  Rather, they were lured by the siren song of free
cosmetic surgery.

28.  Family groups have also been a target of defendants
and the recruiters who work for them.  As a result, numerous sets
of mothers and daughters, as well as husbands and wives, have had
cosmetic surgeries, often at the same time, from defendant
surgeons and clinics.

**D.  Choosing The "Cover" Symptoms, Diagnosis, And Surgery**

29.  Wherever the patients come from, and whatever their
ethnicity, the surgeons and their staff offer them a smorgasbord
of cosmetic procedures, including nose jobs, eye jobs, face lifts,
breast implants, cheek and chin implants, liposuction and tummy
tucks.  Moreover, though defendants know that patients are
required by their insurance and benefit plans to pay a co-payment
(often 20% of the cost of the surgery), the clinics, surgeons and
their staff assure the patients that the procedures will be free
or at nominal cost to them.

30.  Once the patient decides which cosmetic procedure
or procedures to have, the surgeon selects a phony diagnosis and a
phony procedure to use as a cover for billing and documentation
purposes.  As explained below, the surgeon often chooses a cover
diagnosis and procedure that corresponds to the body area targeted
for cosmetic surgery.  In some cases, however, there is no such

12

1 relation, and the surgeon simply invents the cover symptoms,
2 diagnosis and surgery at random.

3        31.    The most commonly used cover surgery is the
4 combination septoplasty and turbinectomy.  In legitimate
5 circumstances, those two nasal surgeries straighten a deviated
6 nasal septum (the septoplasty) and pare overgrown nasal bones
7 called the turbinates (the turbinectomy), to open clogged airways
8 that impair a patient's breathing.  In this case, however,
9 defendants have used the septoplasty/turbinectomy to mask hundreds
10 of cosmetic surgeries, not only to the nose but to the eyes,
11 cheeks, chin, and other parts of the body as well.[1]

12        32.    Another popular cover surgery is the
13 colporrhaphy.  A colporrhaphy is a gynecological surgery that is
14 often combined with other gynecological procedures to relieve
15 urinary stress incontinence, _i.e._, leakage of urine upon exertion,
16 coughing, laughing or sneezing.  This procedure is the preferred
17 cover for a liposuction procedure or an abdominoplasty (also
18 commonly referred to as a "tummy tuck").[2]

19        33.    For patients who receive cosmetic breast implants,

20 _____

21     [1]   Defendants sometimes fraudulently bill other nasal surgical
   procedures, such as a sinusotomy, ethmoidectomy, or septal dermatoplasty,
22 in addition to, or in lieu of, the septoplasty/turbinectomy combination.
   For ease of reference, and to avoid repetition, all of these nasal
23 procedures are referred to collectively in this Complaint as a
   septoplasty.
24
25     [2]   Defendants sometimes fraudulently bill other urinary or
   gynecological surgical procedures, such as an abdomino-vaginal vesical
26 neck suspension, urethropexy, or sphincteroplasty, in addition to the
   colporrhaphy.  For ease of reference, and to avoid repetition, all of
27 these procedures are referred to collectively in this Complaint as a
   colporrhaphy.

28                                    13

the most common cover surgeries are breast biopsies (removal of tissue from a breast lump to test for malignancy), and excision of breast cysts.  Other cover surgeries of choice are hernia repairs and miscellaneous gynecological procedures, such as a laparoscopy or hysteroscopy to alleviate menstrual dysfunction.  Like the colporrhaphy, those surgeries often signal a liposuction or a tummy tuck.

**E.   Fraudulent Radiology**

34.   To further embellish the pre-surgical record, the corrupt surgeon often sends the patient to a radiologist involved in the scam.  The role of the radiologist is to generate a phony CAT scan, x-ray, or mammogram report that appears to substantiate the need for a non-cosmetic surgery.

35.   Though the scheme includes many surgeons, virtually all of those surgeons have had their phony radiology done by only two radiologists.  They are defendants Ronald Grusd and Sim Hoffman.  Grusd participated in the scheme through his company, Oaks Diagnostics d/b/a Advanced Radiology of Beverly Hills, and Hoffman did so through his company, Advanced Professional Imaging.

**F.   Multiple Surgeries**

36.   The surgeries are performed at a species of health facility denominated by State regulations as "surgical clinics." These facilities are commonly referred to as ambulatory surgery centers, surgery centers or "surgicenters."  These are outpatient surgical facilities; that is, the patients are admitted, operated

14

1  upon, and discharged within a single day, and patients do not stay
2  overnight.

3          37.   Many of the patients in question have multiple
4  surgeries.   If the patient has flown to Southern California from
5  the Bay Area or from out of State, and cannot readily return for
6  repeated surgeries, the surgeons may perform two or three
7  surgeries in a single day or in two separate surgical sessions
8  within a few days. In those cases, the doctor may begin the first
9  surgery on a patient only minutes or hours after first meeting the
10 patient.

11         38.   For local patients, or non-local patients who can
12 make several trips to Southern California, multiple surgeries may
13 be spread over a longer period of time.   Some of those patients
14 have had as many as seven separate surgeries by defendant surgeons
15 at defendant clinics.

16         39.   Whether over a period of days, months, or years,  a
17 large percentage of the relevant patients have had more than one
18 cosmetic surgery performed by one or more of the defendant
19 surgeons at one or more of the defendant clinics.   Some patients
20 are successively diagnosed as having a nasal condition, then a
21 breast condition, then a gynecological condition, etc., all
22 supposedly requiring non-cosmetic surgery -- surgery that just
23 happens to be performed by a cosmetic surgeon.

24         40.   In the chaos of so much lying, defendants sometimes
25 find it difficult to keep their cover stories straight.   For
26 example, a defendant surgeon may order a nasal CT scan for a
27 patient's supposed breathing problem on day one, but later bill

28                                  15

for a supposed hernia surgery on the same patient on day two.  Or one surgeon may claim to have straightened a patient's deviated septum without knowing that another surgeon in the scam claimed to have straightened that same septum only a short time before.

## G.   Fraudulent Documentation

41.   After the cosmetic surgery or surgeries are completed, the surgeon often generates two sets of operative reports, a true report of the cosmetic surgery actually performed, and a false report, intended for the patient's insurer, that documents the fictitious cover surgery.

42.   Anesthesiologists also participate in the duplicity, generating both a true anesthesia record and a phony record consistent with the cover surgery.  Nurses also create false records that complement the surgeons' and anesthesiologists' false records.  Trained office staff then segregate the real records from the fake ones, so that later, when insurers request medical records, only the fake ones will be sent.

## H.   Fraudulent Billing

43.   The corrupt surgical clinics and doctors then submit bills to the patient's insurer that identify only the false cover diagnoses and procedures.  Each surgery usually yields at least three fraudulent bills -- one from the surgical clinic with charges for the operating and recovery rooms, medication, equipment and supplies; one from the surgeon for his fees; and one from the anesthesiologist for his or her fees.  If the surgeon has sent the patient for a phony CT scan, x-ray or mammogram, there is

16

1 also a fraudulent bill from one of the two radiologists in the
2 scam. In some cases, there is also a bill from a second surgeon
3 who claims to have assisted the primary surgeon but who, in many
4 cases, was not even present during the surgery.

5     44. After all the participants, plus one or more
6 laboratories, have finished billing, the total tab to insurers
7 usually adds up to at least $15-20,000, per patient per surgery.

8
## I. Patients As Victims
9

10     45. Because this scam involves corrupt doctors and
clinic owners who are focused on deceiving insurers rather than on
11
providing good patient care, patients often receive substandard
12
treatment in substandard conditions with little or no follow-up.
13
In defendants' pursuit of illegal profits, they have left a trail
14
of botched surgeries.
15

16     46. Defendants' scheme has also saddled hundreds of
patients with false medical records. Those false records can
17
leave patients and subsequent doctors dangerously misinformed as
18
to what medical problems and procedures the patients actually have
19
had. That misinformation can seriously compromise a patient's
20
health and safety.
21

22     47. In some cases, patients who request copies of their
medical records are shocked to learn that those records describe
23
medical symptoms that they never had and surgeries that they did
24
not want or need. In one example described below, a patient who
25
wanted liposuction on her thighs was horrified when she found that
26
her medical records described a gynecological procedure. The
27

28     17

1 patient sued the doctors involved for sexual battery.

### IV.   THE STRUCTURE OF THIS LAWSUIT

48.   The defendants in this suit include corrupt surgeons, the two ubiquitous corrupt radiologists, and individual and corporate clinic owners who have been active in the scheme and/or have reaped its illegal profits.

49.   All of the defendants, both individual and corporate, as well as the clinics themselves, are connected in various ways.   Most of the defendant surgeons have engaged in the fraud at multiple defendant clinics, either simultaneously or seriatim, as detailed below.   The surgeons have also used the same two corrupt radiologists, defendants Grusd and Hoffman. Furthermore, many surgeons and clinics have shared the same patients, having been supplied with those patients, and others, by the same recruiters.   These and other connections detailed in succeeding sections create a seamless web of deceit in which all the defendants have participated.   Moreover, the defendants have committed the same fraud, and they have done so over and over again, and over an extended period of time.   For all those reasons, and others described below, the defendants are properly joined together in one action.

50.   For their monetary recovery, plaintiffs are entitled to treble damages under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO"), because defendants have committed countless acts of criminal mail and wire fraud over an extended period of time.   Plaintiffs also

18

1    seek restitution and disgorgement under the California Unfair
2    Competition Act, California Business and Professions Code § 17200
3    <u>et seq</u>.   Finally, plaintiffs seek damages and the imposition of a
4    constructive trust under State and common law.

5         51.   In addition to a monetary recovery, plaintiffs seek
6    a permanent injunction forbidding defendants or their confederates
7    from continuing their fraudulent practices in the future.   Though
8    five defendant surgeons, four anesthesiologists, and three patient
9    recruiters have already pled or are about to plead guilty to
10   federal crimes in connection with this scheme, others have
11   continued their fraudulent activities unabated.   Indeed, the fraud
12   continues to spread, as veterans of the scam open their own
13   surgical clinics to try to secure an even bigger cut of the
14   profits, as others move to different clinics to avoid detection by
15   insurers, and as new doctors join the fraud.   Injunctive relief
16   is, therefore, necessary to prevent continuing injury to
17   plaintiffs, and to the public at large.

18

19                    **V.   THE PARTIES**

20   **A. The Plaintiffs**

21        52. Plaintiff Connecticut General Life Insurance Company
22   is a Connecticut corporation with its principal place of business
23   in Bloomfield, Connecticut.   Plaintiff Equitable Life Assurance
24   Society of the United States is a New York corporation with its
25   principal place of business in New York, New York.   Plaintiff
26   CIGNA Employee Benefits Services, Inc. is a Delaware corporation
27   with its principal place of business in Bloomfield, Connecticut.

28
                                   19

1  Connecticut General Life Insurance Company, Equitable Life
2  Assurance Society of the United States and CIGNA Employee Benefits
3  Services, Inc. are collectively referred to herein as "CIGNA."

4         53.   Plaintiff United Healthcare Corporation is a
5  corporation formed and existing under the laws of the State of
6  Minnesota, with its principal place of business in Minneapolis,
7  Minnesota.   United Healthcare Insurance Company, a Connecticut-
8  based subsidiary of United Healthcare Corporation, is a
9  corporation formed from the merger of two insurance companies, The
10 MetraHealth Insurance Company ("MetraHealth") and United Health &
11 Life Insurance Company.   MetraHealth was formed following the
12 merger of the respective group medical businesses of The
13 Metropolitan Life Insurance Company ("Metropolitan") and The
14 Travelers Insurance Company ("Travelers").   United Healthcare
15 Insurance Company acts as the administrator for the former group
16 medical benefits businesses of Metropolitan and Travelers.

17        54.   United Healthcare Corporation, the named plaintiff,
18 has the right to bring this suit and brings this suit on behalf of
19 itself, United Healthcare Insurance Company, MetraHealth, United
20 Health & Life Insurance Company, Metropolitan  and Travelers.   As
21 used herein, "United" refers to and includes all of those
22 companies.

23        55.   Plaintiff Humana Inc., is a corporation formed and
24 existing under the laws of the State of Delaware, with its
25 principal place of business in Louisville, Kentucky.

26        56.   Plaintiff Aetna U.S. Healthcare, Inc. is a
27 corporation formed and existing under the laws of the State of

28                20

1  Pennsylvania, with its principal place of business in Blue Bell,
2  Pennsylvania.  Plaintiff Aetna Life Insurance Company is a
3  corporation formed and existing under the laws of the State of
4  Connecticut, with its principal place of business in Connecticut.

5           57.  Aetna also has the right to assert the claims, and
6  does assert the claims, that previously were held by The
7  Prudential Insurance Company of America ("Prudential") and its
8  subsidiaries and affiliates, because Prudential's claims and
9  causes of action as related to this matter have been either
10 purchased by, assigned to, or otherwise assumed by Aetna.

11          58.  Plaintiffs all are in the business of underwriting
12 and administering, directly and through their subsidiaries and
13 affiliates, numerous forms of insurance and employee benefit plans
14 throughout the United States, including, but not limited to,
15 health insurance and benefit plans that cover certain medical
16 expenses incurred by participants and eligible dependents.
17 Elective cosmetic surgery is not covered by such insurance and
18 employee benefit plans, and defendants are well aware of that
19 fact.

20          59.  Each of the plaintiffs has been damaged by the
21 fraudulent activities at issue in this case.

22
23
24
25
26
27
28
                                   21

**B. The Defendants**

**Surgical Clinics and Their Owners**

**1. New Images/Beverly Hills Outpatient Surgery Center**

60.   Defendant New Images of Beverly Hills, Inc. is a Nevada corporation that does business as Beverly Hills Outpatient Surgery Center ("BHOSC").  BHOSC is a surgical clinic located at 250 North Robertson Blvd., Beverly Hills, California.

61.   The Chairman of New Images of Beverly Hills, Inc. is defendant Peter M. Golden, M.D.  Golden is an anesthesiologist who has been the chief administrator of BHOSC since its inception. In addition, Golden has personally participated in numerous cosmetic surgeries at BHOSC and has submitted numerous fraudulent bills to plaintiffs in connection with those surgeries.

62.   The owner of New Images of Beverly Hills, Inc. is defendant Sean Michael Golden Irrevocable Trust.  Sean Michael Golden is the son of defendant Peter Golden.

**2.   Willow Glen/Moreno Valley Ambulatory Surgery Center**

63.   Defendant Willow Glen Enterprises, Inc. is a Nevada corporation that does business as Moreno Valley Ambulatory Surgery Center ("Moreno Valley").  Moreno Valley is a surgical clinic located at 24384 Sunnymead Blvd., Moreno Valley, California.

64.   The owners of Willow Glen Enterprises, Inc. are defendants John Bohn and Susan Alter.

### 3. **Advanced Laser Surgical Center**

65. Defendant Advanced Laser Surgical Center, Inc. is a California corporation that has done business as Advanced Laser Surgical Center ("Advanced Laser"). Advanced Laser was a surgical clinic located at 19671 Beach Blvd., Huntington Beach, California.

66. Defendant Advanced Laser Surgical Medical Group, Inc., is a California corporation that billed for services at Advanced Laser.

67. The owners and/or officers of Advanced Laser Surgical Center, Inc. and Advanced Laser Surgical Medical Group, Inc. include defendants Thu Ngoc Pham, Saeid Sadighi and Mir Jaffar Shadjareh.

### 4. **West Olympic Surgery Center**

68. Defendant West Olympic Surgery Center & Laser Institute, Inc. is a California corporation that does business as West Olympic Surgery Center and Laser Institute ("West Olympic"). West Olympic is a surgical clinic located at 11570 West Olympic Blvd., Los Angeles, California.

69. The owner of West Olympic Surgery Center & Laser Institute, Inc. is defendant Ronald W. Strahan, M.D. Strahan is a cosmetic surgeon who has personally performed numerous cosmetic surgeries at West Olympic and has submitted numerous fraudulent bills to plaintiffs in connection with those surgeries.

70. Strahan also is the owner of defendant Los Angeles Surgical Medical Group, Inc., a California corporation that has employed and performed billing services for several surgeons and anesthesiologists who participated in fraudulent cosmetic

23

1 surgeries at West Olympic and elsewhere.

2         **5.  Cal-Surge/Westwood Surgery Center**

3         71.  Defendant Cal-Surge, Inc. is a California

4 corporation that does business as Westwood Surgery Center

5 ("Westwood").  Westwood is a surgical clinic located at 11819

6 Wilshire Blvd., Los Angeles, California.

7         72.  The owner of Cal-Surge, Inc. is defendant Herbert

8 Hudson.

9         73.  The administrator of Westwood was defendant Thomas

10 Cloud, M.D.

11         **6.  Wilshire Outpatient Surgery Center**

12         74.  Defendant Wilshire Outpatient Surgery Center, Inc.

13 is a California corporation that does business as Wilshire

14 Outpatient Surgery Center ("Wilshire Outpatient").  Wilshire

15 Outpatient is a surgical clinic located at 5757 Wilshire Blvd.,

16 Los Angeles, California.

17         75.  The owner of Wilshire Outpatient is defendant

18 Rolando A. Fernando, M.D.  Fernando is a cosmetic surgeon who has

19 personally performed numerous cosmetic surgeries at Wilshire

20 Outpatient and has submitted numerous fraudulent bills to

21 plaintiffs in connection with those surgeries.  Fernando has also

22 submitted fraudulent bills to plaintiffs in connection with

23 cosmetic surgeries he performed at other facilities, including

24 BHOSC and Moreno Valley.

25

26

27

28                                   24

**7.   Wilshire West Ambulatory Surgery Center**

76.   Defendant Wilshire West Ambulatory Surgery Center ("Wilshire West") is a surgical clinic located at 11847 Wilshire Blvd.

77.   The owner of Wilshire West is defendant Mamdouh Bahna, M.D.   Bahna is a cosmetic surgeon who has personally performed numerous cosmetic surgeries at Wilshire West and has submitted numerous fraudulent bills to plaintiffs in connection with those surgeries.   Bahna has also submitted fraudulent bills to plaintiffs in connection with cosmetic surgeries he performed at other facilities, including Westwood.

**8.   All-American/Mariners Bay Surgical Center**

78.   Defendant All-American Medical Group, Inc. is a California corporation that does business as Mariners Bay Surgical Center ("Mariners Bay").   Mariners Bay is a surgical clinic located at 318 S. Lincoln Blvd., Venice, California.

79.   The owner of All American Medical Group, Inc. is defendant Ata O. Montazeri, M.D., a cosmetic surgeon who has personally performed numerous cosmetic surgeries at Mariners Bay and has submitted numerous fraudulent bills to plaintiffs in connection with those surgeries.

**9. Monroe Family Medical Group Outpatient Surgery Center**

80.   Defendant Monroe Family Medical Group Outpatient Surgery Center, Inc. is a California corporation that does business as Monroe Family Medical Group Outpatient Surgery Center ("Monroe").   Monroe is a surgical clinic located at 8231 Westminster Blvd., Westminster, California.

25

1          81.   The owner of Monroe is defendant Lemmon McMillan,
2   M.D.

3          **10.   Providence Ambulatory Surgery Center**

4          82.   Defendant Providence Ambulatory Surgery Center,
5   Inc. is a California corporation that does business as Providence
6   Ambulatory Surgery Center ("Providence").  Providence is a
7   surgical clinic located at 1310 W. Stewart Drive, Orange,
8   California.

9          83.   The owner of Providence Ambulatory Surgery Center,
10  Inc. is defendant Harrell Robinson, M.D.  Robinson is a cosmetic
11  surgeon who has personally performed numerous cosmetic surgeries
12  at Providence and has submitted numerous fraudulent bills to
13  plaintiffs in connection with those surgeries.

14     **Surgeons**

15         84.   In addition to the surgeons identified in the
16  preceding paragraphs who are also owners of defendant surgical
17  clinics, the following surgeons also participated in the
18  fraudulent billing of cosmetic surgeries at defendant clinics:

19         85.   Defendant Abasali Amir-Jahed, M.D., is a surgeon
20  with offices in Beverly Hills, California.  Defendant Amir-Jahed
21  has submitted fraudulent bills to plaintiffs in connection with
22  cosmetic surgeries he performed at several defendant clinics,
23  including BHOSC, Advanced Laser, Westwood, West Olympic, Mariners
24  Bay, and Providence.

25         86.   Defendant Hector H. Arnazzi, M.D., is a surgeon
26  with offices in Torrance, California.  Defendant Arnazzi has
27  submitted fraudulent bills to plaintiffs in connection with

28                              26

1 cosmetic surgeries he performed at several defendant clinics,
2 including BHOSC and Westwood.

3        87. Defendant Steven A. Burres, M.D., is a surgeon with
4 offices in Los Angeles, California. Defendant Burres has
5 submitted fraudulent bills to plaintiffs in connection with
6 cosmetic surgeries performed at several defendant clinics,
7 including Advanced Laser, Westwood, and Mariners Bay.

8       88. Defendant Clifford Ermshar, M.D., is a surgeon with
9 offices in Los Angeles, California. Defendant Ermshar has
10 submitted fraudulent bills to plaintiffs in connection with
11 cosmetic surgeries he performed at several defendant clinics,
12 including BHOSC and West Olympic.

13       89. Defendant William Jorgensen, M.D., is a surgeon
14 with offices in Beverly Hills, California. Defendant Jorgensen
15 has submitted fraudulent bills to plaintiffs in connection with
16 cosmetic surgeries he performed at several defendant clinics,
17 including BHOSC, Westwood, Wilshire Outpatient, and Monroe.

18       90. Defendant Kong S. Koh, M.D., is a surgeon with
19 offices in Los Angeles, California. Defendant Koh has submitted
20 fraudulent bills to plaintiffs in connection with cosmetic
21 surgeries he performed at several defendant clinics, including
22 BHOSC, Moreno Valley, and Westwood.

23       91. Defendant Lee D. Newman, M.D., is a surgeon with
24 offices in Beverly Hills, California. Defendant Newman has
25 submitted fraudulent bills to plaintiffs in connection with
26 cosmetic surgeries he performed at several defendant clinics,
27 including BHOSC, Moreno Valley, West Olympic, and Wilshire

28                              27

1 Outpatient.

2        92.  Defendant Teofilo Po, M.D., is a surgeon with
3 offices in Hacienda Heights, California.  Defendant Po has
4 submitted fraudulent bills to plaintiffs in connection with
5 cosmetic surgeries he performed at several defendant clinics,
6 including BHOSC, Moreno Valley, and Advanced Laser.

7        93.  Defendant Alvin Reiter, M.D., is a surgeon with
8 offices in Beverly Hills, California.  Defendant Reiter has
9 submitted fraudulent bills to plaintiffs in connection with
10 cosmetic surgeries he performed at defendant West Olympic.

11        94.  Defendant Mohsen Tavoussi, D.O., is a surgeon with
12 offices in Costa Mesa, California.  Defendant Tavoussi has
13 submitted fraudulent bills to plaintiffs in connection with
14 cosmetic surgeries he performed at several defendant clinics,
15 including Advanced Laser, Westwood and Mariners Bay.

16        95.  Defendant Ezeckiel Zilka, M.D., is a surgeon with
17 offices in Culver City, California.  Defendant Zilka has submitted
18 fraudulent bills to plaintiffs in connection with cosmetic
19 surgeries he performed at several defendant clinics, including
20 BHOSC, Moreno Valley, Westwood, West Olympic, Wilshire West, and
21 Monroe.

22   **Radiologists**

23        96.  Defendant Sim Hoffman, M.D., is a radiologist who
24 does business as and through defendant Advanced Professional
25 Imaging, Inc.  Hoffman and Advanced Professional Imaging have
26 offices in Anaheim, California.  Hoffman and Advanced Professional
27 Imaging have submitted fraudulent bills and fraudulent radiology

28                                 28

1  reports to plaintiffs in connection with cosmetic surgeries
2  performed at defendants BHOSC, Moreno Valley, Advanced Laser,
3  Westwood, West Olympic, Wilshire West, Mariners Bay, Monroe and
4  Providence.

5          97.   Defendant Ronald Grusd, M.D., is a radiologist who
6  does business as and through defendant The Oaks Diagnostics, Inc.,
7  which, in turn, does business as Advanced Radiology of Beverly
8  Hills.   Grusd, Oaks Diagnostics, and Advanced Radiology of Beverly
9  Hills have offices in Beverly Hills, California.   Grusd and
10 Advanced Radiology have submitted fraudulent bills and fraudulent
11 radiology reports to plaintiffs in connection with cosmetic
12 surgeries performed at defendants BHOSC, Moreno Valley, Westwood,
13 West Olympic, Wilshire Outpatient, Wilshire West, and Monroe.

14     **Doe Defendants**

15         98.   The true names and capacities of the defendants
16 named herein as Does 1 through 25, inclusive, are unknown to
17 plaintiffs.   Plaintiffs therefore sue these defendants by such
18 fictitious names, and they will seek leave of this Court to amend
19 this Complaint to allege their true names and capacities when they
20 have been ascertained.   Plaintiffs are informed and believe and
21 thereon allege that Does 1 through 25, inclusive, have conspired
22 and aided or abetted in the conduct complained of herein and are
23 liable to plaintiffs for their actions.

24
25
26
27
28                              29

**VI. PARTICULARIZED ALLEGATIONS AGAINST ALL DEFENDANTS**

**A. The Beverly Hills Outpatient Surgery Center Branch of the Scam**

99. The roots of much of the fraud in this case can be traced back to one clinic -- Beverly Hills Outpatient Surgery Center ("BHOSC"). Located on Robertson Boulevard in Beverly Hills, BHOSC began operations in 1994 and promptly became a full-time fraud mill.

100. Of the 17 surgeons sued as defendants in this case, 9 of them participated in large numbers of fraudulent surgeries at BHOSC. Equally important, all 9 of those BHOSC surgeons went on to perform fraudulent surgeries at other defendant clinics, covering all of the other 9 defendant clinics in the case. BHOSC was thus a school for fraud, and its alumni literally cover the map in this case.

**1. Ownership -- Peter Golden**

101. BHOSC was originally owned by an entity called Practice Associates of Beverly Hills. The sole shareholder of Practice Associates of Beverly Hills was an anesthesiologist named Peter Golden.

102. As an anesthesiologist, Golden personally participated in dozens of cosmetic surgeries, including the full range of cosmetic surgeries described above, which were then falsely documented and billed as necessary medical surgeries. Golden participated in those surgeries with many different surgeons, including defendants Koh, Newman, Zilka, Po, Fernando, Ermshar and Amir-Jahed.

30

103.  For his part, Golden personally and knowingly prepared and signed false anesthesia records that reflected whatever the phony cover diagnosis and procedure were, but not the cosmetic surgery that actually was performed.

104.  As owner of the facility, Golden presided over a facility permeated with fraud.  Golden knew not only about the fraudulent billing and documentation of surgeries that he participated in, he also knew about all the fraudulent surgeries performed by the numerous surgeons and other anesthesiologists acting under his direction.

105.  In addition, Golden directed the activities of non-medical staff, including those responsible for lying to insurers in order to obtain pre-authorization for surgeries; those responsible for coaching patients to lie to insurers if asked about their symptoms and their surgeries; medical records personnel who were responsible for separating the real records from the phony ones and sending only the phony ones to insurers; and billing and collections staff, who were responsible for submitting the phony bills to insurers and collecting on them.

106.  Golden profited handsomely from the fraud at BHOSC.  Unlike certain of the other clinics, where surgeons and anesthesiologists billed for themselves, most of the billing in connection with surgeries at BHOSC was done through entities controlled by Golden.  At BHOSC, the clinic's bills were sent out under the name of BHOSC, surgeons' bills were sent out under the name of Practice Associates of Beverly Hills, and

31

1 anesthesiologists' bills were sent out under the name of MUA
2 Associates of Beverly Hills. However, all those bills were sent
3 out under the same tax identification number, and the proceeds all
4 flowed, at least in the first instance, to Golden.

5 **2. Advertising**

6       107.  BHOSC issued numerous brochures and ads that
7 invited patients to have cosmetic surgery at BHOSC. To appeal to
8 Asian patients, the brochures were printed in Vietnamese, Thai,
9 Korean, and Chinese.  One such brochure, translated from
10 Vietnamese, states as follows:

11
12              Men or women worry about their appearance when
              they come of age or inherit
13
              certain birth defects.  Now, technological
14
              progress in cosmetic and reconstructive
15
              surgery will offer answers and resolve your
16
              worries.  Your life can be put at ease . .
17
              .[BHOSC] maintains a number of highly skilled
18
              cosmetic surgeons with more than 20 years of
19
              experience.  You have full access to a
20
              complete range of head-to-toe cosmetic
21
              procedures.  Your expectations will be met
22
              quickly and to your satisfaction.
23

24 The brochure then lists available procedures, including "eyelid
25 surgery," "nose remodeling for facial balance," "wrinkles
26 removal," "facelift," "stomach skin enhancement," "facial

27
                              32
28

1   rejuvenation using stomach fat," "double chin elimination," and
2   other cosmetic procedures. The brochure also presents photographs
3   of Asian women "before and after" cosmetic eyelid surgery,
4   cosmetic nose surgery, and cosmetic breast surgery.

5   **3. Guilty Pleas By Drs. Koh and Newman**

6           108. In November 1998, two principal BHOSC surgeons --
7   defendants Kong Koh and Lee Newman -- pled guilty to precisely the
8   type of insurance fraud alleged in this Complaint.

9           109. Koh pled guilty to a six-count Information for
10  mail fraud. By his plea, Koh admitted as follows:

            Between approximately May 1995 and November

            1997, [Koh] worked as a plastic surgeon at

            BHOSC, and performed primarily cosmetic face

            and eye surgery. . . .

              Marketers employed by BHOSC would bring

            defendant KOH patients from all over the

            United States, who had been promised free

            cosmetic surgery on their eyes, face, or nose.

            As defendant KOH well knew, these patients

            came to him because they expected him to bill

            their insurance companies for the cosmetic

            surgeries.

33

1           Defendant KOH would falsely diagnose

2       these patients with certain kinds of breathing

3       or sinus problems so that defendant KOH could

4       bill the patients' insurance companies for

5       medically necessary procedures.  In fact,

6       defendant KOH did not intend to perform any

7       medically necessary procedures, but only

8       cosmetic surgeries.  Once defendant KOH

9       completed a cosmetic surgery on a patient, he

10      would dictate an operative report which

11      falsely stated that: (1) he had diagnosed the

12      patient with certain kinds of breathing or

13      sinus problems requiring a medically necessary

14      surgery; and (2) he had actually performed a

15      medically necessary surgery to remedy the

16      problem. . . .

17          On some occasions, at the direction of

18      the owner of BHOSC, defendant KOH would

19      falsely state in his operative reports that a

20      surgeon assisted him during surgeries.  In

21      fact, he was never assisted by a surgeon

22      during his employ at BHOSC.

23          The information on defendant KOH's false

24      operative reports would then be transferred

25      onto insurance claim forms, which, as

26      defendant KOH then knew, would be submitted by

27

28                              34

1          a BHOSC employee through the U.S. mails to the

2          patients' insurance companies requesting

3          reimbursement for medically necessary

4          procedures that were never rendered or for an

5          assistant surgeon who never provided any

6          services.  The insurance companies would be

7          unaware that defendant KOH had performed any

8          cosmetic surgeries.

9               As a result of defendant KOH's scheme to

10         defraud, thousands of dollars in bills were

11         submitted to, and paid by, insurance companies

12         for services that were not rendered.

13

14         110.  Dr. Newman pled guilty to the same fraud as Dr.
Koh, but involving different cosmetic surgeries and cover

15
surgeries.  Whereas Dr. Koh performed "primarily cosmetic face and

16
eye surgery," but misrepresented them as medically necessary nasal

17
procedures (i.e., septoplasties), Dr. Newman performed "primarily

18
liposuction" but misrepresented those procedures as colporrhaphies

19
and other gynecological surgeries.  As Dr. Newman admitted:

20

21         In order to obtain insurance payments for the

22         cosmetic surgeries, defendant NEWMAN would

23         falsely diagnose these patients with certain

24         kinds of gynecological problems, such as

25         urinary stress incontinence, so that he could

26         bill the patients' insurance companies for

27

28                              35

medically necessary procedures.  In fact,
defendant NEWMAN did not intend to perform any
medically necessary procedures, but only
cosmetic surgeries. . . .

Once defendant NEWMAN completed a
cosmetic procedure on a patient, he would
dictate an operative report which falsely
stated that: (1) he had diagnosed the patient
with certain kinds of gynecological problems
requiring a medically necessary surgery; and
(2) he had actually performed a medically
necessary surgery to remedy the problem.  For
example, on some occasions, defendant NEWMAN
would indicate on an operative report that a
patient had undergone a laparoscopy (a
medically necessary exploratory procedure),
when in truth and fact, as he then knew, he
did not perform  laparoscopy on the patient,
but only a cosmetic surgery, such as
liposuction.

111.   The Koh and Newman guilty pleas also establish
another aspect of the fraud at BHOSC.  Both defendants admitted
that, on some of their operative reports:

1
2
3
4
5
6
7
8
9

[They] would falsely state that a surgeon
named Oscar Leal assisted [them] during
surgeries. In fact, neither Dr. Leal nor
anyone else ever acted as [their] assistant
surgeon when [they] performed surgeries at
BHOSC. [They] made the false statement in
[their] operative reports so that BHOSC could
fraudulently bill insurance companies for the
services of an assistant surgeon.

10
11

## 4. Other Surgeons at BHOSC

12
13
14
15

112. Many other surgeons at BHOSC did precisely as Drs.
Koh and Newman did, varying only in the cosmetic surgeries they
performed and the cover diagnoses and procedures they used to
conceal them.

16
17
18
19
20
21
22
23
24
25
26
27

113. For example, defendants Clifford Ermshar, Ezeckiel
Zilka, Hector Arnazzi, and William Jorgensen, like Dr. Newman,
primarily did tummy tucks and liposuction at BHOSC which they
fraudulently documented as colporrhaphies and other gynecological
procedures. Dr. Ermshar, who later performed surgeries at
defendant West Olympic, was most active at BHOSC throughout 1995.
Dr. Zilka, who performed surgeries at five other defendant clinics
after his stint at BHOSC, performed dozens of surgeries at BHOSC
in 1996. Dr. Arnazzi, who later became a principal surgeon at
defendant Westwood, performed the bulk of his BHOSC surgeries in
1996 and the first half of 1997. Dr. Jorgensen, who also
performed surgeries at Westwood, Wilshire Outpatient, and Monroe,

37

28

1  performed surgeries at BHOSC in 1996, 1997, and 1998.

2          114.   Other surgeons at BHOSC were more eclectic in
3  their fraud.   For example, from mid-1995 through early 1996,
4  defendant Teofilo Po performed cosmetic facial surgeries, breast
5  implants as well as liposuction and tummy tucks at BHOSC,
6  fraudulently documenting all of them as medically necessary
7  procedures.   Defendant Rolando Fernando did the same during 1996.
8  Po and Fernando later became fixtures at other defendant surgical
9  centers.   More recently, both Dr. Po and Dr. Fernando opened their
10 own surgery clinics, with Dr. Fernando having opened defendant
11 Wilshire Outpatient in 1997 and Dr. Po having opened Tustin
12 Outpatient Surgery Center in 1998.

13         115.   Defendant Abasali Amir-Jahed performed primarily
14 breast implants and liposuction at BHOSC from late 1994 through
15 mid-1995, billing and documenting those procedures as excisions of
16 breast cysts and the occasional hernia repair.   He then went on to
17 ply his corrupt trade at five other defendant clinics.

18 **5.   Anesthesiologists at BHOSC**

19         116.   The hundreds of surgeries at BHOSC required the
20 services of an anesthesiologist.   But not just any
21 anesthesiologist would do.   Because anesthesia must be documented,
22 including documentation of the patient's diagnosis and the
23 procedure being performed, a wayward anesthesiologist could do
24 damage to the scheme, in individual cases and as a whole, if he or
25 she provided truthful documentation inconsistent with the
26 surgeon's phony documentation.   To avoid that, BHOSC and its

27

28                                38

1  surgeons needed anesthesiologists who were as corrupt as they
2  were.

3           117.   At the beginning, Peter Golden did most of the
4  anesthesia himself.  As time went on, he gradually gave way to
5  other anesthesiologists.  Unlike some of the surgeons, who
6  specialize in a particular type of cosmetic surgery, the
7  anesthesiologists can participate in any type of cosmetic surgery.
8  As a result, once an anesthesiologist was deemed reliable, he or
9  she was used over and over again.

10          118.   The first active BHOSC anesthesiologist, other
11 than Peter Golden, was Musya Branovan, who participated in
12 numerous surgeries from mid-1995 through early 1996, when he moved
13 to defendant Advanced Laser.  Other early anesthesiologists were
14 Agnes Choa, who later took up residence at defendant Moreno
15 Valley, and Howard Siegel, who later became the house
16 anesthesiologist at defendants West Olympic and Wilshire
17 Outpatient.

18          119.   In April 1999, Drs. Branovan and Choa each pled
19 guilty to multiple counts of mail fraud in connection with their
20 roles in the scheme at BHOSC and elsewhere.  The Informations to
21 which they pled guilty confirm that BHOSC, its surgeons, and
22 anesthesiologists defrauded insurers into paying for non-covered
23 cosmetic surgeries by disguising them as medically necessary
24 surgeries.  For their part in the scheme, Branovan and Choa have
25 admitted that (in the words of the Informations):

26

27          [They] represented to insurance companies that

28                              39

[they] had provided anesthesia services to
patients who received medically necessary
surgeries, when, in truth and fact . . .
[they] provided anesthesia services to
patients who only received elective cosmetic
surgeries, which . . . were not covered by
insurance company policies . . . .

To obtain insurance payments for the
anesthesiology which [they] provided in
connection with the cosmetic procedures, and
to assist the surgeons and the surgery centers
in collecting the fees associated with the
cosmetic procedures, defendant[s] [BRANOVAN
and CHOA] filled out anesthesia reports which
falsely stated that the patients to whom
[they] provided anesthesiology received
medically necessary surgeries.

120.   The second wave of BHOSC anesthesiologists were
David Gendein, Kevin Tehrani, Sharam Taheri, and Chull Whang.   Two
of those anesthesiologists, Drs. Gendein and Tehrani, have either
pled guilty or agreed to plead guilty to mail fraud charges in
connection with their fraudulent activities at BHOSC and
elsewhere.   Those pleas are or will be in substance the same as
those quoted above by anesthesiologists Branovan and Choa.
Gendein was active at BHOSC from early 1996 until at least mid-
1998.   Tehrani was active at BHOSC from mid-1996 until at least

40

1  mid-1998, with considerable activity also at defendant Providence.
2  Taheri, who is a partner of Tehrani, participated in surgeries at
3  BHOSC in mid-1996, and has also been active at defendant
4  Providence.  After a series of surgeries at BHOSC in early 1996,
5  Dr. Whang was active at defendant Advanced Laser in mid-1996, and
6  has since been the primary anesthesiologist at defendant Mariners
7  Bay.

8      121.  Those anesthesiologists knowingly prepared and
9  signed countless false anesthesia records.  The anesthesiologists
10  prepared those records in consultation and coordination with the
11  surgeons, so as to mimic the false diagnoses and procedures that
12  appear on the surgeons' operative reports and other records.

13  **6. Radiologists at BHOSC**

14      122.  The surgeons at BHOSC did not send every one of
15  their patients for radiology to support the false diagnoses they
16  used.  But when they did, they sent those patients to two
17  radiologists, Ronald Grusd and Sim Hoffman.

18      123.  The BHOSC surgeons used Grusd and Hoffman because,
19  like the anesthesiologists, those radiologists were insiders who
20  could be relied upon to play along with the scheme.  Indeed, those
21  radiologists did more than play along: They furthered the scheme
22  by knowingly creating false radiological support for the cover
23  surgeries, either by reporting conditions that did not exist at
24  all or by exaggerating conditions so that corrective surgery would
25  seem necessary.  The surgeons and clinics put those false
26  radiology reports to good use, often referring to them when

27

28                           41

1 | insurers questioned the necessity of a surgery.

2 |        124.   The surgeons at BHOSC were not the only ones to
3 | put their trust in Grusd and Hoffman.  As noted above and detailed
4 | below, virtually all the surgeons in the case, whichever clinic
5 | they were at, used Grusd and Hoffman for the same purpose.

6 | **The Scam In Operation:  Illustrative**
  | **Examples of Particular Fraudulent Acts**
7 |
8 |        125.   The impact of the scheme described above is
  | illustrated by the following examples:
9 |
  | **Patients 1 through 6[3]**
10 |
11 |        126.   As noted above, in November 1998 defendants Kong
  | Koh and Lee Newman pled guilty to committing insurance fraud in
12 | connection with several patients.  The particulars of those
13 | fraudulent acts are as follows.
14 |
15 |        127.   Patient 1 is a CIGNA insured from San Gabriel,
  | California.  On April 5, 1996, defendant Kong Koh performed
16 | cosmetic facial surgery on Ms. 1 at BHOSC, assisted by defendant
17 | Peter Golden as anesthesiologist.  Koh, Golden and BHOSC then
18 | fraudulently billed and documented that surgery as a septoplasty.
19 |
20 |        128.   BHOSC fraudulently billed CIGNA $9,333 for that
  | surgery. Koh fraudulently billed CIGNA $6,150 for that surgery
21 | through Practice Associates of Beverly Hills.  Defendant Peter
22 | Golden, who was the anesthesiologist on that surgery, prepared
23 |
24 |

25 |        [3] Patients are referred to by number in this Complaint to protect
  | patient privacy and confidentiality.  The identities of the patients
26 | included   as   examples   will   be   disclosed   once   an   appropriate
  | confidentiality order is in place.
27 |

28 |                                        42

1   fraudulent anesthesia records in connection with that surgery, and
2   fraudulently billed CIGNA $1,950 through MUA Associates of Beverly
3   Hills.

4           129.   CIGNA paid a total of $10,251 relying on those
5   fraudulent bills.

6           130.   Patient 2 is a CIGNA insured from Garden Grove,
7   California.   On April 26, 1996, defendant Koh performed cosmetic
8   facial surgery on Ms. 2 at BHOSC.   Koh then fraudulently billed
9   and documented that surgery as a septoplasty and a turbinectomy.

10          131.   BHOSC fraudulently billed CIGNA $8,713 for that
11  surgery. Koh fraudulently billed CIGNA $6,150 for that surgery
12  through Practice Associates of Beverly Hills.   Defendant Peter
13  Golden, who was the anesthesiologist on that surgery, prepared
14  fraudulent anesthesia records in connection with that surgery, and
15  fraudulently billed CIGNA $1,700 through MUA Associates of Beverly
16  Hills.

17

18          132.   CIGNA paid a total of $13,313 relying on those
19  fraudulent bills.

20          133.   Patient 3 is a CIGNA insured from Lake Forest,
21  California.   On October 4, 1995, defendant Newman performed a
22  cosmetic surgery on Ms. 3 at BHOSC.   Newman then fraudulently
23  billed and documented that surgery as a colporrhaphy.

24          134.   BHOSC fraudulently billed CIGNA $8,699 for that
25  surgery.   Newman fraudulently billed CIGNA $6,500 for that
26  surgery.   Howard Siegel, who was the anesthesiologist on that

27
                                  43
28

1 surgery, prepared fraudulent anesthesia records in connection with
2 that surgery, and fraudulently billed CIGNA $2,590.

3      135. CIGNA paid a total of $8,515 relying on those
4 fraudulent bills.

5      136. Patient 4 is a CIGNA insured from Rowland Heights,
6 California. On June 27, 1995, defendant Newman performed a
7 cosmetic surgery on Ms. 4 at BHOSC. Newman then fraudulently
8 billed and documented that surgery as a colporrhaphy.

9      137. BHOSC fraudulently billed CIGNA $13,109 for that
10 surgery. Newman fraudulently billed CIGNA $5,875 for that surgery.
11 Defendant Peter Golden, who was the anesthesiologist on that
12 surgery, prepared fraudulent anesthesia records in connection with
13 that surgery, and fraudulently billed CIGNA $2,505 through MUA
14 Associates of Beverly Hills. CIGNA paid a total of $21,884
15 relying on those and other bills submitted in connection with Ms.
16 4's surgery.

17

18      138. Patient 5 is a CIGNA insured from Santa Ana,
19 California. On October 9, 1995, defendant Newman performed a
20 cosmetic surgery on Ms. 5 at BHOSC. Newman then fraudulently
21 billed and documented that surgery as a colporrhaphy.

22      139. BHOSC fraudulently billed CIGNA $8,319 for that
23 surgery. Newman fraudulently billed CIGNA $5,750 for that surgery.
24 Defendant Peter Golden, who was the anesthesiologist on that
25 surgery, prepared fraudulent anesthesia records in connection with
26 that surgery, and fraudulently billed CIGNA $1,450 through MUA

27

28

44

1 Associates of Beverly Hills.

2         140.  CIGNA paid a total of $13,287 relying on those
3 fraudulent bills.

4         141.  Patient 6 is a CIGNA insured from Garden Grove,
5 California.  On December 15, 1995, defendant Newman performed a
6 cosmetic surgery on Ms. 6 at BHOSC.  Newman then fraudulently
7 billed and documented that surgery as a colporrhaphy.

8         142.  BHOSC fraudulently billed CIGNA $7,389 for that
9 surgery. Newman fraudulently billed CIGNA $6,500 for that surgery.
10 Musya Branovan, who was the anesthesiologist on that surgery,
11 prepared fraudulent anesthesia records in connection with that
12 surgery, and fraudulently billed CIGNA $1,190.

13         143.  CIGNA paid a total of $15,009 relying on those
14 fraudulent bills.

15 **Patient 7**

16         144.  Patient 7 is a Prudential insured who lives in
17 Atlanta, Georgia.

18         145.  In January 1996, she was considering having
19 cosmetic surgery to remove fat from around her stomach.  She saw
20 an ad in the Vietnam News that said she could have cosmetic
21 surgery to remove fat and that insurance would pay for it.  She
22 called the toll-free number in the advertisement and spoke to a
23 recruiter named Kim Tran.  She told Tran that she wanted to have
24 fat removed from around her stomach.  Tran took Ms. 7's insurance
25 information and told her to call back in about a week.  A week
26 later, Ms. 7 called Tran and Tran told her to fly out to Los

27

28                                45

1 | Angeles.

2 |     146.   Tran met Ms. 7 at the airport and took her to
3 | BHOSC.  During her ten days in Los Angeles, Ms. 7 went to BHOSC
4 | twice, on February 5 and February 7.  On February 5, defendant
5 | Newman performed a tummy tuck on her.  On February 7, defendant
6 | Koh removed fat from around her eyes and performed another
7 | cosmetic procedure to straighten her nose.

8 |     147.   Between and after the surgeries, Ms. 7 stayed at a
9 | motel on Wilshire Boulevard at BHOSC's expense.  Her only expenses
10 | were her plane fare to Los Angeles and about $200 that she paid
11 | for medication.

12 |     148.   Defendant Newman fraudulently billed $6,500 for
13 | the tummy tuck, disguising it as a colporrhaphy and related
14 | gynecological procedures to relieve urinary incontinence.  He also
15 | billed for a pre-op office visit that never took place.  Defendant
16 | Koh charged Prudential $8,572 for the cosmetic eye and nose work,
17 | which he fraudulently billed as a septoplasty.  In addition, BHOSC
18 | fraudulently billed $18,177 for the two surgeries.  Defendant
19 | Peter Golden provided anesthesia for both surgeries and
20 | fraudulently billed a total of $3,150.  One of BHOSC's billing
21 | entities, Practice Associates of Beverly Hills, billed for the
22 | services of Dr. Oscar Leal as an assistant surgeon on the
23 | colporrhaphy/tummy tuck but, in fact, Dr. Leal was not present
24 | during the procedure.

25 |     149.   All those defendants generated false medical
26 | records and other documentation designed to defraud Prudential
27 |
28 |     46

1 into believing that medically necessary rather than cosmetic
2 surgeries had been performed.

3        150.    In reliance on those billings, Prudential paid
4 $27,761 to these defendants.

5 **Patients 8 through 14**

6        151.    One example of the patient clusters in this case
7 involves a group of Vietnamese-American women who worked at a
8 poultry plant in Georgia.  Over a ten-week period between October
9 1995 and January 1996, seven of those women (Patients 8 through
10 14), all CIGNA insureds, flew to Los Angeles and had a total of
11 ten cosmetic surgeries at BHOSC.

12        152.    All of the women were recruited by agents of
13 BHOSC, including a patient broker named Hoang Nhung who operated
14 out of a beauty salon in Chamblee, Georgia, outside of Atlanta.
15 The women either paid nothing at all for the surgeries, or a few
16 hundred dollars to the recruiter or the clinic.  The women were
17 provided free hotel rooms and meals during their stay.

18        153.    Most of the patients flew to California over a
19 weekend, were brought to BHOSC for the first time on a Monday, and
20 had a pre-arranged cosmetic surgery that same day.  To make it
21 appear that the surgeon had seen the patient before the day of the
22 surgery, the surgeons prepared phony reports of pre-surgical
23 consultations with the patients and backdated them into the
24 preceding week or month.  In fact, on the days that the patients
25 (according to those fraudulent records) met with their surgeons in
26 Beverly Hills, the patients actually were at work in Georgia.

27

28                                47

The surgeons billed CIGNA $250 apiece for those phony consultations.

154.   For example, defendant Koh fraudulently billed CIGNA for a pre-op office consultation with Patient 11 on November 29, 1995; defendant Po fraudulently billed for a pre-op visit with Patient 9 on October 20, 1995; and defendant Newman fraudulently billed for such a visit with Patient 8 on October 2, 1995. However, the employee attendance records of those patients prove that the patients were at their jobs on the other side of the country when those consultations supposedly took place.

155.   Six of the seven patients had surgeries performed by defendant Koh.   Koh fraudulently billed and documented all of those surgeries as septoplasties and turbinectomies.   In fact, the surgeries on all of those patients -- including Patient 10 on November 20, 1995, Patient 12 on December 18, 1995, and Patient 14 on January 15, 1996 -- were cosmetic surgeries.

156.   Defendants Po and Newman each performed two surgeries in the cluster, fraudulently billing and documenting them as colporrhaphies.   In fact, each of those surgeries -- on Patient 8 on October 26, 1995, on Patient 9 on November 3, 1995, on Patient 10 on November 23, 1995, and on Patient 13 on January 5, 1996 -- was a cosmetic procedure.

157.   Practice Associates of Beverly Hills or Dr. Oscar Leal fraudulently submitted bills to CIGNA representing that Dr. Leal was the assistant surgeon on four surgeries -- Patient 9 on

48

1 November 3, 1995, Patient 12 on December 18, 1995, Patient 13 on
2 January 5, 1996, and Patient 14 on January 15, 1996.  In fact, Dr.
3 Leal was not present at any of those surgeries.

4        158.   The charges in the BHOSC bills are every bit as
5 phony and canned as the fraudulent diagnoses, procedures, and
6 medical records that supposedly support those bills.  For example,
7 the BHOSC bills for four of these surgeries, on three different
8 patients, are for the same exact amount -- $8,939.48.  Not only
9 are the totals the same, but every charge on the itemized bill is
10 the same, including charges for 9 different medications and 54
11 different medical supplies.  Moreover, the four identical bills
12 are for 3 septoplasties and 1 colporrhaphy.  Thus, BHOSC not only
13 submitted the identical bill for nasal procedures on three
14 different patients, it submitted the identical bill, down to the
15 Q-tip, for a gynecological procedure on one of the same patients.

16        159.   Defendant Koh's fraudulent bills for his six
17 supposed septoplasties average about $8,700 and defendants Po's
18 and Newman's fraudulent bills for their four supposed
19 colporrhaphies average about $5,400.  Defendant Peter Golden and
20 Musya Branovan, who were the anesthesiologists on 5 of the
21 surgeries, submitted fraudulent bills that averaged about $1,550.
22 The 4 bills for Oscar Leal, the phantom assistant surgeon,
23 averaged $1,750.  With about $8,600 in average charges from BHOSC,
24 the charges for the ten surgeries ranged from $15-20,000 per
25 surgery.

26        160.   CIGNA paid a total of $68,539 on the fraudulent

27

28

49

1  bills for those fraudulent surgeries.

2  **Patient 15**

3      161.  Patient 15 is a Prudential insured who lives in
4  Norwalk, California.

5      162.  In January 1996, she was considering having
6  cosmetic surgery to smooth out the wrinkles under her eyes and on
7  her upper eyelids.  A friend recommended BHOSC.

8      163.  At BHOSC, the staff told her that she would have
9  to pay $1,500 for the cosmetic eye surgery, but that she would get
10  that money back if insurance paid for the surgery.  She paid the
11  $1,500, and, on February 10, 1996, Oscar Leal performed cosmetic
12  surgery to remove the eye wrinkles.

13      164.  Three days after the eye surgery, Ms. 15 went back
14  to BHOSC to have the eye sutures removed.  While there, she was
15  told that she could have breast implants for another $1,200, but
16  that she would also get that money back if insurance paid.  Two
17  days later, on February 16, 1996, she paid the $1,200 and had the
18  breast implants inserted by defendant Teofilo Po.

19      165.  The day before the scheduled breast implant
20  surgery, defendant Po sent Ms. 15 for a mammogram by defendant
21  Ronald Grusd.  Grusd fraudulently billed for the mammogram under a
22  phony diagnosis of "unspecified breast disorder."

23      166.  After Ms. 15's cosmetic eye surgery on February
24  10, Dr. Leal fraudulently billed Prudential $6,200, claiming that
25  he had performed a septoplasty and a turbinectomy.  BHOSC
26  fraudulently billed over $8,000 for those supposed surgeries, and

27

28                          50

1  defendant Golden fraudulently billed another $1,575.

2          167.  For the breast implants on February 16, defendant
3  Po fraudulently billed $3,850 for excision of a breast cyst, BHOSC
4  fraudulently billed $7,745 for clinic charges, and Agnes Choa
5  fraudulently billed $880 for anesthesia.  There were additional
6  charges for defendant Grusd's mammogram and for lab charges.

7          168.  All those defendants prepared false medical
8  records to disguise Ms. 15's cosmetic eye surgery and breast
9  implants as medically necessary procedures.

10          169.  Prudential paid $21,362 relying on these
11  fraudulent bills.

12  **Patients 16, 17, and 18**

13          170.  In order to provide one-stop cosmetic surgery
14  shopping, and thereby maximize their profit per patient, BHOSC and
15  Golden always had at least one surgeon on hand who specialized in
16  each of the most popular types of cosmetic surgery -- facial,
17  breast, and abdominal/liposuction.  In the first part of 1995,
18  those surgeons were defendants Koh, Abasali Amir-Jahed and
19  Clifford Ermshar, respectively.  Many patients had surgeries by
20  more than one of those surgeons.

21          171.  Patient 16, a CIGNA insured from Garden Grove,
22  California, had cosmetic surgery performed by all three in quick
23  succession.  On February 21, 1995, she had breast implants by
24  defendant Amir-Jahed.  On March 6, 1995, she had cosmetic facial
25  surgery by defendant Koh.  And on March 8, 1995, she had a tummy
26  tuck or liposuction by defendant Ermshar.  Each of those surgeons

27

28                                  51

1 fraudulently billed and documented those cosmetic surgeries as
2 their preferred cover surgery, Amir-Jahed using breast biopsies,
3 Koh using a septoplasty, and Ermshar using a colporrhaphy.

4          172.  Patients 17 and 18 opted for two out of the three.
5 Patient 17, a United insured from North Hollywood, had a tummy
6 tuck and/or liposuction from defendant Ermshar on May 4, 1995,
7 which Ermshar fraudulently billed and documented as a
8 colporrhaphy.  She had breast implants by Amir-Jahed on May 18,
9 1995, which Amir-Jahed fraudulently billed and documented as
10 bilateral biopsies.

11          173.  Patient 18 a Humana insured, was from Chicago, and
12 in slightly more of a hurry.  She had her tummy tuck and/or
13 liposuction by Ermshar (fraudulently billed and documented as a
14 hernia) on April 25, 1995, and cosmetic breast surgery by Amir-
15 Jahed (fraudulently billed as removal of damaged implants) on May
16 1, 1995.

17          174.  These typical scenarios yielded typically large
18 revenues for BHOSC and the surgeons.  CIGNA paid $42,984 for
19 Patient 16.  United paid $23,014 for Patient 17.  Humana paid
20 $26,375 for Patient 18.

21 **Patient 19**

22          175.  Ms. 19 is a resident of Los Angeles County,
23 California.

24          176.  In 1996, Ms. 19 was referred to defendant Hector
25 Arnazzi at BHOSC for tummy tuck surgery.  She met with Arnazzi,
26 and he agreed to perform the tummy tuck.  She had surgery at BHOSC

27

28                              52

1  in November 1996 by Arnazzi and Golden but not the surgery she
2  expected.

3           177.  After the surgery, Ms. 19 found that defendants
4  had not performed a tummy tuck as she had requested, but a
5  liposuction procedure instead.  The liposuction left her with
6  scarring on her abdomen.

7           178.  Ms. 19 then obtained copies of her medical records
8  from BHOSC.  She was surprised to see that the records did not
9  mention liposuction or a tummy tuck, but instead described a
10 colporrhaphy and other gynecological surgeries that supposedly had
11 been performed to relieve a urinary incontinence problem.  Ms. 19
12 had never been incontinent and had never discussed having
13 gynecological surgery with Arnazzi or Golden.

14          179.  Ms. 19 questioned defendants about the references
15 in her medical records to an incontinence problem that she did not
16 have and to gynecological surgeries that she did not want or need
17 and to which she had not consented.  She was told that they had
18 not actually performed those surgeries but had falsely documented
19 them in her medical records in order to obtain insurance benefits
20 for the surgeries.

21 **Patient 20**

22          180.  Patient 20 is a Prudential insured from San Jose,
23 California.

24          181.  In mid-1996, a co-worker told Ms. 20 about a woman
25 named Van who had contacts with doctors who would perform cosmetic
26 surgery at no cost to the patient and collect from the patient's

27
                                    53
28

1  health insurance.

2      182.  Ms. 20 called Van.  Van took Ms. 20's health
3  insurance information and arranged a meeting with her so that Ms.
4  20 could give Van her insurance identification card.  Ms. 20 told
5  Van that she wanted to have a tummy tuck and to have the wrinkles
6  around her eyes removed.

7      183.  Van called back and told Ms. 20 that Prudential
8  would pay for her surgery and that Ms. 20 would only have to pay
9  $250.  Van also told Ms. 20 that her roundtrip airfare between San
10 Jose and Los Angeles, and her hotel and meals while she was there,
11 would be paid for.

12     184.  Ms. 20 flew to Los Angeles with several other
13 women who were going to have cosmetic surgery.  Van accompanied
14 them and drove them to the hotel.  The next day, Van drove Ms. 20
15 to BHOSC where Ms. 20 met with a doctor and told him that she
16 wanted to have a tummy tuck and have the wrinkles around her eyes
17 removed.  The doctor told Ms. 20 that the clinic was too busy and
18 that she would have to come back in a few days.

19     185.  About three days later, on July 16, 1996, Ms. 20
20 returned to BHOSC and had a tummy tuck performed by defendant
21 Ezeckiel Zilka.  On July 20, 1996, Ms. 20 returned again to BHOSC
22 and had surgery by defendant Rolando Fernando to remove the
23 wrinkles from around her eyes.  She had no other surgery except
24 the two cosmetic surgeries.

25     186.  Defendant Zilka fraudulently billed Prudential
26 $8,700 for the tummy tuck on July 16, disguising it as a

27

28                          54

1  colporrhaphy and other gynecological surgeries to relieve urinary
2  incontinence.  Defendant Fernando fraudulently billed about $6,500
3  for the wrinkle removal, disguising it as a septoplasty.  BHOSC
4  fraudulently billed a total of $20,200 more for the two surgeries,
5  and David Gendein, the anesthesiologist on both surgeries,
6  fraudulently billed another $3,250.

7       187.  All those defendants knowingly prepared false
8  medical records and other documentation to conceal the cosmetic
9  surgeries. Prudential paid $17,108 in reliance on those fraudulent
10 bills.

11 **Patients 21 and 22**

12      188.  Another surgeon who was active in the fraud at
13 BHOSC was defendant William Jorgensen.  Jorgensen went on to
14 perform fraudulent surgeries at defendants Westwood, Wilshire
15 Outpatient, and Monroe.

16      189.  Patient 21 is a United insured from Los Angeles.
17 Ms. 21 first met with defendant Jorgensen on the morning of March
18 26, 1996.  By 10:30 a.m., he was performing cosmetic surgery on
19 her.  BHOSC and Jorgensen, together with anesthesiologist David
20 Gendein, fraudulently billed the surgery as a colporrhaphy.
21 United paid $6,316 because of that fraud.

22      190.  Patient 22 is a Prudential insured from West
23 Covina, California.  On September 13, 1997, Jorgensen performed a
24 cosmetic surgery on her that he fraudulently billed as a
25 colporrhaphy.  In reliance on the phony bills and operative
26 reports that BHOSC, Jorgensen, and others issued concerning this

27

28

55

1  patient, Prudential paid $11,066.

2  **Patients 23 and 24**

3  191.  Patients 23 and 24 are husband and wife CIGNA
4  insureds who worked for two different employers in North Carolina.
5  On June 3, 1996, Mr. 23 and Ms. 24 had back-to-back  cosmetic
6  surgeries at BHOSC performed by defendant Koh, assisted by
7  anesthesiologist Agnes Choa.  Koh, Choa and BHOSC fraudulently
8  billed and documented both surgeries as septoplasties.

9  192.  Defendant Hoffman also submitted fraudulent bills
10  for nasal CT scans on both these patients, and for a mammogram on
11  Ms. 24.

12  193.  Relying on the fraudulent bills it received for
13  the surgeries on Mr. 23 and Ms. 24, CIGNA paid $25,125.

14  **Patient 25**

15  194.  Patient 25 is a CIGNA insured from Tolland,
16  Connecticut.  The earliest record that any of the defendants saw
17  Ms. 25 is a bill from defendant Grusd for a sinus CT scan that he
18  supposedly performed on her on June 10, 1996.  The bill indicates
19  that Ms. 25 was referred for that CT scan by defendant Koh.
20  However, defendant Koh's first record of having seen Ms. 25 is on
21  August 10, 1996.

22  195.  Defendant Koh submitted a fraudulent claim to
23  CIGNA that he performed a septoplasty and a turbinectomy on Ms. 25
24  on September 6, 1996.  Defendant Arnazzi submitted a fraudulent
25  claim to CIGNA that he performed a laparoscopy on Ms. 25 on
26  September 10, 1996 to diagnose the cause of her pelvic pain.

27

28

56

1        196.  Defendant Arnazzi filled out and signed an

2  "initial consultation sheet" dated September 3, 1996.  That

3  initial consultation sheet states that Ms. 25 had already had a

4  septoplasty.  However, according to defendant Koh, he did not

5  perform her septoplasty until September 6, 1996.

6        197.  In fact, Ms. 25 had neither a septoplasty nor a

7  laparoscopy.  She came from Connecticut to have cosmetic surgery,

8  and that is what she received.

9        198.  In December 1996, Ms. 25 came back to California

10  for more cosmetic surgery.  On December 27, 1996, she had cosmetic

11  surgery on her breasts performed by defendant Rolando Fernando at

12  Moreno Valley.  Fernando fraudulently billed and documented that

13  cosmetic surgery as a breast biopsy.

14        199.  CIGNA paid a total of $17,331 relying on these

15  fraudulent bills.

16  **Patient 26**

17        200.  Patient 26 is a resident of Los Angeles County,

18  California.  In June 1996, Ms. 26 responded to a pink flyer

19  circulating in her neighborhood advertising liposuction.  She

20  called the 800 number listed on the flyer and was referred to the

21  Prado Clinic in Downey for a preoperative evaluation.  The Prado

22  Clinic then arranged an appointment for her at BHOSC.

23        201.  At BHOSC, she was examined by an individual, Liber

24  Sarmiento, who represented himself to her as a doctor but who, she

25  later learned, in fact was not a doctor.  Sarmiento persuaded Ms.

26  26 to have a tummy tuck rather than a liposuction.  He assured her

27

28

1 that her insurance would cover the surgery.

2       202.   On July 11, 1996, Ms. 26 had a tummy tuck
3 performed at BHOSC by defendant Ezeckiel Zilka, assisted by
4 anesthesiologist Kevin Tehrani.   The surgery left a large ugly
5 scar on her abdomen.   She was later told by another physician that
6 she had been "butchered."

7       203.   Ms. 26 also found out later that Zilka, Tehrani,
8 Oscar Leal and BHOSC had fraudulently billed her insurer for
9 gynecological surgeries to remedy urinary incontinence, and had
10 prepared fraudulent operative reports and other medical records
11 documenting a supposed incontinence problem and the gynecological
12 surgeries they supposedly performed.

13       204.   In fact, Ms. 26 had never had an incontinence
14 problem, and Zilka and Tehrani had not performed any gynecological
15 surgery on her.   They had only performed a tummy tuck, which they
16 fraudulently billed and documented as a gynecological procedure to
17 obtain insurance benefits.

18 **Patient 27**

19       205.   Patient 27 is a Prudential insured who lives in
20 Garden Grove, California.   In July 1996, Ms. 27 was at a beauty
21 salon in Westminster when the owner, Kim Xuan Lan, told her that
22 she could arrange for Ms. 27 to have any cosmetic surgery she
23 wanted for $1,200.   Ms. 27 decided that she wanted breast implants
24 to increase her breast size and also to have her lips surgically
25 enhanced.   Kim took her insurance card and, a few days later,
26 called back to say that Ms. 27 had an appointment for the cosmetic

27

28

58

1  surgery at BHOSC.

2       206.  On August 7, 1996, Ms. 27 went to BHOSC where she
3  met with a doctor who helped her select the size of implants she
4  wanted, and with defendant Koh who told her he would be performing
5  the lip enhancement.  She had the cosmetic surgery that day.

6       207.  Defendant Koh fraudulently billed $6,675 for the
7  lip enhancement, which he disguised as a septoplasty and a
8  turbinectomy.  BHOSC fraudulently billed $7,473 for clinic charges
9  in connection with those phony surgeries, and Kevin Tehrani
10 fraudulently submitted charges of $2,400 for anesthesia.  Koh and
11 Tehrani prepared false medical records and other documentation
12 designed to deceive Prudential into paying for Ms. 27's cosmetic
13 surgeries.

14      208.  Defendant Sim Hoffman fraudulently submitted
15 $1,794 in charges for CT scans and x-rays of Ms. 27's nose.

16      209.  Prudential paid a total of $6,121 in reliance on
17 defendants' fraudulent bills.

18

19            **B.  The Moreno Valley Ambulatory Surgery Center**
                  **Branch of the Scam**

20      210.  The success of BHOSC spawned other surgical
21 clinics that engage in the same fraud.  One of those offshoots is
22 defendant Moreno Valley Ambulatory Surgery Center.

23 1.  **Ownership -- John Bohn and Susan Alter**

24      211.  The founders of Moreno Valley were defendants John
25 Bohn and Susan Alter.  In 1995, Bohn had been the Administrator of
26 BHOSC, where he was intimately involved in, and familiar with, the

27

28                          59

1  fraud practiced there. In 1996, Bohn and Alter decided to
2  replicate that fraud at their own facility.  As described below,
3  they succeeded in doing that and reaped the financial rewards of
4  that illegality.

5        212.  In February 1996, Bohn and Alter formed a company
6  called Willow Glen Enterprises, which they incorporated in Nevada.
7  In April 1996, Bohn, Alter and Willow Glen leased an existing
8  medical facility in Riverside County (which they later bought). By
9  August 1996, Moreno Valley was up and running.

**2.  Advertising**

11       213.  Moreno Valley advertises itself as a cosmetic
12  surgery center.  One of its more widely circulated self-promotions
13  states:

> Medical & technological advances have made it
> possible for cosmetic procedures to be per-
> formed safely on an outpatient basis . . . .
> Based on your individual needs, we will advise
> you on the best possible medical and aesthetic
> options available . . . . There is minimal
> discomfort associated with cosmetic surgery
> and oral pain medication is adequate . . . We
> invite you to meet with us to begin the
> journey towards vibrant health and enhanced
> beauty . . . .

26  The advertisement proceeds to describe the cosmetic surgery

1 available at Moreno Valley, including "breast

2 augmentation/enlargement," "eyelid surgery" (described as "the art

3 of eyelid beautification"), "nasal surgery" (described as "the art

4 of sculpting the nose to create a natural look") and

5 "abdominoplasty/tummy tuck."

6 **3.  Moreno Valley Staff**

7        214.   Bohn and Alter staffed their new facility with

8 doctors who knew how to commit BHOSC-style fraud.  They began by

9 recruiting BHOSC surgeons Rolando Fernando, Teofilo Po, and

10 Ezeckiel Zilka.

11       215.   To fill the anesthesiologist's spot, Bohn and

12 Alter enlisted BHOSC alumna Agnes Choa and a new member of the

13 scheme, Raymond Grier.  Grier was a full-time anesthesiologist

14 because, several years earlier, California licensing authorities

15 had revoked his license to practice any other form of medicine,

16 after finding that he had supplied numerous patients with

17 controlled substances without any medical justification.

18       216.   For backup surgeons and anesthesiologists,  Bohn

19 and Alter tapped BHOSC veterans Kong Koh, Lee Newman, Musya

20 Branovan and Howard Siegel.

21 **4.  Patient Recruitment and Exploitation at Moreno Valley**

22       217.   Bohn and Alter took the recruitment of out-of-

23 state Asian patients to new extremes.  From the moment Moreno

24 Valley opened its doors, many of its patients have been Asian-

25 Americans from states outside California, including Tennessee,

26 Connecticut, Washington, Illinois, Colorado, Texas, New Mexico,

27

28
                                61

1 Louisiana, Florida, North Carolina, New Jersey, and Minnesota.

2        218.   Moreno Valley exploits these out-of-state patients
3 in numerous ways.  Because some of those patients can only stay in
4 California for a short time before they have to return home, many
5 such patients have been pressured into having several surgeries
6 within a week.  Because many of the patients speak little or no
7 English, they have been forced to undergo surgeries without any
8 meaningful communication with the surgeons, and to sign consent
9 forms and financial responsibility forms without understanding
10 what they are signing.

11        219.   At Moreno Valley, defendants Po, Fernando, Zilka,
12 Koh, and Newman replicated the fraudulent patterns they had
13 enacted at BHOSC, performing the same cosmetic surgeries and
14 covering them with the same falsified symptoms, diagnoses and
15 medical procedures.

16 **The Scam In Operation:  Illustrative**
   **Examples of Particular Fraudulent Acts**
17
        220.   The impact of the scheme described above is
18
   illustrated by the following examples:
19
   **Patient 28**
20
        221.   Patient 28 is a United insured from San Jose who
21
   has had at least 4 cosmetic surgeries.  Defendant Teofilo Po
22
   performed 2 of those surgeries at Moreno Valley.
23
        222.   Ms. 28 began with a surgery at a non-defendant
24
   clinic on September 1, 1995, which was billed as a septoplasty. A
25
   few months later, on December 20, 1995, Ms. 28 had a cosmetic
26
   surgery performed at defendant Advanced Laser that was
27
                              62
28

1  fraudulently billed as a hernia repair.

2      223.  After a year off, Ms. 28 started up again.  On
3  December 5, 1996, Ms. 28 had a cosmetic surgery by defendant Po at
4  Moreno Valley.  Po fraudulently billed and documented that surgery
5  as a septoplasty.  On February 27, 1997, Ms. 28 had her fourth
6  surgery overall and her second by defendant Po at Moreno Valley, a
7  supposed breast cyst excision.

8      224.  United paid $56,420 relying on those fraudulent
9  bills.

10 **Patient 29**

11     225.  Patient 29 is a Laotian-American woman who lives
12 in Northglenn, Colorado, a suburb of Denver.  Ms. 29 had three
13 cosmetic surgeries at Moreno Valley, two in November 1996, one of
14 which was botched, and a third in May 1997, which attempted to
15 correct the botched surgery.

16     226.  In the fall of 1996, Ms. 29 received a telephone
17 call from a Laotian-American woman named Sue Nanda, a Denver-based
18 patient broker who recruited patients for Moreno Valley and other
19 defendant clinics.  Ms. 29 did not know Ms. Nanda.  Ms. Nanda had
20 gotten Ms. 29's name from another patient broker, Bounthan
21 Phanekham, who scouts the Denver Asian community for prospective
22 cosmetic surgery patients on behalf of Moreno Valley and other
23 defendant clinics.

24     227.  In that and later calls, Ms. Nanda tried to
25 interest Ms. 29 in having cosmetic surgery in California to round
26 her eyes and enlarge her breasts.  Ms. Nanda told Ms. 29 that she

27

28                                    63

1  would make arrangements and pay for Ms. 29's roundtrip airfare and
2  housing in California.  Ms. 29 would have to advance $1,200, which
3  would be returned to her in full after the surgeries.  Ms. 29
4  agreed to make the trip and paid Ms. Nanda the $1,200.

5          228.  On November 9, 1996, Ms. 29 flew with Ms.
6  Phanekham from Denver to the Ontario, California airport.  Ms.
7  Nanda met them at the airport and took Ms. 29 to a room at a
8  Comfort Inn next door to the Moreno Valley clinic.  There were
9  three bedrooms, all occupied by Asian women preparing for, or
10  recovering from, various cosmetic surgeries.

11          229.  Once they were in California, Ms. Nanda advised
12  Ms. 29 that, despite her prior promises, she would only be
13  returning $100 of the $1,200 Ms. 29 had paid, with the remainder
14  supposedly being used to pay expenses.

15          230.  On the first or second morning after Ms. 29's
16  arrival, Ms. Nanda escorted Ms. 29 to the clinic next door for her
17  eye surgery.  There, Ms. 29 met defendants Bohn and Alter.  After
18  obtaining Ms. 29's insurance card, Alter gave Ms. 29 several
19  documents to sign, including a patient financial responsibility
20  form and a consent to treatment form.  Though Ms. 29 does not
21  speak or write English, the forms were entirely in English.  Bohn,
22  Alter and Nanda pressured Ms. 29 into signing them without any
23  explanation of what they contained.

24          231.  Before her eye surgery, a nurse took Ms. 29's
25  blood pressure and weighed her. She was then taken into the
26  operating room and given a shot that made her unconscious.  No

27

28

64

1  pre-op tests were done.  No one questioned Ms. 29 before the
2  surgery concerning her health, prior hospitalizations, drug
3  sensitivities, or any aspect of her medical history.  Ms. 29 never
4  spoke to, or even saw, a doctor before the surgery.  Ms. 29 later
5  learned that the doctor who performed the eye surgery was
6  defendant Teofilo Po, assisted by anesthesiologist Agnes Choa.

7         232.  After Ms. 29 awoke from surgery, she was taken
8  back to the Comfort Inn.  The area around her eyes was bloody and
9  bruised, and her eyes were swollen nearly shut.  She received no
10 medical attention or medication at the motel.

11        233.  Two days later, Ms. Nanda took Ms. 29 back to the
12 clinic for her breast surgery.  Before her surgery, no one
13 discussed with Ms. 29 what size implants she wanted or how large
14 she wanted her breasts to be.  No one discussed with her any risks
15 or possible complications of the surgery.  Ms. 29 later learned
16 that the doctor who performed the breast surgery was defendant
17 Rolando Fernando, assisted by anesthesiologist Raymond Grier.

18        234.  After the breast surgery, Ms. 29 was again taken
19 back to the Comfort Inn.  Her breasts were bandaged and swollen,
20 with incisions and some bleeding visible beneath the bandages.
21 She remained in the motel room for approximately three days before
22 she was taken back to the airport for her return flight to Denver.
23 During that time, she received no medical attention.  She bought
24 pain medication from Ms. Nanda.

25        235.  In mid-January 1997, Ms. 29 began to feel a
26 painful hardening in one of her breasts and a watery feeling in

27
                                  65
28

1 the other. She contacted Ms. Nanda, who told her that these
2 sensations were normal. Ms. 29 pressed for an explanation, and
3 Ms. Nanda said she would contact the breast surgeon and report
4 back. Ms. Nanda called back a week later and told Ms. 29 that if
5 she was not satisfied with the operation, she would have to have
6 the implants removed. Ms. Nanda said that she would arrange for
7 the trip back to California, but Ms. 29 would have to pay for it
8 herself. For the next month and a half, Ms. 29 called Ms. Nanda
9 repeatedly to find out the arrangements for her return trip to
10 California. Ultimately, Ms. 29 spoke to Ms. Phanekham who told
11 Ms. 29 that the Moreno Valley doctors were unhappy with Ms. 29
12 because her insurer had not yet paid their bills.

13 236. Those bills were fraudulent. Defendant Po, who
14 performed Ms. 29's cosmetic eye surgery, had billed her insurer
15 $7,650 for performing a supposed nasal septoplasty and
16 turbinectomy. Po's bill also included a $250 charge for a pre-op
17 consultation with Ms. 29 in his Los Angeles office on November 7,
18 though Ms. 29 did not even arrive in California until November 9.
19 The bills for the breast implant surgery fraudulently stated that
20 Ms. 29 had undergone excision of breast tumors.

21 237. Meanwhile, Ms. 29 had received a questionnaire
22 from her insurer asking various questions about her surgeries.
23 When Ms. Nanda learned about the questionnaire, she went to Ms.
24 29's house and had Ms. 29 sign the questionnaire form without any
25 answers filled in. She told Ms. 29 that she would send the form
26 to California so that the owner of Moreno Valley could fill it out

27

28

66

1 properly to get the surgery paid for quickly.

2       238.  Ms. Nanda later sent the questionnaire back to Ms.
3 29 with the answers filled in.  The answers stated, falsely, that
4 Ms. 29 had been referred to defendant Po and Moreno Valley by
5 "family" and that she had the surgery while she was visiting
6 relatives in California.  The answers also falsely stated that
7 Ms. 29 had a septoplasty and a turbinectomy on November 11, 1996,
8 followed by excisions of tumors from both breasts on November 13,
9 1996.  Ms. Nanda directed Ms. 29 to send the completed
10 questionnaire back to her insurer, which she did.

11       239.  In May 1997, Ms. 29 went back to California for
12 the hoped-for corrective surgery.  Ms. Nanda picked up Ms. 29 at
13 L.A. Airport and took her to Wilshire Outpatient in Los Angeles,
14 which is owned by defendant Fernando who performed the prior
15 breast surgery at Moreno Valley.  After some discussion with
16 defendant Fernando, Ms. Nanda told Ms. 29 that Fernando would
17 replace the implants, but that he would so at Moreno Valley rather
18 than at Wilshire Outpatient.  That night, Ms. Nanda transported
19 Ms. 29 and several other Asian women from Los Angeles back to the
20 Comfort Inn next to Moreno Valley.

21       240.  The next day, Ms. 29 went back to Moreno Valley
22 for the corrective surgery.  She awoke hours later in her room at
23 the Comfort Inn.  Ms. Nanda visited Ms. 29 later that evening, and
24 sold her two bottles of medication.

25       241.  The next day, Ms. 29 found that her breasts were
26 badly swollen and bruised.  She went back to Moreno Valley where

27

28                           67

1  an Asian-American nurse examined her and advised her that her
2  breasts were infected.  Ms. 29 bought another bottle of medication
3  and was driven with ten other women back to the motel.  She
4  examined her breasts later and found that, in addition to the
5  bruising and discoloration she had observed earlier, her stitches
6  appeared to be open.  The following morning, Ms. Nanda took Ms. 29
7  and other Asian-American patients back to Los Angeles Airport.

8          242.  In December 1997, Ms. 29's implants were
9  surgically removed in Denver.  It is uncertain whether Ms. 29 can
10 undergo further cosmetic surgery to correct the deformity of her
11 breasts caused by the Moreno Valley surgeries.

12 **Patients 30 through 36**

13         243.  Another patient cluster involves a group of
14 Laotian-Americans who worked, or whose spouses worked, at an
15 automobile plant in Smyrna, Tennessee. During six months in 1996,
16 13 patients in that cluster had a total of 21 surgeries at BHOSC
17 and Moreno Valley.  Relying on fraudulent bills submitted on those
18 surgeries, CIGNA paid over $400,000.

19         244.  In April 1996, Patient 30, the wife of a worker at
20 the plant, had two cosmetic surgeries at BHOSC.  After she
21 returned to Tennessee, that patient started recruiting for BHOSC
22 and Moreno Valley. In Summer 1996, she began shepherding groups of
23 auto workers or their wives, as well as other area residents, to
24 California for cosmetic surgeries.  Once they arrived in
25 California, some of the patients were put up at a motel in Los
26 Angeles or at the Comfort Inn next to Moreno Valley, and were

27

28
                                    68

1 transported back and forth to the clinics for surgeries.

2      245. Seven of these patients had a total of 10
3 surgeries at Moreno Valley in September, October and December,
4 1996. One of those patients was the recruiter herself, Patient
5 30. After having cosmetic eyelid surgery and a tummy tuck or
6 liposuction at BHOSC in April, she had breast implants performed
7 by defendant Fernando at Moreno Valley on September 13, 1996.

8      246. The Moreno Valley patients also included a worker
9 at the plant and her husband, Patients 32 and 36. Ms. 32 had
10 cosmetic nose surgery by defendant Fernando on September 24, 1996.
11 Mr. 36 then decided to have wrinkles removed from under his eyes.
12 He had that surgery by defendant Koh on December 23, 1996.

13      247. The other four patients also had cosmetic
14 surgeries. Patient 31 had a cosmetic facial surgery by defendant
15 Fernando on September 10, 1996 and a tummy tuck and/or liposuction
16 by defendant Zilka on September 13, 1996. Patient 33 had a tummy
17 tuck and/or liposuction by defendant Fernando on October 14, 1996,
18 and a cosmetic facial surgery by defendant Po on October 17, 1996.

19      248. Patient 34 had a tummy tuck and/or liposuction by
20 defendant Zilka on December 20, 1996, and a cosmetic facial
21 surgery by defendant Koh on December 23, 1996. Patient 35 had a
22 tummy tuck and/or liposuction by defendant Fernando on December
23 21, 1996.

24      249. The defendant surgeons, Moreno Valley, and the
25 anesthesiologists Grier, Choa and Branovan, fraudulently billed
26 and documented all of these cosmetic surgeries as medically

27

28                           69

1 necessary surgeries. Defendants Koh, Po, and Fernando
2 fraudulently billed and documented the cosmetic facial surgeries
3 they performed as septoplasties and turbinectomies. Defendant
4 Zilka fraudulently billed and documented the tummy tucks and
5 liposuctions he performed as colporrhaphies and other
6 gynecological procedures. Defendant Zilka fraudulently billed and
7 documented the breast implants he performed on Patient 30, the
8 recruiter, as excisional breast biopsies.

9           250.   Defendants Grusd and Hoffman also had their hands
10 in this fraud cluster. For the most part, Grusd billed for phony
11 radiology on patients who had surgeries at BHOSC and Hoffman did
12 so for patients who went to Moreno Valley. On one Moreno Valley
13 patient, however, Patient 31, both Grusd and Hoffman billed.
14 Hoffman's bill on that patient was for an x-ray supposedly
15 performed on September 16, 1996, 3 days after the patient had her
16 last surgery.

17           251.   Other of Hoffman's bills were equally fraudulent.
18 For example, Hoffman billed almost $2,000 for supposedly
19 performing a sinus CT scan on Patient 35. Hoffman's report stated
20 that the patient had a severely deviated septum. However, the
21 patient did not have a nasal surgery, she had a gynecological
22 surgery. Hoffman claimed to have performed that CT scan on
23 December 21, 1996, the same day that the patient had her long-
24 scheduled surgery. However, the patient's surgery began at 9:40
25 A.M., and she was prepped for surgery long before that. Hoffman's
26 radiology office is in Anaheim, several hours drive from Moreno

27

28

70

1 | Valley.

2 | **Patient 37**

3 | 252. Patient 37 is an Aetna insured from Houston,
4 | Texas. On February 11, 1998, Ms. 37 had a surgery performed by
5 | defendant Newman at Moreno Valley that Newman and Moreno Valley
6 | fraudulently billed and documented as a colporrhaphy. Those
7 | defendants billed Aetna almost $20,000 for the surgery. However,
8 | someone at either the clinic or at Dr. Newman's office forgot to
9 | remove the true operative report from the documents that were sent
10 | along with the bill.

11 | 253. Though the phony operative report indicated that a
12 | colporrhaphy was performed to treat the patient's "symptomatic
13 | pelvic relaxation, urinary stress incontinence, and partial
14 | separation of rectosphincter muscles," the true report stated that
15 | the patient had "elective liposuction" for "exogenous obesity"
16 | with "5,100 cc of high quality fat" removed from her "upper and
17 | lower abdomen, flanks, hips, lateral and medial thighs and knees."

18 | 254. Aetna was fortunate to receive the true operative
19 | report on Ms. 37 by mistake. Countless other true reports of
20 | cosmetic surgeries, which were concealed from plaintiffs during
21 | the claims process, await discovery in this case.

22 | **Patient 38**

23 | 255. Patient 38 is a Prudential insured who lives in
24 | Aliso Viejo, California. In mid-1997, Ms. 38 was interested in
25 | having cosmetic breast surgery, and a friend referred her to
26 | Moreno Valley.

27 |

28 |

71

256.   At Moreno Valley, Ms. 38 met with defendant Susan Alter.   Ms. 38 had wanted a breast lift, but defendant Alter persuaded her to have implants instead.   Alter told her that she would have to pay $1,700 before the operation and that insurance would cover the rest.

257.   On June 19, 1997, defendant Fernando performed the breast implant procedure.   He fraudulently documented and billed that procedure as a surgery to remove a breast cyst.   Defendant Fernando billed $1,500, Moreno Valley itself billed $8,633, and Raymond Grier submitted a fraudulent anesthesiologist's bill for $770.   There were additional bills for pre-op work and post-op pathology.

258.   As a result of defendants' fraud, Prudential paid $9,081.

**Patient 39**

259.   Patient 39 lives in Riverside County, California. In mid-1996, Ms. 39 decided she wanted a tummy tuck.   An acquaintance referred her to defendant John Bohn at Moreno Valley.

260.   On September 21, 1996, Ms. 39 met with defendants Fernando and Bohn at Moreno Valley.   They scheduled Ms. 39 to have a tummy tuck at Moreno Valley on October 2, 1996.   Bohn told Ms. 39 that she would only have to pay $200 for the tummy tuck and that her health insurance would cover the rest.

261.   On October 2, 1996, Ms. 39 went to Moreno Valley for the tummy tuck surgery.   Before the surgery started, Bohn had Ms. 39 sign a "consent to surgery" form on which the name of the

72

1  surgical procedure was left blank.  Bohn pressured Ms. 39 to sign
2  the consent form without a procedure listed (which she did),
3  telling her that they "were in a hurry" and that the missing
4  information would be filled in later.

5          262.  After the tummy tuck surgery, Ms. 39 experienced
6  post-operative complications and requested copies of her medical
7  records from Moreno Valley.  When she received the records,
8  including records signed by defendants Fernando and Bohn and
9  anesthesiologist Raymond Grier, she saw that they made no mention
10 of the tummy tuck procedure but instead indicated that she had
11 undergone a colporrhaphy and other gynecological procedures to
12 alleviate urinary incontinence.  Ms. 39 had never been incontinent
13 and had never discussed any gynecological procedure with
14 defendants Bohn, Fernando, or anyone else.

15         263.  Ms. 39 was appalled and confused, and, after
16 further investigation, she brought suit in August 1997 against
17 defendants Willow Glen, Bohn, Fernando, and others.  Among other
18 claims, Ms. 39 claimed that she has been damaged because she has
19 no reliable record of the procedures performed on her.  On the
20 assumption that the documented gynecological procedures actually
21 were performed, she also alleged that defendants committed sexual
22 battery by performing those procedures without her consent.

23         264.  In fact, those gynecological surgeries were not
24 performed.  Her tummy tuck was simply disguised that way so that
25 defendants could fraudulently access her insurance.

26
27
28
                                    73

1  **Patients 40 and 41**

2      265.  Patients 40 and 41 are a Vietnamese-American man
3  and woman from San Jose.  In April 1997, they worked for the same
4  employer, whose benefit plan was administered by CIGNA.

5      266.  On April 15, 1997, Mr. 40 and Ms. 41 had back-to-
6  back cosmetic surgeries performed by defendant Po at Moreno
7  Valley.  Po and Moreno Valley fraudulently billed and documented
8  both surgeries as a septoplasty and turbinectomy.

9      267.  Po's operative reports for both patients are
10  virtually identical.  Both reports begin by stating that the
11  patient suffers from constant nasal "airway blockage with
12  headaches, sinusitis, and frequent nosebleeds."  Both reports go
13  on to say that the patient has used decongestants and "a steroid
14  at one time" without relief.  The next paragraph of both reports
15  states that "the nasal mucosa was boggy with blockage and
16  narrowing at about 85% on the left side and 80% on the right
17  side."  Both reports then state that the "nasal septum was
18  deviated to the left and there was enlargement and hypertrophy of
19  the inferior turbinates bilaterally."  The two page description of
20  the surgical procedure that follows these "findings" is verbatim
21  identical in both reports.

22      268.  Defendant Sim Hoffman submitted claims and a
23  radiology report for both patients, indicating that he performed a
24  sinus CT scan on both patients on April 15, the same day as the
25  surgery.  Ms. 41's medical records place her at Moreno Valley
26  before 9:00 A.M.  Hoffman's radiology office is in Anaheim,

27

28                                  74

1 | several hours away from Moreno Valley.

2 |     269.  Hoffman's CT scan reports on both patients state
3 | that "[t]here is deviation of the nasal septum to the right."
4 | However, as noted above, Po's operative reports state that both
5 | patients had nasal septums that were "deviated to the left."
6 | **Patient 42**

7 |     270.  Patient 42 is a United insured from Sun Valley,
8 | California.  Ms. 42 had 2 cosmetic surgeries at Moreno Valley.

9 |     271.  Both were performed by defendant Lee Newman.  On
10 | May 12, 1997, Newman performed a cosmetic surgery on Ms. 42 that
11 | he fraudulently billed as a colporrhaphy to relieve urinary
12 | incontinence.  Less than a month later, on June 6, 1997, Newman
13 | performed another cosmetic surgery on Ms. 42, this time
14 | fraudulently billing and documenting the surgery as a laparoscopy.

15 |     272.  United paid a total of $34,692 in reliance on
16 | those fraudulent bills.

17 | **Patient 43**

18 |     273.  Patient 43 is a Humana insured from Haltom City,
19 | Texas.

20 |     274.  On August 18, 1998, Ms. 43 had a surgery
21 | performed by defendant Fernando at Moreno Valley.  All of the
22 | records that Moreno Valley sent Humana indicated that the only
23 | surgery Ms. 43 had there was a colporrhaphy to correct a urinary
24 | incontinence problem.

25 |     275.  However, when Humana obtained Ms. 43's records
26 | from her gynecologist in Texas, Humana learned what procedures Ms.

27

28

1  43 really had. Those records indicate that, on August 28, 1998,
2  10 days after her surgery, Ms. 43 visited her gynecologist in
3  Texas to have sutures removed "from liposuction." Three weeks
4  after that, she went to her gynecologist to have him check on her
5  "tummy tuck incision."

6         276. Moreno Valley, Fernando, anesthesiologist Raymond
7  Grier and others billed Humana over $17,000 for the colporrhaphy
8  that wasn't.

9  **Patient 44**

10        277. Patient 44 is a Humana insured from Bartlett,
11 Illinois. In late 1996, Ms. 44 went to Houston, Texas to have
12 cosmetic eyelid surgery and breast implants. But she was not
13 finished.

14        278. In August 1997, Ms. 44 had more cosmetic surgery
15 performed by defendant Newman at Moreno Valley. Newman and Moreno
16 Valley fraudulently billed and documented that surgery as a
17 colporrhaphy and other gynecological procedures.

18        279. State regulations require that, after a patient
19 has surgery, the clinic must identify on a discharge form the
20 person in whose care the patient is released. The discharge form
21 for Ms. 44 indicates that she was released to "Sue Nanda
22 (friend)." In fact, Sue Nanda was not Ms. 44's "friend" but the
23 recruiter who directed Ms. 44 from Chicago to Moreno Valley for
24 her cosmetic surgery.

25        280. Moreno Valley, Newman, anesthesiologist Grier and
26 others fraudulently billed Humana more than $28,000 for Ms. 44's

27

28                              76

1  cosmetic surgery.

2
3

### C.   The Advanced Laser Surgery Center Branch of the Scam

4       281.   At about the same time that Bohn and Alter were
5  making plans to open Moreno Valley, another clinic based on the
6  BHOSC fraud model was opening its doors.   That clinic was
7  defendant Advanced Laser Surgical Center in Huntington Beach.

8  ### 1. Ownership

9       282.   Advanced Laser Surgical Center and its billing
10 alter ego, Advanced Laser Surgical Medical Group, were owned and
11 operated by a group that included Thu Ngoc Pham, Saeid Sadighi,
12 and Mir Jaffar Shadjareh.   In late 1997, after Advanced Laser had
13 ceased operations, another clinic opened on the same site.   That
14 clinic -- Beachside Surgical Center -- is owned by a relative of
15 Mir Jaffar Shadjareh, Amir Shadjareh.

16      283.   Thu Ngoc Pham, Saeid Sadighi and Mir Jaffar
17 Shadjareh were aware of the fraudulent activities at Advanced
18 Laser and directly profited from them.

19 ### 2. Advertising

20      284.   Ads for Advanced Laser featured photos of
21 Vietnamese starlets and promised free airfare, lodging and meals
22 for out-of-state patients.   One ad, translated from its original
23 Vietnamese, offers the following cosmetic surgeries:

24
25              -- Nose: Perform nose surgery or correct
                previous nose surgery using own cartilage.
26
                Make nose narrow.
27
                              77
28

1          - Eyes: Widen eyes and correct eye brows.

2          -- Facial Skin: correct facial skin (acne

3          scars), eyes, neck with new method that

4          doesn't cause scar tissue.  Also correct tummy

5          bulges even after several child births.

6          -- Breast: Breast augmentation to make them

7          big and round looking.  Replace silicone

8          breast implants with saline breast implants

9          with new safe method.

10         -- Liposuction: Take fat out with safe

11         liposuctioning in the tummy, shoulders, legs

12         and chin.  New methods with less pain.

13         -- Fat Implant: Use your own body fat to add

14         to your nose, eyes, cheeks, hands and legs.

**3.   Advanced Laser Patients, Doctors, and Surgeries**

285.   As at Moreno Valley, the vast majority of
Advanced Laser's patients were Asian-American women.  Many of
those women came from out-of-state and from the San Jose area.

286. Also like Moreno Valley, Advanced Laser staffed
itself with doctors who received their fraud training at BHOSC.
Among the surgeons who practiced fraud at Advanced Laser were
former BHOSC surgeons Teofilo Po and Abasali Amir-Jahed.  Advanced
Laser's anesthesiologists included former BHOSC anesthesiologists
Musya Branovan and Chull Whang.

287.   Other surgeons at Advanced Laser included
defendants Steven Burres and Mohsen Tavoussi, who performed nose,

1  eye and other cosmetic surgeries that they and Advanced Laser

2  fraudulently billed as septoplasties.

3  **The Scam In Operation:   Illustrative**
   **Examples of Particular Fraudulent Acts**

4

5         288.   The impact of the scheme described above is

   illustrated by the following examples:

6  **Patients 45 through 50**

7

8         289.   Another patient cluster involves 13 Asian-American

   patients who all worked in the same facility near Charlotte, North

9  Carolina.   All were insured by CIGNA.

10

11        290.   Six of those patients had cosmetic surgeries

   within a month in 1996 at Advanced Laser, and the other seven had

12  surgeries at BHOSC.   The patients were channeled from North

13  Carolina to both BHOSC and Advanced Laser by a common recruiter

14  who worked for both clinics.   The Advanced Laser patients are

15  discussed below.

16

17        291.   Four of the six Advanced Laser patients (Patients

   45, 46, 47, and 48) had surgery on the same day -- May 8, 1996 --

18  all by defendant Steven Burres.   Burres also supposedly had

19  initial consultations with each of the four that same day.

20  Indeed, Burres was so busy that day that he committed fraud well

21  into the night, operating on the last of the four patients until

22  almost midnight.

23

24        292.   Burres fraudulently assigned the same diagnosis to

   each patient (deviated septum and hypertrophy of the turbinates)

25  and fraudulently billed and documented the same surgery on each

26  patient (a septoplasty and a turbinectomy).   Indeed, the operative

27                              79

28

1  reports on two of the four are <u>verbatim</u> identical; all four are
2  substantially identical.  However, the septoplasties and
3  turbinectomies described in those reports were not the surgeries
4  that Burres actually performed.

5       293.  Buried in Burres' pre-op notes on two of the
6  patients are references to what those patients came to California
7  for: cosmetic eyelid surgery.  But there are no references to
8  those cosmetic eyelid surgeries in any of the formal operative
9  reports by Burres or in any of the formal anesthesia records
10 prepared by Musya Branovan, who assisted Burres in all four
11 surgeries.

12      294.  Another thing missing from those documents is any
13 reference to the participation of an assistant surgeon, whose
14 involvement would have been noted in such documents.  Yet each of
15 the bills from Advanced Laser includes a charge of almost $3,000
16 for the services of an assistant surgeon, defendant Saeid Sadighi.
17 Sadighi was the Chairman of the company that billed for surgeries
18 at Advanced Laser, defendant Advanced Laser Surgical Medical
19 Group, Inc.  Those fraudulent charges were included at the
20 direction of one or more of the owners and officers of Advanced
21 Laser named above with the fraudulent intent to bill for services
22 of Dr. Sadighi that were not rendered.

23      295.  Defendant Burres not only met the four patients
24 for the first time on the day of their surgeries but also,
25 according to the records, referred two of them to defendant Sim
26 Hoffman for nasal CT scans that day.  Hoffman generated fraudulent

27
28                              80

1 reports of those supposed CT scans that stated that the patients'
2 airways were severely obstructed.

3     296. About a month later, two more patients in the
4 cluster came from North Carolina to have cosmetic surgeries at
5 Advanced Laser. Patients 49 and 50 were husband and wife. On
6 June 7, Mr. 49 had a cosmetic surgery performed by defendant
7 Teofilo Po, which Po fraudulently billed and documented as a
8 septoplasty and a turbinectomy. Ms. 50 had her cosmetic surgery
9 the following day by defendant Burres, who fraudulently billed and
10 documented the procedure as yet another septoplasty and
11 turbinectomy. Chull Whang served as the anesthesiologist on both
12 of those surgeries, generating fraudulent anesthesia records that
13 complemented the fraudulent reports prepared by Po and Burres.

14     297. Ms. 50's records reflect significant coordination
15 between Advanced Laser and BHOSC in coping with heavy patient
16 traffic. Ms. 50 was originally scheduled for surgery at BHOSC.
17 Shortly before that scheduled surgery, the site of the surgery was
18 changed to Advanced Laser. In other words, the two clinics were
19 sharing patients.

20     298. Each of the fraudulent clinic bills for the six
21 patients in the cluster was between $15,000 and $18,000.
22 Defendants Burres and Po fraudulently billed an average of about
23 $7,000 for each of the six surgeries. Musya Branovan and Chull
24 Whang fraudulently billed about $1,200 for anesthesia per case.
25 There were additional charges in some cases for radiology by
26 defendant Hoffman and pathology and other lab charges. All told,

27

28                        81

per case charges at Advanced Laser often exceeded $25,000.

**Patients 51 through 59**

299.   Another major cluster of patients at Advanced Laser were Aetna insureds who worked for two aircraft manufacturers in Wichita, Kansas.  Many of those patients were recruited by a Wichita-based patient recruiter named Kim Tu.

300.   Between December 1995 and July 1996, 19 employees and family members from those two companies made all-expenses-paid trips from Kansas to Orange County to have cosmetic surgery at Advanced Laser.  Most of the patients had two cosmetic surgeries. All of those cosmetic surgeries were performed by defendants Steven Burres, Abasali Amir-Jahed, Mohsen Tavoussi, and Teofilo Po, who fraudulently billed and documented them as an assortment of septoplasties, colporrhaphies, hernia repairs, and breast procedures.

301.   Among the first of this Kansas contingent were a mother and daughter, Patients 51 and 52.  The mother, Patient 51, had cosmetic surgeries performed by defendant Amir-Jahed on December 15 and 19, 1995; those cosmetic surgeries were fraudulently billed to Aetna as a breast cyst excision and a hernia repair.  The daughter, Patient 52, also had two cosmetic surgeries on the same two days, the first a supposed breast cyst excision by defendant Amir-Jahed and the second a supposed septoplasty by defendant Po.  Those cosmetic procedures also were fraudulently billed to Aetna.  This mother-daughter team cost Aetna $67,907.

82

1         302.   There were two sets of husbands and wives within

2  the cluster.  In one case, the husband, Patient 53, had a phony

3  septoplasty by defendant Burres on February 22, 1996, and, four

4  days later, defendant Amir-Jahed followed with a phony hernia

5  repair on the wife, Patient 54.

6         303.   In the other case, the husband, Patient 55, had a

7  phony septoplasty by defendant Burres on July 6, 1996, and the

8  wife, Patient 56, also had a phony septoplasty on the same day

9  performed by defendant Tavoussi.  Aetna paid $58,050 relying on

10  those defendants' fraudulent bills for the two couples' surgeries.

11         304.   The heaviest influx of Wichita patients was from

12  late April through early July of 1996.  During that period, 13

13  patients had 20 cosmetic surgeries at Advanced Laser.  Those

14  patients, and the fraudulent surgeries defendants billed for them,

15  included Patient 57 (septoplasty by Burres on April 27 and

16  colporrhaphy and hernia repair by Amir-Jahed on May 1); Patient 58

17  (colporrhaphy and hernia repair by Amir-Jahed on May 22 and

18  septoplasty on May 30); and Patient 59 (septoplasty by Tavoussi on

19  July 2).

20         305.   Defendant Hoffman provided phony radiological

21  support for surgeries on the Aetna Kansas patients, but not

22  without a few fraudian slips.  For example, Hoffman billed for a

23  nasal CT scan that he supposedly performed on Patient 57 on April

24  29, 1996.  In his report, Hoffman found "deviation of the nasal

25  septum to the left" and "enlargement of the middle and inferior

26  turbinates bilaterally with severe narrowing of the nasal

27

28                        83

1  airways."  Those findings were supposed to support the patient's
2  need for a septoplasty and a turbinectomy.  However, according to
3  the bills and reports submitted by defendants Burres and Advanced
4  Laser, Ms. 57 had already had a septoplasty and a turbinectomy to
5  correct those problems, two days earlier on April 27.

6  **Patient 60**

7         306.   Patient 60 is a United insured from San Angelo,
8  Texas.  Defendant Abasali Amir-Jahed performed three different
9  cosmetic surgeries on Ms. 60 at Advanced Laser over a three-day
10 period in the summer of 1996.  A few months later, Ms. 60 came
11 back to Los Angeles and had a fourth cosmetic surgery from
12 defendant Mohsen Tavoussi at Westwood.

13        307.   Defendant Amir-Jahed first saw Ms. 60 on June 27,
14 1996, shortly after she arrived from Texas.  Amir-Jahed promptly
15 diagnosed Ms. 60 with three conditions -- urinary incontinence, a
16 hernia, and breast lumps in both breasts, all supposedly requiring
17 immediate surgery.

18        308.   The following day, Amir-Jahed claimed to have
19 performed surgeries for two of those conditions, a colporrhaphy
20 for Ms. 60's urinary incontinence and a hernia repair.  In fact,
21 Ms. 60 had neither urinary incontinence nor a hernia, and the
22 surgeries Amir-Jahed performed that day were cosmetic surgeries.

23        309.   On the same day that Amir-Jahed supposedly was
24 performing two major surgeries on Ms. 60 in Huntington Beach,
25 defendant Sim Hoffman fraudulently claimed to have performed a
26 mammogram on Ms. 60 in Anaheim.  Three days later, on July 1,

27

28
                                  84

1996, Amir-Jahed performed a third cosmetic surgery on Ms. 60 that
he later claimed involved removal of a breast cyst.

310. Five months after having three cosmetic surgeries
in three days by defendant Amir-Jahed, Ms. 60 came back for more
surgery by defendant Mohsen Tavoussi. On December 20, 1996, the
first time he saw her, Tavoussi assigned Ms. 60 the only major
cover diagnosis she had not received the first time around --
deviated septum with hypertrophied turbinates and nasal airway
obstruction. The next day, at Westwood, Tavoussi performed what
he later claimed was a septoplasty and a turbinectomy.

311. For Ms. 60's cosmetic surgery spree, United paid
defendants Amir-Jahed, Tavoussi, Advanced Laser and Westwood, and
their associates, $62,042, relying on their fraudulent bills.

### D. The Wilshire Outpatient Surgery Center Branch of the Scam

#### 1. Ownership -- Rolando Fernando

312. In mid-1997, after lengthy stints at BHOSC and
Moreno Valley, defendant Rolando Fernando opened his own fraud
mill in the mid-Wilshire district of Los Angeles -- Wilshire
Outpatient Surgery Center.

#### 2. Advertising

313. A brochure for Wilshire Outpatient invites
patients to "Call now and kiss life's imperfections goodbye!" The
brochure applauds the Center's "state of the art" approach and
equipment for performing such cosmetic surgeries as eyelid
surgery, nasal surgery, facial implant surgery, facial

85

1 | rejuvenating surgery, laser peel, liposuction, breast
2 | augmentation/reduction surgery and abdominal tummy tuck surgery.
3 | The brochure includes "before and after" pictures of satisfied
4 | cosmetic surgery patients.

5 | **3.  Doctors and Surgeries at Wilshire Outpatient**

6 | 314.  Dr. Fernando is the primary surgeon at Wilshire
7 | Outpatient, performing the full range of cosmetic procedures
8 | outlined in his brochures, but billing and documenting them as
9 | medically necessary septoplasties, colporrhaphies, hernias,
10 | breast cyst excisions, and other procedures.  Defendants Newman
11 | and Jorgensen have also submitted fraudulent bills for surgeries
12 | at Wilshire Outpatient.

13 | 315.  The anesthesiologist involved with many of the
14 | fraudulent procedures at Wilshire Outpatient is Howard Siegel, who
15 | has also assisted in fraudulent surgeries at BHOSC and West
16 | Olympic.

17 | 316.  Both Dr. Fernando and Dr. Siegel have continued to
18 | commit fraud at other facilities at the same time that they
19 | operate at Wilshire Outpatient. Dr. Fernando has continued to
20 | perform surgeries at Moreno Valley, and Dr. Siegel remains the
21 | chief anesthesiologist at West Olympic.

22 |
23 |
24 |
25 |
26 |
27 |
28 |

86

**The Scam In Operation:  Illustrative
Examples of Particular Fraudulent Acts**

317.   The impact of the scheme described above is illustrated by the following examples:

**Patient 61**

318.   Patient 61 is a CIGNA insured from Santa Ana, California.  Ms. 61 had two cosmetic surgeries, both of them fraudulently billed and documented as colporrhaphies.

319.   The first surgery was performed by defendant Zilka at BHOSC on August 9, 1996.  Zilka, BHOSC, Oscar Leal and anesthesiologist Kevin Tehrani all billed and documented that surgery as a colporrhaphy to relieve urinary incontinence.  If Ms. 61 had actually had an incontinence problem, which she did not, that surgery would have solved that problem.

320.   Yet 9 months later, she was at Wilshire Outpatient, supposedly having the exact same surgery for the exact same problem.  On May 7, 1997, defendant Fernando fraudulently billed CIGNA for a second colporrhaphy.  The documentation he submitted to CIGNA makes no reference to the prior identical surgery.

321.   Defendant Grusd fraudulently billed for a pelvic ultrasound that he claims to have performed at defendant Fernando's request on May 5, 1997, two days before the second colporrhaphy.  Yet according to defendant Fernando's records submitted to CIGNA, defendant Fernando first saw the patient on May 7, 1997, the same day as the surgery.

322.   CIGNA paid $17,812 for defendants' fraudulent

87

1 bills on Ms. 61.

2 **Patient 62**

3     323. Patient 62 is a CIGNA insured who lives in
4 Chicago. In 1997, she had two cosmetic surgeries performed by
5 defendant Fernando, one at Moreno Valley and one at Wilshire
6 Outpatient.

7     324. The first surgery was at Moreno Valley on May 5,
8 1997. Moreno Valley, Fernando, and anesthesiologist Agnes Choa
9 fraudulently billed and documented that surgery as a septoplasty
10 and a turbinectomy. However, on a recovery room form a nurse
11 accidentally told the truth. That form indicates that the patient
12 had a cosmetic implant.

13     325. Defendant Sim Hoffman fraudulently billed and
14 documented a sinus CT scan in connection with Ms. 62's Moreno
15 Valley surgery. That scan supposedly was performed on the same
16 day as the surgery, in Anaheim, several hours away from Moreno
17 Valley.

18     326. Ms. 62 either stayed in California after her first
19 surgery or returned briefly to Chicago and then came back. A
20 month after her first surgery, on June 6, 1997, Ms. 62 was back in
21 Fernando's operating room, this time at Wilshire Outpatient.

22     327. Fernando fraudulently billed and documented Ms.
23 62's second surgery as a gynecological procedure, a dilation and
24 curettage ("D&C"), to stop excessive menstrual bleeding. However,
25 the medical record gives him away.

26     328. According to the record, Ms. 62's second surgery

27

28

1  lasted about 3 hours.  A routine D&C like the one described takes
2  a matter of minutes.  The supply list for the surgery includes a
3  surgical blade, and the recovery room record describes the
4  "incision area."  However, there is no need for a blade in a D&C,
5  and there is no incision in that procedure.  A nursing record
6  describes the patient's position during the procedure as "supine."
7  A patient is not in a supine position during a D&C.  These
8  anomalies exist in the record because Ms. 62 did not have a D&C,
9  she had a cosmetic surgery.

10        329.  CIGNA was billed almost $31,000 for these 2
11  cosmetic procedures.

12  **Patient 63**

13        330.  Patient 63 is a United insured from Salinas,
14  California.  Ms. 63 had 3 cosmetic surgeries, the last of them at
15  Wilshire Outpatient.

16        331.  The first two of Ms. 63's cosmetic surgeries were
17  by defendant Strahan at West Olympic, on December 1, 1995 and July
18  12, 1996.  Strahan, West Olympic and L.A. Surgical Group
19  fraudulently billed and documented both those surgeries as
20  septoplasties and turbinectomies.  Howard Siegel was the
21  anesthesiologist on both of those fraudulent surgeries.

22        332.  Siegel was also the anesthesiologist on Ms. 63's
23  third cosmetic surgery.  That surgery was performed by defendant
24  Rolando Fernando at Wilshire Outpatient on June 13, 1997.
25  Fernando, Siegel, and Wilshire Outpatient fraudulently billed and
26  documented that surgery as excision of a breast cyst.

27

28                                89

1        333.   Defendants Hoffman and Grusd both played a role in
2   the fraudulent surgeries involving Ms. 63.   Hoffman fraudulently
3   billed and documented a facial and sinus CT scan and x-ray on Ms.
4   on November 22, 1995, just before her first surgery by defendant
5   Strahan at West Olympic.   Defendant Grusd fraudulently billed and
6   documented a mammogram on June 13, 1997, the same day that
7   defendant Fernando performed the phony breast surgery at Wilshire
8   Outpatient.

9        334.   United paid a total of $47,765 for Ms. 63's three
10  fraudulent surgeries.

11  **Patient 64**

12       335.   Patient 64 is a United insured from Santa Ana,
13  California.   Ms. 64 had two cosmetic surgeries from defendants,
14  the second at Wilshire Outpatient.

15       336.   On November 15, 1996, Ms. 64 had a cosmetic
16  surgery performed by defendant Zilka at Moreno Valley.   Zilka and
17  Moreno Valley fraudulently billed and documented that surgery as a
18  colporrhaphy to relieve urinary incontinence.

19       337.   On May 8, 1997, Ms. 64 had her second cosmetic
20  surgery, by defendant Fernando at Wilshire Outpatient.   Fernando,
21  Wilshire Outpatient, and anesthesiologist Howard Siegel
22  fraudulently billed and documented that surgery as a septoplasty
23  and a turbinectomy.

24       338.   United paid $29,928 relying on the fraudulent
25  bills for these procedures.

26

27

28                                  90

1 **Patients 65 through 68**

2      339.   Defendants Newman and Jorgensen also practiced
3 fraud at Wilshire Outpatient along with Dr. Fernando.  All three
4 had performed fraudulent surgeries at BHOSC in 1996, and Fernando
5 and Newman had also been colleagues in fraud at Moreno Valley.

6      340.   Patient 65 is an Aetna insured from Portland,
7 Oregon.  On March 20, 1998, without ever having had a prior
8 consultation with Dr. Newman, Ms. 65 had cosmetic surgery
9 performed by Dr. Newman at Wilshire Outpatient.  Newman,
10 anesthesiologist Howard Siegel, and Wilshire Outpatient
11 fraudulently billed and documented the surgery as a hysteroscopy
12 and a laparoscopy.

13      341.   Five months later, Ms. 65 was back on the L.A.
14 cosmetic surgery circuit, this time in the hands of defendant
15 Strahan.   On August 14, 1998, Ms. 65 had cosmetic facial surgery
16 by defendant Strahan at West Olympic that he fraudulently billed
17 and documented as a turbinectomy and other nasal procedures.
18 Defendant Grusd billed for a fraudulent nasal CT scan in
19 connection with that surgery.

20      342.   Relying on these defendants' fraudulent bills,
21 Aetna paid a total of $23,399 in connection with Ms. 65's two
22 cosmetic surgeries.

23      343.   Patient 66 is an Aetna insured from Carrollton,
24 Texas.   On May 23, 1997, she had cosmetic surgery performed by
25 defendant Newman at Wilshire Outpatient.

26      344.   Ms. 66's first appointment in California
27
28                                91

apparently was with defendant Hector Arnazzi, who billed for an office visit with her on May 22, 1997, the day before the surgery. That same day, she was sent for radiology to defendant Hoffman.

345.   However, by the next day, she was Dr. Newman's patient.  Newman, anesthesiologist Howard Siegel and Wilshire Outpatient fraudulently billed and documented the surgery as a colporrhaphy and related procedures to alleviate urinary incontinence.  Aetna paid $15,947.

346.   Patient 67 is an Aetna insured from San Dimas, California.  She had two fraudulent cosmetic surgeries by defendant Jorgensen.  The first was on July 29, 1997 at Wilshire Outpatient, which Jorgensen, Siegel and the clinic fraudulently billed and documented as gynecological procedures.  Less than two months later, on September 17, 1997, Jorgensen performed a second cosmetic procedure on Ms. 67, this one a supposed colporrhaphy at Monroe.  Aetna paid a total of $43,579 for the two Jorgensen surgeries.

347.   Patient 68 is an Aetna insured from Paramount, California.  Ms. 68 also had two cosmetic surgeries.  The first was by defendant Jorgensen at Wilshire Outpatient on May 18, 1998, disguised as a colporrhaphy.  The second was four months later, on September 15, 1998, a supposed septoplasty at another clinic, Tustin Outpatient Surgery Center, at which Jorgensen is also active and which is owned by defendant Teofilo Po.  In between the two surgeries, on June 26, 1998, Ms. 68 was passed briefly to defendant Arnazzi for an office visit.

92

1      348.   Aetna paid $14,812 in connection with Ms. 68's two
2  cosmetic surgeries.

3
4              **E. The Westwood Surgery Center**
               **Branch of the Scam**

5      349.   Another fraudulent clinic with ties to BHOSC is
6  defendant Westwood Surgery Center.

7  **1.   Ownership/Administration -- Herbert Hudson and Thomas Cloud**

8      350.   The owner of Westwood is defendant Cal Surge, Inc.
9  The sole shareholder of Cal Surge, Inc. is defendant Herbert
10 Hudson.

11     351.   Hudson is not a doctor, and his primary business
12 experience has been as the owner and operator of a chain of
13 chicken and waffles restaurants in Los Angeles and elsewhere.  To
14 run the operation at Westwood, Hudson employed a defrocked doctor
15 named Thomas Cloud.

16     352.   In 1986, Cloud's medical license was revoked by
17 California licensing authorities because he was found to have
18 forged and sold hundreds of phony prescriptions for dangerous
19 drugs and controlled substances.  Prior to that, Cloud had been
20 disciplined by the Medical Board of Alabama for prescribing a
21 controlled substance without a legitimate medical purpose.

22     353.   In December 1995, Cloud's license was reinstated
23 for a 5-year probationary period.  During that probation, Cloud
24 was "prohibited from acting as a medical director, administrator,
25 or supervisor of any licensed health care facility."  Despite that
26 prohibition, Cloud served as Administrator and Director of

27
28                              93

1 Operations at Westwood, where, according to a contract he signed,
2 he was "fully responsible for all medical procedures, patient
3 medical care and medical supplies."

4     354.  Westwood began operations in early 1996, under a
5 temporary license from California licensing authorities.  Westwood
6 later applied for a permanent license, but the California
7 authorities denied that application, citing "problems existing at
8 the surgery center [that] are so serious as to effect the delivery
9 of adequate patient care."  Undeterred, Westwood continued its
10 activities.

11     355.  Cloud and Hudson were aware of the fraudulent
12 activities at Westwood and directly benefitted from that
13 wrongdoing.

14 **2.  Recruitment at Westwood**

15     356.  One of the first things Hudson and Cloud did after
16 opening Westwood was to retain the services of a patient recruiter
17 named Davis Bao.  In July 1996, Hudson and Cloud signed an
18 employment agreement with Bao under which Bao was to act as
19 Manager and Marketing Director of Westwood.  Under that agreement,
20 Bao was to use his contacts in the Asian-American community to
21 procure at least 10 new patients each month to have surgery at
22 Westwood.  In return for his services, Bao was to receive 35% of
23 Westwood's net profits, with Hudson and Cloud sharing the
24 remaining 65%.

25     357.  Hudson and Cloud also had agreements with other
26 recruiters to send patients to Westwood.  One of those other

27

28     94

1 recruiters was Kim Pham, who operated through a company called
2 Beverly Hills Beauty Consultants. Xuan Lani, who recruited out of
3 a beauty salon in Westminster, also sent patients to Westwood.

4 **3. Doctors and Surgeries at Westwood**

5       358.  Like the other clinics, the staff at Westwood has
6 included several surgeons who honed their fraud skills at BHOSC.
7 Those surgeons include defendants Ezeckiel Zilka, Abasali Amir-
8 Jahed, Kong Koh, Hector Arnazzi, and William Jorgensen.  Other
9 surgeons who performed surgeries on patients at Westwood include
10 Steven Burres, who also performed surgeries at defendant Advanced
11 Laser; Mamdouh Bahna, who also performed surgeries at defendant
12 Wilshire West; and Mohsen Tavoussi, who also performed surgeries
13 at defendants Advanced Laser and Mariners Bay.

14 **The Scam In Operation:  Illustrative
Examples of Particular Fraudulent Acts**

15
16       359.  The impact of the scheme described above is
illustrated by the following examples:
17
**Patient 69**
18
19       360.  Patient 69 is a Prudential insured who lives in
20 Laguna Beach, California.  In mid-1996, Ms. 69 told a co-worker,
21 Vicky, that she wanted to have cosmetic surgery to remove a mole
22 on her hip.  The co-worker said that she knew of a surgery center
23 where the mole could be removed and Ms. 69's insurance would pay
24 for it.  Ms. 69 gave Vicky her insurance card, and the next day
25 Vicky confirmed that Ms. 69's insurance would cover the mole
26 removal.

27       361.  About two weeks later, Ms. 69 went with Vicky to

28                              95

Westwood.  That day, Ms. 69 signed some forms and was given a blood test by clinic staff, but did not meet with any doctors.

362.  On October 23, 1996, Vicky drove Ms. 69 to Westwood, where her mole was removed by defendant Ezeckiel Zilka. The procedure took about 15 minutes.  Ms. 69 did not have any other procedures done that day.

363.  Though defendant Zilka only removed a mole from Ms. 69's hip, he fraudulently billed Prudential almost $7,000 for several gynecological procedures that he claimed he performed on her.  He also billed $350 for a pre-surgery consultation on October 21, 1996 that never occurred.  Westwood fraudulently billed almost $17,000 in clinic charges for the supposed gynecological surgeries.  The anesthesiologist, Artis Woodward, billed another $1,700.  Defendants prepared false medical records and other documentation in connection with those phony surgeries.

364.  Defendant Steven Burres fraudulently billed Prudential $405 for performing a nasal diagnostic procedure, a nasal endoscopy, on Ms. 69 on October 3, 1996, three weeks before the gynecological procedures supposedly performed by defendant Zilka.  Defendant Mohsen Tavoussi fraudulently billed Prudential $825 for supposedly performing another nasal endoscopy on October 24, 1996, the day after the supposed gynecological surgeries. Those nasal endoscopies either were not performed at all, or their results were deliberately misinterpreted or exaggerated to supply cover for cosmetic surgeries that never materialized.

365.  Prudential paid a total of $19,397 in reliance on

96

1  the fraudulent bills submitted by the Westwood providers in
2  connection with Ms. 69.

3          366.  After Ms. 69 learned about the exorbitant charges
4  that had been billed to Prudential for her mole removal, she went
5  to Westwood and complained in person to defendant Thomas Cloud,
6  the administrator of Westwood.  Defendant Cloud offered Ms. 69 a
7  bribe if she would agree not to tell Prudential about her
8  complaints.  Ms. 69 refused.

9  **Patients 70 and 71**

10         367.  Patient 70 is a CIGNA insured who lives in
11 Palmdale, California.

12         368.  In April 1997, defendant Mamdouh Bahna
13 fraudulently billed for a cosmetic surgery on Patient 70.  Before
14 that surgery, on March 21, 1997, Ms. 70 was referred to defendant
15 Ronald Grusd for a sinus CT scan.  At that point, Ms. 70 had not
16 even had an office visit with defendant Bahna.  Instead, the
17 referral was made by defendant Thomas Cloud, the administrator of
18 Westwood.  Cloud made that referral so that Grusd could report
19 phony nasal symptoms that would provide cover for the cosmetic
20 surgeries Ms. 70 desired.

21         369.  On April 5, 1997, Bahna performed about $3\frac{1}{2}$ hours
22 of surgery on Ms. 70, fraudulently billing and documenting it as a
23 septoplasty.

24         370.  Some of the procedures that defendant Bahna
25 actually performed that day are identified in notes that he made
26 the day of the surgery.  Those notes state: "Patient desires
27
28                                97

1  chemical peel [and] blepharoplasty [cosmetic eyelid surgery]. Has
2  old chin implant that [is] not satisfactory [and] desires change
3  of implant."   Later in those notes, Bahna lists among the
4  procedures to be performed: "four quadrant bleparoplasty,"
5  "replacement of conventional chin implant," and "peel to face."
6  None of those procedures are disclosed in any of Bahna's operative
7  reports.

8            371.  Four days after the surgeries, Bahna performed a
9  follow-up surgery on Ms. 70 to stop postoperative bleeding from
10  her nose.  Bahna performed that follow-up surgery not at Westwood
11  but at his own clinic, Wilshire West.

12            372.  CIGNA paid $4,430 relying on the fraudulent
13  billings for these surgeries.

14            373.  Bahna also performed a cosmetic surgery at
15  Westwood on Patient 71, a United insured from Lancaster,
16  California.  Bahna and Westwood fraudulently billed that surgery,
17  on March 22, 1997, as a septoplasty.  Defendant Grusd billed for a
18  phony nasal CT scan the day before that surgery.

19            374.  About three years earlier, Ms. 71 had a cosmetic
20  surgery at BHOSC by defendant Koh.  It, too, was fraudulently
21  billed as a septoplasty.

22            375.  United paid a total of $35,563 for those two
23  fraudulent surgeries.

24

25

26

27

28                                      98

1 **Patients 72 through 76**

2        376.   The diagnoses that defendants assigned to patients
3 had no meaning except as camouflage for fraud.  As a result, when
4 a patient was passed from doctor to doctor within the scam, as
5 patients often were, the patient's diagnosis could change from
6 week to week or even day to day.  An example of that phenomenon
7 involves Patient 72.

8        377.   Ms. 72 is a CIGNA insured from Springfield,
9 Virginia.  On July 14, 1997, defendant Mohsen Tavoussi, a facial
10 surgeon, referred Ms. 72 for radiology to defendant Sim Hoffman.
11 Tavoussi made the referral with a phony diagnosis of acute
12 sinusitis.  Hoffman knew the diagnosis was phony, and obliged by
13 performing a fraudulent sinus CT scan and x-ray.

14        378.   A week later, July 21, 1997, with Tavoussi's nasal
15 diagnosis still in place, it was defendant Steven Burres' turn.
16 Burres, a close associate of defendant Tavoussi, billed for a
17 nasal diagnostic procedure called a nasal endoscopy.

18        379.   The next day, however, a new doctor entered the
19 picture, and the diagnosis changed.  On July 22, defendant Hector
20 Arnazzi billed for an office visit with Ms. 72.  Arnazzi, a
21 gynecologist, billed the visit under a diagnosis of vaginal
22 prolapse and urinary incontinence.  The next day, July 23, 1997,
23 Arnazzi performed a cosmetic surgery which he fraudulently billed
24 as a colporrhaphy.

25        380.   Abrupt changes in doctors, as with Ms. 72, reflect
26 the vigorous competition among doctors for the opportunity to
27
28                                    99

1 perform lucrative surgeries on patients.  In many instances, the
2 winner of that competition was determined by the recruiter who
3 controlled the patient.  In Ms. 72's case, the recruiter was Xuan
4 Lani, who operated out of a beauty salon in Westminster.  Indeed,
5 Xuan Lani's name appears on defendant Arnazzi's bill for the
6 surgery he performed on Ms. 72, in the box marked "referring
7 physician or other source."

8        381.  Xuan Lani's name appears in the same box on
9 defendant Arnazzi's surgical bills for other patients at about the
10 same time.  Another example is Patient 73, also a CIGNA insured.
11 On July 18, 1997, 5 days before the surgery on Ms. 72, Xuan Lani
12 delivered Ms. 73 to Arnazzi to have breast implants.  Arnazzi
13 fraudulently billed that breast implant procedure as a
14 hysteroscopy.

15        382.  Other CIGNA-insured patients that Xuan Lani
16 recruited for defendant Arnazzi include Patient 74 (Surgery Date:
17 August 13, 1997) and Patient 75 (Surgery Date: September 25,
18 1997).  Arnazzi performed cosmetic surgeries on both those women
19 but fraudulently billed and documented the surgeries as medically
20 necessary gynecological procedures.

21        383.  At times, uncertainty among the defendants as to
22 which cover diagnosis and procedure to use led to total confusion.
23 For example, Patient 76 is a CIGNA insured from San Jose.  On
24 February 4, 1997, defendant Thomas Cloud referred Ms. 76 for
25 radiology to defendant Ronald Grusd under a diagnosis of ethmoidal
26 sinusitis.  Grusd performed a sinus CT scan and fraudulently

27

28                                 100

1 reported a deviated septum and sinusitis.

2        384.   The next day, February 5, 1997, Ms. 76 had
3 cosmetic surgery at Westwood.  Westwood's bill identifies Ms. 76's
4 diagnosis as deviated septum and sinus disease and the procedures
5 performed as a septoplasty and a turbinectomy.  However, defendant
6 Tavoussi, who performed the surgery, and anesthesiologist Artis
7 Woodward, submitted bills and operative reports that make no
8 reference to any nasal diagnosis or procedure, but instead reflect
9 a skin disorder and an eyelid repair.  In other words, the left
10 hand of the fraud lost track of what the right hand was doing.

11        385.   Westwood's bills exhibit the same suspicious
12 uniformity as BHOSC's bills, described above.  For example,
13 Westwood's bills for many of its supposed nasal surgeries,
14 including those on Patients 70 and 76 above, are identical, to the
15 item and to the penny -- $14,220.49.

16 **Patient 77**

17        386.   Patient 77 is a United insured from Las Vegas,
18 Nevada.

19        387.   On November 16, 1996, defendant Tavoussi
20 fraudulently diagnosed Ms. 77 with a deviated septum requiring a
21 septoplasty and a turbinectomy.  However, before Tavoussi could
22 perform that surgery, Ms. 77 came down with a more pressing non-
23 existent condition, a hernia.  Defendant Amir-Jahed supposedly
24 diagnosed that condition on November 23, 1996 (a Saturday), and on
25 the following Tuesday, November 26, he performed what he claimed
26 in fraudulent billings was a hernia repair at Westwood.

27

28                                  101

388. In the meantime, defendant Po somehow displaced defendant Tavoussi. On December 2, 1996, Po performed Ms. 77's second cosmetic surgery within a week. He performed that surgery at Moreno Valley, fraudulently billing and documenting it as a septoplasty and a turbinectomy.

389. United paid $28,162 for Ms. 77's two cosmetic surgeries.

**Patient 78**

390. Patient 78 is a United insured from San Jose.

391. On March 13, 1997, defendant Amir-Jahed billed for an initial consultation with Ms. 78. The very next day, March 14, Amir-Jahed claimed to have performed both a colporrhaphy and a breast cyst excision on Ms. 78 at Westwood. In fact, Amir-Jahed did not perform those two surgeries but two cosmetic surgeries.

392. The same day as the two surgeries, defendant Grusd fraudulently billed and documented performing a mammogram on Ms. 78.

393. The charge to United for the day's fraud was over $24,000. United paid $14,557 in reliance on defendants' fraudulent bills.

**Patients 79 and 80**

394. On August 1, 1997, defendant Koh performed cosmetic facial surgeries at Westwood on two Aetna insureds from San Jose, Patients 79 and 80.

395. In each case, Westwood, Koh, and anesthesiologist Artis Woodward knowingly prepared false bills and medical records

102

1  that misrepresented that the patients had deviated nasal septums,
2  airway blockage, and other dysfunctional nasal symptoms and
3  conditions, and that a septoplasty and a turbinectomy had been
4  performed to alleviate those symptoms and conditions.  Defendant
5  Grusd prepared false radiology reports in each case to provide
6  apparent substantiation for the non-existent symptoms and
7  conditions and the need for functional nasal surgery.  In fact,
8  both patients sought and received only cosmetic surgery.

9        396.  As a result of defendants' fraudulent
10  misrepresentations, Aetna paid defendants $16,849 for the two
11  surgeries.

12  **Patients 81 through 83**

13        397.  Another surgeon who had a piece of the corrupt
14  action at Westwood was defendant William Jorgensen. In the
15  following examples, Jorgensen submitted bills for serving as an
16  assistant surgeon on Westwood surgeries performed by Dr. Adel
17  Samaan.

18        398.  Patient 81 is a CIGNA insured from San Jose who
19  had three cosmetic surgeries involving several different
20  defendants.  Ms. 81 began on March 19, 1997 at Westwood.  There,
21  she supposedly had a colporrhaphy and a hernia repair on the same
22  day by Dr. Samaan, with Dr. Jorgensen assisting.  In fact, those
23  were cosmetic surgeries.

24        399.  Ms. 81 continued her tour of the caption on
25  September 18, 1997, with a cosmetic facial surgery by defendant
26  Tavoussi.  That surgery was followed two months later, on November
27

28                                    103

1  15, 1997, by another cosmetic facial surgery performed by
2  defendant Bahna at Wilshire West. Both of those surgeries, two
3  months apart, were fraudulently billed and documented as
4  septoplasties.

5        400. Defendants Grusd and Hoffman tripped over each
6  other providing phony radiology reports for Ms. 81's last two
7  surgeries. Hoffman billed for a nasal CT scan he supposedly
8  performed on Ms. 81 on September 17, 1997. His report, which
9  indicates that the patient was referred by Dr. Tavoussi, states
10 that the patient had "bilateral ethmoid sinusitis," "deviation of
11 the nasal septum to the left," and "enlargement of the right and
12 left inferior turbinates which contributes to narrowing of the
13 right and left nasal canals." Those conditions, if they had
14 existed, would have been corrected by the septoplasty that
15 Tavoussi claimed he performed the following day, if he had
16 performed such a surgery.

17        401. However, on November 14, 1997, the day before Ms.
18 81's supposed second septoplasty (by Dr. Bahna), defendant Grusd
19 issued a report of a CT scan that he supposedly did on Ms. 81.
20 In his report, Grusd claimed to have found the same conditions
21 that Hoffman claimed to have found before the purported first
22 septoplasty by Dr. Tavoussi -- sinusitis, septal deviation, and
23 obstructed airways.

24        402. CIGNA paid a total of $23,987 for Ms. 81's
25 cosmetic surgery.

26        403. Patients 82 and 83 are two Aetna insureds from
27

28                                104

1  Amarillo and Garland, Texas, respectively.  On December 18, 1996,
2  Ms. 82 had cosmetic surgery performed by Dr. Samaan at Westwood,
3  with defendant Jorgensen acting as assistant surgeon.  Westwood,
4  Samaan, and Jorgensen all submitted fraudulent bills for a
5  combination colporrhaphy and hernia repair.  The same fraudulent
6  bills and documentation using the same pretext were generated for
7  a cosmetic surgery by Dr. Samaan on Patient 83 on February 18,
8  1997, again with defendant Jorgensen assisting.

9      404.  Aetna paid $46,374 for the Westwood surgeries on
10  these two Texas patients.

11  **Patient 84**

12      405.  Patient 84 is a Prudential insured who lives in
13  Laguna Niguel, California.  She contacted Westwood on the
14  recommendation of a friend because she wanted to have some
15  unsightly skin removed from around a caesarian section scar.

16      406.  In August 1997, Ms. 84 went to Westwood and met
17  defendant Ezeckiel Zilka.  Zilka told her that she would not have
18  to pay anything for the cosmetic procedure unless her insurance
19  company did not pay.

20      407.  On September 27, 1997, defendant Zilka performed a
21  cosmetic surgery to remove the excess skin from around Ms. 84's
22  scar.  He fraudulently billed $6,650 for the procedure, disguising
23  it on his bill and in associated medical records as a medically
24  necessary gynecological procedure.  Westwood fraudulently billed
25  more than $16,000 in clinic charges, and there were $1,900 in
26  anesthesia charges from Dr. Woodward.  Defendant Sim Hoffman
27

28                                   105

1 fraudulently billed almost $2,000 for a CT scan of Ms. 84's nose
2 even though he knew that there was nothing wrong with Ms. 84's
3 nose and even though defendant Zilka later claimed he performed a
4 gynecological surgery.  Those defendants also prepared false
5 medical records and other documentation to disguise Ms. 84's scar
6 repair as a medically necessary procedure.

7 408.  Prudential paid $22,250 in reliance on the
8 fraudulent bills submitted in connection with Ms. 84's cosmetic
9 scar removal.

10 **Patients 85 and 86**

11 409.  As noted in prior examples, defendant Steven
12 Burres routinely billed for phony nasal procedures called
13 endoscopies, as well as bogus diagnostic tests, that helped set up
14 phony nasal surgeries by other surgeons at Westwood, including
15 defendant Tavoussi.  However, Burres also performed phony
16 surgeries himself at Westwood, as he did at Advanced Laser and
17 elsewhere.

18 410.  Patient 85 is an Aetna insured from Uniondale, New
19 York.  On June 28, 1996, defendant Burres performed a cosmetic
20 surgery on Ms. 85 at Westwood, which he and Westwood fraudulently
21 billed and documented as a septoplasty.  Defendant Hoffman
22 fraudulently billed for a nasal CT scan days before the surgery.

23 411.  Patient 86 is an Aetna insured from Anaheim,
24 California.  She, too, had a cosmetic surgery performed by
25 defendant Burres at Westwood, on October 30, 1996, that Westwood
26 and Burres fraudulently billed as a septoplasty.  She had also had

27

28

106

1 a prior phony septoplasty four months earlier at BHOSC, and two
2 weeks before that, she had a phony breast cyst excision at BHOSC.

3        412.  Between Patients 85 and 86, defendants defrauded
4 Aetna of $59,639.

5 **Patient 87**

6        413.  Patient 87 is a Humana insured from Georgia. On
7 October 14, 1997, Ms. 87 had a surgery performed by defendant
8 Zilka at Westwood.

9        414.  After the surgery, Zilka filled out a form called
10 a "Physician Attestation Statement." That document required Zilka
11 to state Ms. 87's primary diagnosis and the surgical procedures he
12 performed on her.  Zilka wrote that Ms. 87 had a "ventral hernia"
13 and that he had performed a "ventral hernia repair." Zilka then
14 signed the document under a printed paragraph that reads:

16            I certify that the narrative description of
17            the primary and the secondary diagnosis and/or
18            the major procedure(s) performed are accurate
19            and complete to the best of my knowledge.  I
20            certify such under the penalty of perjury and
21            under the duress of knowing that falsification
22            of this form shall result immediately in a 850
23            report filed with the California Medical Board
24            and immediate suspension of staff privileges.

25        415.  Though Zilka swore under penalty of perjury that
26 Ms. 87 had a "ventral hernia" and that he performed a "ventral
27

28                              107

1 hernia repair," Ms. 87 had no such problem and Zilka performed no
2 such procedure. It was defendant Grusd who exposed Zilka's lie.

3        416.  The day before Ms. 87's surgery, Zilka sent Ms.
4 87 to Grusd for a pelvic CT scan. But he apparently did not let
5 Grusd know that he intended to disguise her cosmetic surgery as a
6 ventral hernia repair. As a result, Grusd told the truth, stating
7 in his report: "There are no ventral hematomas or ventral
8 hernias."

9        417.  Defendants billed Humana more than $25,000 for
10 Ms. 87's phony hernia repair.

11
12                **F.  The West Olympic Surgery Center**
                    **Branch of the Scam**

13        418.  Just as the fraudulent activities at BHOSC were
14 beginning to intensify, another fraud behemoth in West Los Angeles
15 was getting started. That clinic was defendant West Olympic
16 Surgery Center and Laser Institute.

17 **1. Ownership -- Ronald W. Strahan**

18        419.  West Olympic was started in 1994 by a cosmetic
19 surgeon, defendant Ronald Strahan, who is the sole shareholder of
20 West Olympic. Strahan and a partner owned the building at 11570
21 West Olympic, where Strahan had previously maintained his medical
22 offices. In October 1994, Strahan and his partner leased space in
23 the building to Strahan's new venture. West Olympic immediately
24 went into high fraud gear, and has remained there ever since.

25
26
27
28                                    108

**2.    Doctors and Surgeries at West Olympic**

420.    The medical staff at West Olympic included Strahan himself and defendants Clifford Ermshar, Lee Newman, Alvin Reiter, Ezeckiel Zilka and Abasali Amir-Jahed, among others.  Strahan and Reiter primarily performed cosmetic facial surgeries and liposuction that they disguised and fraudulently billed as medically necessary nasal surgeries.  Ermshar, Newman, Zilka and Amir-Jahed primarily performed liposuction and tummy tucks that they disguised and billed as gynecological procedures and hernia repairs.

421.    Ermshar, Newman, Zilka and Amir-Jahed also performed fraudulent surgeries at BHOSC.  In 1995, Ermshar and Newman were on the surgical staffs of both West Olympic and BHOSC at the same time, and performed fraudulent surgeries at both clinics.

422.    Howard Siegel has been the chief anesthesiologist at West Olympic since 1995.  When defendant Strahan first appointed Siegel to that position, Siegel was on probation for using narcotics while performing anesthesia at four different hospitals, and for falsifying clinical records to disguise his theft of those narcotics.  Prior to his appointment at West Olympic, Siegel had participated in fraudulent surgeries at BHOSC. Since then, Siegel has facilitated countless fraudulent surgeries both at West Olympic and at Wilshire Outpatient.

423.    In mid-1995, Strahan formed a company called Los Angeles Surgical Medical Group to bill for the services of doctors

109

1 | at West Olympic.  Strahan is the sole shareholder of Los Angeles
2 | Surgical Medical Group.  Since its inception, Strahan has used
3 | that company to submit hundreds of fraudulent bills, including
4 | bills for his own services and for the services of Ermshar,
5 | Reiter, Siegel and others.

6 | **3.  Guilty Pleas by West Olympic Participants**

7 | 424.  In May 1999, defendants Strahan and Reiter pled
8 | guilty to multiple counts of mail fraud in connection with their
9 | activities at West Olympic.  The familiar outline of their crimes
10 | is described in the Information to which Strahan pled guilty:

> In order to obtain insurance company
> payments for the costs of these elective
> cosmetic surgeries, defendant STRAHAN would
> take the following actions, among others:
>
> Defendant STRAHAN would falsely diagnose
> certain patients with a medical problem which
> required a medically necessary surgery.  For
> example, some patients who wanted liposuction
> were falsely diagnosed as having sinus or
> nasal disorders which required surgeries, the
> costs of which were covered by insurance
> company policies.  Similarly, other patients
> who wanted a "nose job" were falsely diagnosed
> as having sinus or nasal disorders or as
> having suffered an accident which required
> surgeries, the costs of which were likewise

110

1         covered by insurance company policies.

2             Defendant STRAHAN would counsel some

3         patients that, in order to bill insurance

4         companies for the costs of elective cosmetic

5         surgeries, it would be necessary to fabricate

6         a medical condition or an accident which would

7         justify billing for a medically necessary

8         surgery. . . .

9             Defendant STRAHAN would perform elective

10        cosmetic surgeries on patients, but would not

11        perform the medically necessary surgeries

12        which he would later falsely claim to the

13        insurance companies he had performed.

14           Once defendant STRAHAN had completed an

15        elective cosmetic surgery, he would sometimes

16        prepare an operative report which falsely

17        stated that he had diagnosed the patient with

18        a medical problem and that he had corrected

19        the medical problem through a medically

20        necessary surgery. In his operative report,

21        defendant STRAHAN would not mention that he

22        had performed an elective cosmetic surgery on

23        the patient.

24           Defendant STRAHAN would then cause bills

25        to be submitted to the patients' insurance

26        companies which falsely stated that defendant

27

28                   111

1                 STRAHAN had performed medically necessary

2                 surgeries on the patients, and which requested

3                 payments from the insurance companies for the

4                 costs of these medically necessary surgeries.

5                 In truth and in fact, as defendant STRAHAN

6                 well knew, he had not performed these

7                 medically necessary surgeries on the patients.

8

9    The Information to which defendant Reiter pled guilty is to the same effect.

10

11         425.  A recruiter for West Olympic, Luis Sandoval, has

12    pled guilty to recruiting patients for cosmetic surgery at West

13    Olympic through a feeder clinic owned by Strahan, and to coaching

14    those patients to make up phony medical symptoms to assist in deceiving insurers.

15         426.  Most recently, in August 1999, a lawyer named

16    Gustavo Zarate pled guilty to shredding hundreds of pounds of

17    incriminating documents at West Olympic in an attempt to thwart

18    the Government's investigation of West Olympic. At the time,

19    Zarate was a law student who was employed as an administrative

20    assistant at West Olympic.  The documents that were shredded

21    included thousands of "surgery checklists" for West Olympic

22    patients which identified the cosmetic surgeries actually

23    performed on the patients as well as the phony medical procedures

24    that were fraudulently billed to insurers.

25

26

27

28                       112

1 **4.  Patients at West Olympic**

2          427.  West Olympic's patient population has been
3 primarily Hispanic.  West Olympic and Strahan attracted Hispanic
4 patients by advertising in Spanish-language media and by direct
5 recruiting in Hispanic communities.

6          428.  For example, Strahan owns a storefront clinic in
7 East Los Angeles called East L.A. Cosmetic Surgery, which he and
8 the other West Olympic surgeons have used as a feeder clinic for
9 Hispanic patients destined for cosmetic surgery.  Luis Sandoval,
10 the West Olympic recruiter who pled guilty, recruited patients
11 through East L.A. Cosmetic Surgery.  Next door to East L.A.
12 Cosmetic Surgery is another clinic that also channels patients to
13 West Olympic, and which is run by Dr. Barry J. Freeman and a
14 defrocked doctor named Larry Borden.  These individuals are
15 associated with companies called C.R.V. Medical Services and
16 Summit Medical Associates.  A large number of West Olympic's
17 patients since 1995 have been recruited through Freeman, Borden
18 and their companies.  Freeman, Borden and their companies have
19 also submitted fraudulent bills to plaintiffs for many of the same
20 patients, including for fictitious treatments for sinusitis,
21 cystic acne and back pain.

22 **The Scam In Operation:  Illustrative
Examples of Particular Fraudulent Acts**
23

24          429.  The impact of the scheme described above is
illustrated by the following examples:
25

26

27

28                                      113

**Patient 88**

430. Patient 88 is a United insured from Glendale, California.

431. On November 15, 1996, Strahan performed a cosmetic surgery on Mr. 88 at West Olympic. Strahan and West Olympic fraudulently billed and documented the surgery as a turbinectomy to relieve Mr. 88's sinus problems. The surgery was actually a cosmetic eyelid surgery and a liposuction procedure.

432. Defendant Grusd facilitated the fraud involving Mr. 88. On October 9, 1996, a month before the surgery, Grusd fraudulently billed and documented a nasal CT scan on Mr. 88.

433. On December 8, 1997, Strahan sent a letter to United demanding payment for the November, 1996 surgery. In that letter, Strahan stated:

> This patient was first seen by me on September
> 25, 1996. He was a 49-year-old male who had
> some treatment for sinus disease in the past,
> however, he did not remember who did it or
> where it was done.

434. In fact, Strahan knew perfectly well who had previously treated Mr. 88 because it was Strahan himself. In November 1993, Strahan billed for a turbinectomy on Mr. 88, the same procedure he had supposedly performed again in November 1996. Strahan misrepresented when he had first seen Mr. 88, and pretended not to know who Mr. 88's prior doctor was, so that

114

1 United would not question why Strahan appeared to have performed
2 the same procedure twice.

3        435.   United paid Strahan and West Olympic $17,979
4 relying on the fraudulent billing for Mr. 88's cosmetic surgeries.
5 **Patients 89, 90 and 91**

6        436.   One of the most concentrated clusters in the case
7 involved a large group of Aetna insureds who worked for a food
8 products company in Southern California.  From late July through
9 early December of 1996, at least 21 employees of that company had
10 cosmetic surgeries at West Olympic performed by defendants
11 Strahan, Reiter and Ermshar.  Most of those surgeries were
12 fraudulently billed as septoplasties, with a handful fraudulently
13 billed as colporrhaphies, hernia repairs and gynecological
14 surgeries.

15       437.   During one week in September of 1996, the stream
16 of patients from that company to West Olympic became a flood.
17 From September 17 to September 24, 10 patients from the company
18 had a total of 13 cosmetic surgeries, including 4 patients on
19 September 20, and 3 patients on September 24.

20       438.   Defendant Alvin Reiter performed cosmetic
21 surgeries on 3 of the patients during that week -- Patient 89 on
22 September 20, 1996, Patient 90, also on September 20, 1996, and
23 Patient 91 on September 24, 1996.  Defendant Reiter and West
24 Olympic fraudulently billed each of those cosmetic surgeries as a
25 septoplasty, and prepared false documentation of those supposed
26 septoplasties.

27

28                                    115

1              439.   Defendant Hoffman also supplied phony
2  documentation and submitted a fraudulent bill in connection with
3  the surgeries on Patients 89, 90 and 91, claiming to have
4  performed a nasal CT scan several days before each of the
5  septoplasties.

6              440.   Aetna paid in excess of $300,000 in connection
7  with the surgeries in this cluster.

8  **Patient 92**

9              441. Patient 92 is a CIGNA insured from San Jose.

10             442. On November 23, 1996, defendant Zilka performed a
11  cosmetic surgery on Ms. 92 at West Olympic.  He fraudulently
12  billed and documented that surgery as a colporrhaphy to relieve
13  urinary incontinence.

14             443. As with many patients in this case, once was not
15  enough for Ms. 92.  In mid-January, Ms. 92 again flew the cosmetic
16  surgery shuttle from San Jose to Los Angeles.  This time, her
17  destination was BHOSC.  On January 17, 1997, defendant Koh
18  performed a cosmetic facial surgery on Ms. 92 at BHOSC.  He
19  fraudulently billed and documented that surgery as a septoplasty
20  and a turbinectomy.  The day before that surgery, January 16,
21  1997, defendant Grusd did a phony nasal CT scan on Ms. 92.

22             444. CIGNA paid $6,045 in reliance on defendants'
23  fraudulent bills for these cosmetic surgeries.

24

25

26

27

28                                116

**Patient 93**

445. Patient 93 is a United insured from West Covina, California.  She had 3 cosmetic surgeries in a year at West Olympic and BHOSC.

446. Her first cosmetic surgery was performed by defendant Newman at West Olympic on June 29, 1995.  Newman and West Olympic fraudulently billed and documented that surgery as a hysteroscopy and a laparoscopy to relieve menstrual dysfunction.

447. A year later, she had two more cosmetic surgeries in succession at BHOSC.  The first, on May 21, 1996, was fraudulently billed and documented as a septoplasty and a turbinectomy.  The second, on June 11, 1996, was fraudulently billed and documented as an excision of a breast cyst.

448. United paid $13,237 relying on these fraudulent bills.

**Patients 94, 95 and 96**

449.  Defendant Amir-Jahed also performed surgeries at West Olympic.  His involvement at that clinic reflects the competition among surgeons for lucrative surgical opportunities.

450.  For instance, Patient 94 was a Humana insured from San Jose.  The first defendant that Ms. 94 saw in Los Angeles was defendant Tavoussi, who billed for an office visit with Ms. 94 on October 14, 1996.  Tavoussi fraudulently billed for that office visit under a false diagnosis of chronic rhinitis, expecting to use that diagnosis in order to disguise a cosmetic facial surgery as a septoplasty.

117

1    451.   Overnight, the doctor and diagnosis changed.   The
2  next day, October 15, 1996, Amir-Jahed entered the picture,
3  billing for an office visit with Ms. 94 under a diagnosis of
4  female stress incontinence.

5    452.   Amir-Jahed got the patient.   On October 16, 1996,
6  Amir-Jahed performed cosmetic surgery on Ms. 94 at West Olympic,
7  fraudulently billing it as a colporrhaphy and a hernia repair.
8  Humana paid $5,432 for the surgery.

9    453.   The competition involving Patient 95, a CIGNA
10  insured from Sunnyvale, California, ended differently.   Again, Dr.
11  Amir-Jahed apparently was not the first defendant to see the
12  patient when she arrived in Los Angeles.   That privilege belonged
13  to defendant Zilka, who billed for an office visit with Ms. 95 on
14  August 12, 1996 under a diagnosis of vaginal prolapse.   Two days
15  later, on August 14, 1996, Amir-Jahed also billed for an office
16  visit with Ms. 95 under the same diagnosis.

17    454.   In the end, Drs. Zilka and Amir-Jahed both billed
18  for a colporrhaphy on Ms. 95.   Dr. Zilka fraudulently billed for
19  performing a colporrhaphy at West Olympic on August 14, 1996, the
20  same day that Amir-Jahed billed for an office visit.   Three days
21  later, on August 17, 1996, Amir-Jahed also fraudulently billed for
22  a colporrhaphy at West Olympic, with a hernia repair thrown in for
23  good measure.   Five days after that, on August 22, 1996, the
24  patient went for another cosmetic surgery, this time at Mariners
25  Bay, which fraudulently billed CIGNA for a supposed excision of a
26  breast mass.

27

28    118

455.    After all the jockeying and the submission of three sets of fraudulent bills, CIGNA paid $23,198.

456.    Dr. Amir-Jahed apparently had Patient 96, a CIGNA insured from Santa Ana, all to himself.  After sending the patient to defendant Hoffman for phony radiology on September 25, 1996, Amir-Jahed fraudulently billed CIGNA for a hernia repair and excision of a breast cyst at West Olympic on September 26, 1996. As a result of the fraud, CIGNA paid $13,250.

**Patient 97**

457.    Patient 97 is an Aetna insured from San Gabriel, California.  Ms. 97 had 4 cosmetic surgeries at West Olympic.

458.    The first three of those surgeries -- on January 29, 1995, October 29, 1995, and January 29, 1996 -- all were performed by surgeons affiliated with L.A. Surgical, and all were fraudulently billed as nasal surgeries.  Defendant Hoffman fraudulently billed for a nasal CT scan on October 5, 1995, before the supposed second septoplasty.

459.    The fourth cosmetic surgery was performed on March 11, 1997 by defendant Ermshar.  Ermshar and West Olympic fraudulently billed that surgery as a colporrhaphy.

460.    Aetna paid a total of $33,309 for those 4 surgeries.

**Patient 98**

461.    Patient 98 is an Aetna insured from Rego Park, New York.  In October 1995, relatives of Ms. 98 had cosmetic surgeries performed by defendants Newman and Ermshar at BHOSC and West

119

1 Olympic.  In January 1997, it was her turn.

2          462.  On January 24, 1997, defendant Newman performed
3 cosmetic surgery on Ms. 98 at West Olympic.  West Olympic, Newman
4 and anesthesiologist Howard Siegel fraudulently billed that
5 surgery as a laparoscopy and a hysteroscopy.  Relying on
6 defendants' fraudulent bills, Aetna paid $6,434.

7 **Patients 99 through 107**

8          463.  West Olympic and its surgeons often fraudulently
9 billed for two cover surgeries in a single day.  In 1995 and 1996,
10 for example, West Olympic and its surgeons frequently billed
11 United for various pairings of septoplasties, colporrhaphies, and
12 hernia surgeries on the same day.  United insureds who supposedly
13 had these twin surgeries include:  Patient 99 (septoplasty and
14 colporrhaphy on September 6, 1996); Patient 100 (hernia repair and
15 colporrhaphy on December 15, 1995); Patient 101 (septoplasty and
16 hernia repair on May 15, 1995); Patient 102 (septoplasty and
17 colporrhaphy on April 12, 1996); Patient 103 (turbinectomy and
18 hernia repair on July 18, 1995); Patient 104 (septoplasty and
19 hernia repair on March 6, 1995); and Patient 105 (septoplasty and
20 hernia repair on July 31, 1995).

21          464.  The cosmetic surgeries disguised as septoplasties
22 were performed and were fraudulently billed and documented by
23 defendants Strahan, Reiter or other members of the L.A. Surgical
24 Group.  The cosmetic surgeries disguised as colporrhaphies or
25 hernia repairs were performed and were fraudulently billed by
26 defendants Clifford Ermshar, Ezeckiel Zilka or Lee Newman.

27

28                                120

465. West Olympic and its surgeons even went so far as to bill all three of these cover surgeries in a single day. For example, on December 21, 1994, defendant Strahan falsely billed and documented a septoplasty on Patient 106, a Prudential insured, while defendant Ermshar falsely billed and documented a hernia repair and a colporrhaphy on the same patient. Those defendants went for the same trifecta on another Prudential insured, Patient 107, on May 8, 1995.

**Patients 108 through 117**

466. West Olympic and its surgeons also often submitted fraudulent billings for surgeries on more than one member of the same family. For example, West Olympic surgeons performed cosmetic surgeries, and then submitted fraudulent bills for non-cosmetic surgery, on both a husband and a wife within a short time of each other. Examples of "his and her" surgeries on Prudential insureds include: Patients 108 and 109 (septoplasties by Strahan on August 26 and 31, 1994); Patients 110 and 111 (septoplasties by Strahan on June 2 and November 12, 1995); Patients 112 and 113 (septoplasties by Strahan on June 3 and August 2, 1996); Patients 114 and 115 (septoplasties/hernia surgeries by Strahan and Ermshar on June 11 and August 30, 1996); and Patients 116 and 117 (septoplasties by Strahan on July 25 and September 2, 1994).

121

### G. The Monroe Family Outpatient Surgery Center
### Branch of the Scam

467.  Not far from Westminster's Little Saigon, a hub of patient recruitment in this case, is a clinic to which the recruiters have directed many patients -- Monroe Family Medical Group Outpatient Surgery Center.

### 1.  Ownership -- Lemmon McMillan

468.  Monroe, which is now known as West Cliff Outpatient Surgical Center, is owned by a doctor, defendant Lemmon McMillan.  McMillan opened Monroe in early 1997.  That was about the same time that McMillan ended three years of probation for abandoning two dangerously ill patients whose gynecological surgeries he had botched.  At Monroe, McMillan left the surgical operations to others but directed the fraud operations himself.

### 2.  Advertising

469.  A flyer for Monroe/West Cliff leaves no doubt as to what surgeries are performed there.  The flyer, translated from Vietnamese, reads:

> 1)  Why you have to choose Westcliff?
>
> - In case you need cosmetic surgery, you need:
> professional, careful, confidential, safe, and
> no third party involved.
>
> 2)  Why you need a professional?
>
> - All surgeons have different specialty.
> Therefore there are no surgeon who does
> cosmetic eyes surgery and also breast

122

1            implants. Westcliff has a lot of surgeons

2            specialize in just one kind of cosmetic

3            surgery. This is the first cosmetic surgery

4            hospital with more than 15 surgeons for every

5            kind of surgery. Westcliff chooses only the

6            best cosmetic surgeons in the field from the

7            state and from the America Board of Cosmetic

8            Surgery.

9

10 **3. Connections to Other Clinics**

11        470. Monroe is linked to other defendant clinics in

12 several ways. One way is through common doctors. Two surgeons who

13 performed surgeries at Monroe -- Ezeckiel Zilka and William

14 Jorgensen -- performed surgeries at numerous other clinics,

15 including BHOSC, Moreno Valley, Westwood, West Olympic, Wilshire

16 Outpatient, and Wilshire West.

17        471. A Monroe anesthesiologist, Brownell Payne, who

18 until recently was on probation for Medi-Cal fraud, is now on

19 staff at Tustin Outpatient Surgery Center, which is owned by

20 BHOSC/Moreno Valley/Advanced Laser alumnus Teofilo Po. The

21 ubiquitous radiologists -- Sim Hoffman and Ronald Grusd - provided

22 phony radiological support for surgeries at Monroe, as well as at

23 numerous other defendant clinics.

24        472. The patient population at Monroe is largely

25 Vietnamese-American, many of them from San Jose and distant states

26 such as Louisiana, Georgia, and Nebraska. The same recruiters who

27 channeled those patients to Monroe also directed patients to other

28                        123

1  clinics, including at least defendants BHOSC, Westwood, Advanced
2  Laser, Moreno Valley, and Mariners Bay.  Patients who were shopped
3  around by recruiters would sometimes end up having one surgery at
4  Monroe and another surgery at another defendant clinic.

5  **4.  Doctors and Surgeries at Monroe**

6        473.  While at Monroe, Defendants Zilka and Jorgensen
7  primarily performed tummy tucks and liposuction that they
8  fraudulently documented and billed as gynecological surgeries.

9  **The Scam In Operation:  Illustrative**
   **Examples of Particular Fraudulent Acts**
10
11        474.  The impact of the scheme described above is
   illustrated by the following examples:
12
   **Patient 118**
13
        475. Patient 118 is a CIGNA insured from Lincoln,
14
   Nebraska.
15
        476. On July 30, 1997, defendant Zilka performed a
16
   cosmetic surgery on Ms. 118 at Monroe.  He fraudulently billed and
17
   documented that surgery as a colporrhaphy to relieve urinary
18
   incontinence.  In fact, Ms. 118 did not have an incontinence
19
   problem and neither needed nor received a colporrhaphy.
20
        477. The day before Ms. 118's cosmetic surgery, July 29,
21
   1997, Monroe sent her to defendant Hoffman so that he could
22
   provide phony radiological support for her cover surgery.
23
   However, Hoffman and Zilka were not on the same page.  Though
24
   Zilka later claimed to have performed a colporrhaphy, Hoffman
25
   billed and documented a sinus CT scan and x-ray.
26
        478.  Defendants and their associates submitted more
27
28                              124

1  than $16,000 in fraudulent bills in connection with Ms. 118's
2  surgery.

3  **Patient 119**

4          479. Patient 119 is a Prudential insured from San Jose.

5          480. Ms. 118 had two cosmetic surgeries by defendant
6  Zilka, one at West Olympic on November 23, 1996, and the other at
7  Monroe on April 26, 1997.  Zilka and West Olympic fraudulently
8  billed and documented the first surgery as a colporrhaphy for
9  urinary incontinence.  Zilka and Monroe fraudulently billed and
10 documented the second surgery as a hysteroscopy and a laparoscopy.

11         481. In between, Ms. 119 stopped off for a cosmetic
12 facial surgery by defendant Koh at BHOSC on January 17, 1997.  Koh
13 and BHOSC fraudulently billed and documented that surgery as a
14 medically necessary nasal surgery.  Defendant Grusd provided a
15 fraudulent nasal CT scan on January 16, 1997, the day before the
16 BHOSC surgery.

17         482. Prudential paid $49,178 in reliance on defendants'
18 fraudulent bills for Ms. 119.

19 **Patient 120**

20         483. Patient 120 is another Prudential insured from San
21 Jose.  Ms. 120 had 4 cosmetic surgeries at three different
22 defendant clinics.

23         484. The first two surgeries were at Advanced Laser, on
24 July 3, 1996 and a week later on July 10, 1996.  The first was a
25 cosmetic breast surgery performed by defendant Amir-Jahed, who
26 fraudulently billed and documented the surgery as an excision of a

27

28                                 125

1   breast cyst.   The second surgery was fraudulently billed and
2   documented as a colporrhaphy to relieve urinary incontinence.

3         485. Three months later, defendant Zilka took over.  On
4   October 14, 1996, Zilka performed a cosmetic surgery on Ms. 120 at
5   Westwood that he fraudulently billed and documented as a
6   hysteroscopy and a laparoscopy.

7         486. On March 29, 1997, Zilka performed a cosmetic
8   surgery on Ms. 120 at Monroe.  He billed that surgery as a
9   colporrhaphy to relieve urinary incontinence, the second time that
10  ruse was used for Ms. 120.

11        487. On April 8, 1997, 9 days after Ms. 120's fourth
12  cosmetic surgery, defendant Hoffman fraudulently billed Prudential
13  for a nasal CT-scan and x-ray.

14        488. Prudential paid $20,203 relying on the fraudulent
15  bills for Ms. 120's cosmetic surgeries.

16  **Patient 121**

17        489. Patient 121 is a CIGNA insured from San Jose.  In
18  February 1998, Ms. 121 had cosmetic surgeries at Providence and
19  Monroe.

20        490. First, on February 4, 1998, Ms. 121 had a cosmetic
21  surgery performed by defendant Robinson at Providence.  Robinson
22  and Providence fraudulently billed and documented that surgery as
23  a septoplasty and a turbinectomy.

24        491. Three weeks later, defendant Jorgensen performed
25  another cosmetic surgery on Ms. 121 at Monroe.  Jorgensen and
26  Monroe fraudulently billed and documented that surgery as a

27

28                              126

colporrhaphy to relieve urinary incontinence.

492. For that fraudulent doubleheader, CIGNA was billed more than $22,000.

**Patient 122**

493. Patient 122 is a Humana insured who lives in Janesville, Wisconsin.

494. On December 14, 1997, Ms. 122 had a surgery performed at Monroe by defendant William Jorgensen. Shortly after the surgery, Monroe mailed Humana a bill for $14,329. At about the same time, defendant Jorgensen sent Humana a surgeon's bill for $7,000 for Ms. 122's surgery.

495. With their bills, Monroe and Jorgensen sent medical records. Those records included a History and Physical form signed by defendant Jorgensen, an initial consultation sheet signed by Jorgensen, operative notes and an operative report signed by Jorgensen, an anesthesia record signed by anesthesiologist Jeffrey Weissblatt, and an assignment of benefits and consent to surgery form signed by Ms. 122. All of those documents, including the bills referred to above, fraudulently represented that the only surgeries Ms. 122 had were a colporrhaphy and related procedures to relieve urinary incontinence.

496. On January 19, 1998, Humana wrote to Monroe requesting the "complete medical file" (emphasis in original) of Ms. 122's December 14, 1997 surgery, including, in addition to various medical records, all "pre- and postoperative photos."

127

1  Humana asked that Monroe return the records with a signed
2  certification that the records returned are the complete medical
3  records on file at Monroe for Ms. 122.

4          497.  Humana received essentially the same materials it
5  had already received, all indicating that Ms. 122's only surgery
6  was the colporrhaphy and related gynecological procedures to
7  relieve urinary incontinence.  Elvira Lopez of Monroe's medical
8  records department signed a certification representing that the
9  records were Ms. 122's "complete medical and financial records
10 file."

11         498.  In fact, those records were anything but complete.
12 While Humana was awaiting a response to its written request, it
13 sent a representative to Monroe to copy Ms. 122's records in
14 person.  The records obtained in person included an entire set of
15 documents that Monroe did not produce either with its bill or in
16 response to Humana's letter request.  Those hidden records
17 revealed that the surgery Ms. 122 had on December 14, 1997 was a
18 tummy tuck.

19         499.  Indeed, for virtually every document that Monroe
20 had produced showing that only a gynecological surgery had been
21 performed, there was another version of the same document showing
22 that, in fact, a tummy tuck had been performed.  The hidden
23 records also contained pre-op photos of Ms. 122, showing her
24 protruding stomach.

25         500.  In other words, Monroe and Jorgensen had prepared
26 two completely separate sets of records, one reflecting the cover

27

28                                   128

1  diagnosis and surgery and the other reflecting the tummy tuck that
2  was actually performed. Their intent was to release only the
3  phony gynecological records to Humana and to withhold the tummy
4  tuck records. Humana obtained the tummy tuck records only because
5  a Humana representative unexpectedly appeared to copy them in
6  person, which in this instance short-circuited Monroe's usual
7  vetting procedures.

8  **Patients 123 through 126**

9         501.  Defendants Grusd and Hoffman facilitated the fraud
10 at Monroe by preparing fraudulent radiological reports that
11 purported to support the need for functional surgeries that they
12 knew were unnecessary.

13        502.  Examples of Monroe patients for whom defendant
14 Hoffman prepared such reports are two Prudential insureds, Patient
15 123 from Tucker, Georgia (July 21, 1997), and Patient 124 from
16 Santa Ana, California (April 22, 1997).

17        503.  Examples of Monroe patients for whom defendant
18 Grusd prepared fraudulent radiology reports are two Humana
19 insureds, Patient 125 from Houston, Texas (November 24, 1997) and
20 Patient 126 from Union City, California (September 24, 1997).

21        504.  The two Humana patients were referred to Grusd for
22 nasal CT scans by defendant Lemmon McMillan, the owner of Monroe.
23 McMillan made those referrals with knowledge that the patients had
24 no nasal condition requiring diagnosis, and for the purpose of
25 having defendant Grusd prepare a false report that would appear to
26 support the need for surgery and thereby enhance the prospects of

27

28                                  129

1  fraudulently procuring insurance benefits from Humana.

2       **H.   The Wilshire West Ambulatory Surgery Center
            Branch of the Scam**

3

4       505.   Another stop on the patient railroad is defendant
   Wilshire West Ambulatory Surgery Center.

5

6  **1. Ownership -- Mamdouh Bahna**

7       506.   Wilshire West is owned by a surgeon, defendant
   Mamdouh Bahna, who also owns the building on Wilshire Boulevard in

8
   which the clinic is located.  Bahna performs most of the cosmetic

9
   surgeries at Wilshire West himself, fraudulently billing and

10
   documenting them as septoplasties.  Another regular at Wilshire

11
   West is the ever-present Ezeckiel Zilka, who performs liposuction

12
   and tummy tucks which he disguises as colporrhaphies,

13
   laparoscopies, and other gynecological procedures.

14
        507.   Bahna also performed surgeries at nearby defendant

15
   Westwood.  He provided bogus second opinions for surgeries there

16
   as well, supporting the need for surgeries to be performed by

17
   other corrupt surgeons such as defendant Tavoussi.

18
        508.   Bahna and Wilshire West are plugged into the same

19
   patient pipeline that feeds other defendant clinics.  Like the

20
   others, many of the patients at Wilshire West are Vietnamese-

21
   Americans from San Jose and out-of-state.  Many of those patients

22
   work at the same companies as patients who have gone to other of

23
   the defendant facilities, such as BHOSC, Moreno Valley, Advanced

24
   Laser, Westwood, West Olympic and Monroe. Because recruiters

25
   generally supply several clinics, a patient who makes three trips

26
   to Southern California to have three different cosmetic surgeries

27

28                              130

1 may end up having each one done at a different clinic.

2 **The Scam In Operation: Illustrative
Examples of Particular Fraudulent Acts**

3

4      509.   The impact of the scheme described above is
illustrated by the following examples:

5

6 **Patient 127**

7      510.   Patient 127 is a Prudential insured from San Jose.
Defendant Bahna fraudulently billed for having performed a
8 septoplasty on her at Wilshire West, even though she supposedly
9 had the same surgery twice elsewhere.

10

11      511.   Ms. 127 had a total of 6 cosmetic surgeries
performed by various defendants in a two-year period.  The first
12 four were: a cosmetic surgery by defendant Amir-Jahed at Advanced
13 Laser on January 20, 1996, which he fraudulently billed and
14 documented as the removal of a breast cyst; a cosmetic surgery by
15 defendant Burres at Advanced Laser on February 10, 1996, which he
16 fraudulently billed and documented as a septoplasty; a cosmetic
17 surgery by defendant Tavoussi at Westwood on September 20, 1996,
18 which he fraudulently billed and documented as a second
19 septoplasty; and a cosmetic surgery by defendant Zilka on January
20 18, 1997, which he fraudulently billed as a colporrhaphy.

21      512.   For Ms. 127's fifth cosmetic surgery, it was
22 defendant Bahna's turn.  On August 16, 1997, Bahna performed a
23 cosmetic surgery on Ms. 127 at Wilshire West, which he
24 fraudulently billed and documented as yet another septoplasty.  If
25 that surgery actually had been a septoplasty, which it was not, it
26 would have been her third such surgery in 18 months.  Two days
27

28                              131

1 later, Bahna had to perform a follow-up surgery on Ms. 127 to stop
2 post-operative bleeding.

3       513.   None of the defendants had yet billed Prudential
4 for performing a hernia repair on Ms. 127. Defendant Zilka took
5 care of that on March 7, 1998, performing a cosmetic surgery on
6 her at Westwood that he fraudulently billed and documented as a
7 hernia repair.

8       514.   Both defendants Hoffman and Grusd participated in
9 the fraud involving Ms. 127. Hoffman fraudulently billed and
10 documented a sinus CT scan on Ms. 127 on September 19, 1996, the
11 day before Ms. 127's supposed second septoplasty by defendant
12 Tavoussi at Westwood. Defendant Grusd fraudulently billed and
13 documented a sinus CT scan on Ms. 127 on August 16, 1997, the same
14 day as her supposed third septoplasty by defendant Bahna at
15 Wilshire West.

16       515.   Prudential paid $54,038 to defendants relying on
17 defendants' fraudulent billings.

18 **Patient 128**

19       516.   Patient 128 is a CIGNA insured from San Jose.   Ms.
20 128 has had at least 4 cosmetic surgeries performed by defendants.
21 The last of the 4 was at Wilshire West.

22       517.   On March 19, 1997, Ms. 128 had 2 cosmetic
23 surgeries at Westwood.  Those cosmetic surgeries were fraudulently
24 billed and documented as a colporrhaphy and a hernia repair.

25       518.   On September 18, 1997, Ms. 128 had a cosmetic
26 surgery performed by defendant Mohsen Tavoussi at a non-defendant

28                         132

1 clinic.    Tavoussi fraudulently billed and documented that surgery
2 as a septoplasty.

3           519.    On November 15, 1997, Ms. 128 had cosmetic surgery
4 performed by defendant Bahna at Wilshire West.    Though defendant
5 Tavoussi had supposedly performed a septoplasty on Ms. 128 less
6 than two months earlier, defendant Bahna fraudulently billed and
7 documented the Wilshire West surgery as another septoplasty.

8           520.    The two fraudulent septoplasties by Tavoussi and
9 Bahna were supported by two fraudulent CT scans by defendants
10 Grusd and Hoffman.    On September 17, 1997, the day before the
11 supposed first septoplasty by defendant Tavoussi, Hoffman
12 fraudulently billed for a sinus CT scan on Ms. 128.    The report of
13 that CT scan stated that Ms. 128 had a "deviation of the septum to
14 the left" and "bilateral ethmoid sinusitis."

15           521.    Two months later, on November 14, 1997, the day
16 before the supposed second septoplasty by Bahna, Grusd billed for
17 a second sinus CT scan.    Though Ms. 128's deviated septum and
18 sinusitis supposedly had already been corrected by Tavoussi's
19 septoplasty, Grusd reported the exact same conditions that Hoffman
20 had reported before Tavoussi's septoplasty, i.e., a nasal septum
21 "deviated to the left" and "bilateral ethmoidal sinusitis."

22           522.    CIGNA paid $16,425 to defendants in connection
23 with fraudulent billing of surgery at Wilshire West.

24
25
26
27
                                 133
28

1 **Patient 129**

2      523. Defendants Bahna and Wilshire West came in at the
3 end of another string of cosmetic surgeries performed by
4 defendants on another patient from San Jose, a Prudential insured,
5 Patient 129. Ms. 129 had 5 cosmetic surgeries in less than a
6 year, the last two at Wilshire West.

7      524. Ms. 129 started with a cosmetic surgery by
8 defendant Tavoussi at Westwood on September 20, 1996. Tavoussi
9 fraudulently billed and documented that cosmetic surgery as a
10 septoplasty.

11      525. On March 14, 1997, Ms. 129 had two cosmetic
12 surgeries in one day by defendant Amir-Jahed. He fraudulently
13 billed and documented those two surgeries as a colporrhaphy and
14 excision of a breast cyst.

15      526. On August 16, 1997, defendant Bahna finished off
16 Ms. 129's run with two cosmetic surgeries in one day at Wilshire
17 West. Bahna fraudulently billed and documented those two
18 surgeries as a septoplasty/turbinectomy, supposedly Ms. 129's
19 second, and a hernia repair.

20      527. Defendant Grusd also participated in the fraud
21 involving Ms. 129. Grusd fraudulently billed and documented a
22 mammogram on Ms. 129 on March 13, 1997, the day before her
23 fraudulent breast surgery by defendant Amir-Jahed. He also
24 fraudulently billed and documented a nasal CT scan on August 15,
25 1997, the day before the fraudulent septoplasty by defendant Bahna
26 at Wilshire West.

27

28
                       134

1          528.   Prudential was defrauded into paying $28,181 in
2   connection with Ms. 129's cosmetic surgeries.

3   **Patients 130 and 131**

4          529.   As noted, defendant Ezeckiel Zilka also performed
5   cosmetic surgeries at Wilshire West, generating fraudulent bills
6   and medical records for that clinic as he did at BHOSC, Moreno
7   Valley, Westwood, West Olympic, and Monroe.

8          530.   Patient 130 is a Prudential insured from Houston,
9   Texas.  According to the bills submitted, Ms. 130's first contact
10  with any of the defendants was an office visit with defendant
11  Bahna on January 7, 1997.  Bahna billed that office visit under a
12  diagnosis of chronic sinusitis, in anticipation of performing a
13  cosmetic facial surgery and using sinusitis as a cover diagnosis.

14         531.   The next day, however, January 8, 1997, Ms. 130
15  had cosmetic surgery performed at Wilshire West not by defendant
16  Bahna but by defendant Zilka.  Wilshire West and Zilka
17  fraudulently billed the surgery as a colporrhaphy and a hernia
18  repair.

19         532.   Six months later, Ms. 130 reappeared in the care
20  of Dr. Terry Dubrow, a surgeon who performed surgeries at
21  defendant Monroe.  At that point, her fictitious nasal problems
22  reappeared as well.  On July 22, 1997, Ms. 130 had a cosmetic
23  surgery by Dr. Dubrow at Monroe that was fraudulently billed as a
24  septoplasty.

25         533.   Patient 131, a Prudential insured from San Jose,
26  also had a cosmetic surgery by Dr. Zilka at Wilshire West followed
27

28                                135

1  by one by Dr. Dubrow at Monroe.  And by the time Ms. 131 got to
2  Wilshire West, she had already had 3 other surgeries at BHOSC.

3          534.  Ms. 131's first BHOSC surgery was by defendant
4  Newman on January 3, 1996, a liposuction or tummy tuck that
5  Newman, defendant Peter Golden and BHOSC fraudulently billed as a
6  colporrhaphy.  Five days later, on January 8, 1996, Ms. 131 had a
7  cosmetic facial surgery by defendant Koh that Koh, Golden and
8  BHOSC fraudulently billed as a septoplasty.  On October 7, 1996,
9  defendant Hector Arnazzi, anesthesiologist Kevin Tehrani and BHOSC
10  fraudulently billed a third cosmetic surgery as a hernia repair.

11          535.  Six months later, Ms. 131 moved on to Wilshire
12  West, where she had a cosmetic surgery by defendant Zilka on April
13  12, 1997 that Zilka and Wilshire West fraudulently billed and
14  documented as a hysteroscopy and a laparoscopy.

15          536.  Lastly, Ms. 131 had a cosmetic surgery by Dr.
16  Dubrow at Monroe on July 26, 1997 that Dubrow and Monroe
17  fraudulently billed as another septoplasty.  Defendant Grusd
18  fraudulently billed for a nasal CT scan the day before that final
19  surgery.

20          537.  The total damage to Prudential for these five
21  surgeries was $66,788.

22  **Patient 132**

23          538.  Patient 132 is a CIGNA insured from San Diego,
24  California.  Ms. 132 had cosmetic surgeries at BHOSC and at
25  Wilshire West.

26          539.  Ms. 132's first cosmetic surgery was performed at
27
28                              136

1  BHOSC by defendant Rolando Fernando on July 29, 1996.  Fernando
2  and BHOSC fraudulently billed that surgery as a septoplasty.  On
3  June 20, 1997, Ms. 132 had a cosmetic surgery by defendant Bahna
4  at Wilshire West.  It, too, was fraudulently billed as a
5  septoplasty.

6          540.  Defendants Grusd and Hoffman facilitated the fraud
7  involving Ms. 132.  On July 29, 1996, the same day as the BHOSC
8  surgery, Grusd supposedly performed a nasal CT scan in which he
9  found deviation of the nasal septum and 80-90% airway obstruction.
10 If the patient had such a problem, and if Dr. Fernando had
11 performed the surgery he claimed to have performed, the problem
12 would have been resolved.  However, on June 18, 1997, just before
13 the Wilshire West surgery, Hoffman performed a nasal CT scan in
14 which he supposedly still found a deviated septum and airway
15 obstruction.

16         541.  CIGNA paid $9,064 for Ms. 132's two surgeries.

17
18                 **I.   The Mariners Bay Surgical Center**
                        **Branch of the Scam**

19 **1.   Ownership -- Ata O. Montazeri**

20        542.  Mariners Bay Surgical Center in Venice is owned by
21 defendant All-American Medical Group, Inc.  The sole shareholder
22 of All-American is a gynecologist, defendant Ata Montazeri.

23        543.  Montazeri is the subject of a pending disciplinary
24 Complaint brought against him by the Medical Board of California.
25 The Complaint seeks revocation or suspension of Montazeri's
26 medical license based on, among other things, his commission of

27
28                                 137

1 "dishonest and corrupt acts." Specifically, the Complaint alleges
2 that, in applications for staff positions at two hospitals,
3 Montazeri lied about his credentials and concealed the fact that
4 he had been terminated from two different residency programs
5 because of clinical incompetence.

6          544. Montazeri opened Mariners Bay in 1995.  As
7 detailed below, Montazeri is intimately involved in the fraud
8 complained of here.

9 **2.  Advertising**

10         545. Mariners Bay solicits cosmetic surgery patients on
11 its website on the Internet.  On that Website, Mariners Bay calls
12 itself "Mariners Bay <u>Plastic</u> Surgical Center" (emphasis added).
13 The site's home page features a photo of the outside of the clinic
14 with a stretch limousine parked in front. The "Examples" page
15 includes photos of patients before and after breast augmentation,
16 a tummy tuck, laser skin resurfacing, and cosmetic nasal
17 reconstruction.  The site describes Mariners Bay as an "institute"
18 that "combines the science of medicines [sic] and the art of
19 sculpturing to fulfill the desires of the 21st century woman and
20 man who wants to look younger and healthier."  The site then
21 describes the following surgical offerings:

22

23              1.   The newly developed Ultra Pulse Laser for
24                   rejuvenation of the face.  This bloodless
25                   procedure is usually performed in less than an
26                   hour with a local sedative.  It easily

27

28
                                   138

replaces facelift surgery and has immediate results for looking younger.

2.  Full body liposuction with the safest methodology to satisfy your desires.

3.  Reconstruction of the pelvic floor muscle relaxation [sic] relating to childbirth or miscellaneous trauma to enhance sexual relationship.

4.  Hair transplants using the state-of-the-art Ultra Pulse Laser to minimize trauma to scalp with instantaneous results.

5.  We employ the latest technologies in breast implant surgery to reduce the risk of undiagnosed malignancy in the future.

6.  Perfect Nose reconstruction.

7.  Correction of remaining scars from cystic acne and resurfacing the skin scar with state-of-the-art Ultra Pulse Laser.

8.  Removal of tattoos and age spots, correction of spider veins and facial capillary veins.

9.  Dermal abrasion and acid-peeling by our qualified dermatologists.

546.  According to the website, Mariners Bay "has a complimentary round trip transportation limousine service available for [patients'] consultation & surgery. For out-of-state

139

1 patients, Hotel accommodations as well as airline tickets and
2 transportation is [sic] provided."

3 **3. Patients at Mariners Bay**

4        547.   Mariners Bay's advertising, together with the
5 efforts of patient recruiters, has drawn a mix of Asian-American
6 and Hispanic-American patients from across Southern California,
7 points north, and other states including Virginia and Texas.
8 Again, many of those patients worked for the same companies as
9 patients who went to other defendant facilities, including BHOSC,
10 Moreno Valley, West Olympic, Westwood, Wilshire Outpatient,
11 Monroe, Advanced Laser and Wilshire West.

12 **4. Doctors and Surgeries at Mariners Bay**

13        548.   In addition to Montazeri himself, surgeons who
14 have performed surgeries at Mariners Bay include defendants Amir-
15 Jahed and Tavoussi.  Montazeri primarily performed liposuction and
16 tummy tucks that he disguised and fraudulently billed as
17 gynecological surgeries; Amir-Jahed primarily performed breast
18 implants disguised and fraudulently billed as excisions of breast
19 cysts; and Tavoussi primarily performed cosmetic facial surgeries
20 disguised and fraudulently billed as nasal surgeries.  Defendant
21 Burres also facilitated the fraud at Mariners Bay, as described
22 below.  Amir-Jahed has committed the same fraud at defendants
23 BHOSC, Advanced Laser, Westwood, West Olympic, and Providence.
24 Tavoussi and Burres have committed the same fraud at defendants
25 Advanced Laser and Westwood.

26        549.   The anesthesiologist on most of the surgeries at

27

28                                  140

1   Mariners Bay was Chull Whang.  Whang also facilitated fraud at
2   defendants BHOSC and Advanced Laser.

3          550.  During a Department of Health Services inspection
4   at Mariners Bay in June of 1998, investigators found telltale
5   signs of the cosmetic surgery fraud scheme, though they apparently
6   did not recognize them as such.  The investigators' inspection
7   report stated:

> Two closed medical records contained separate
> consents for liposuction in addition to the
> other [medical] surgeries.  However, there was
> no documentation in either the operative
> report or in the anesthesia record of the
> liposuction.

15         551.  The investigators seem to have interpreted the
16  absence of any documentation of the two liposuction procedures as
17  merely two cases of sloppy medical recordkeeping.  In fact, that
18  omission was not due to negligence but to fraud.  As at every
19  defendant clinic, Mariners Bay surgeons and anesthesiologists do
20  not document their cosmetic surgeries on the same reports as the
21  pretextual medical surgeries, because to do so would invite
22  scrutiny by insurers.  Instead, the cosmetic surgeries either are
23  documented on completely separate sets of medical records (which
24  are promptly purged from the regular files), or they are not
25  documented at all.

141

**The Scam In Operation:  Illustrative
Examples of Particular Fraudulent Acts**

552.  The impact of the scheme described above is
illustrated by the following examples:

**Patient 133**

553.  Ms. 133 is a United insured from Downey,
California.  She may hold the record in this case, having had 8
cosmetic surgeries at various clinics by 4 different defendant
surgeons.  Three of those surgeries were performed by defendant
Ata Montazeri at Mariners Bay.

554.  Ms. 133 began on April 8, 1994, with a cosmetic
surgery at a non-defendant clinic that was billed as a
colporrhaphy.  About 2 months later, on May 27, 1994, she had a
cosmetic surgery by defendant Amir-Jahed that he fraudulently
billed and documented as a hernia repair.

555.  On January 6, 1995, she was diagnosed at Mariners
Bay with a supposed breast lump.  Two weeks later, she was
diagnosed at Mariners Bay with a supposed menstrual disorder.
That same day, Montazeri performed a cosmetic surgery on Ms. 132
which he fraudulently billed and documented as a hysteroscopy.

556.  Ms. 133 then turned to defendant Koh.  On April
26, 1995, Koh billed for an office visit with Ms. 133 at which he
supposedly diagnosed nasal airway obstruction.  On May 1, 1995,
Koh performed a cosmetic surgery on Ms. 133 at BHOSC, which he
fraudulently billed and documented as a septoplasty.

557.  Next up was defendant Strahan at West Olympic.
Though Ms. 133 supposedly had just had a septoplasty by defendant

142

Koh at BHOSC, on May 24, 1996 she supposedly had another one by defendant Strahan at West Olympic, billed under the aegis of L.A. Surgical Medical Group. A week before that surgery, defendant Hoffman fraudulently billed and documented a CT scan of Ms. 133 for a supposed deviated septum.

558. Ms. 133 then returned to Mariners Bay. On October 31, 1996, Montazeri performed two more cosmetic surgeries on Ms. 133 at Mariners Bay, which he fraudulently billed and documented as a hysteroscopy and a hernia repair. Ms. 133 supposedly had already had each of those surgeries at least once.

559. Finally, on December 13, 1996, Ms. 133 had her last cosmetic surgery. Defendant Amir-Jahed performed it at Westwood, fraudulently billing and documenting it as a colporrhaphy.

560. United was defrauded into paying $54,121 for this orgy of cosmetic surgery.

## Patient 134

561. Patient 134 is a United insured from Santa Ana. In April 1997, Ms. 134 had two cosmetic surgeries in a week, one at Westwood and the other at Mariners Bay.

562. On April 21, 1997, Ms. 134 had a cosmetic surgery performed by defendant Tavoussi at Westwood. Tavoussi fraudulently billed that surgery as a septoplasty.

563. On the same day that defendant Tavoussi supposedly was repairing Ms. 134's deviated septum, defendant Amir-Jahed billed United for an office visit at which he supposedly

143

1  determined that she had another problem in need of surgical
2  repair.  Amir-Jahed fraudulently diagnosed Ms. 134 as suffering
3  from vaginal prolapse which he claimed was causing urinary
4  incontinence.

5       564.  A week later, on April 29, 1997, Amir-Jahed
6  performed a cosmetic surgery on Ms. 134 at Mariners Bay which he
7  fraudulently billed as a colporrhaphy.  However, Amir-Jahed
8  apparently got his fraud wires crossed with defendant Hoffman's
9  because, the day before the supposed colporrhaphy surgery, Hoffman
10  fraudulently billed for and documented performing a mammogram on
11  Ms. 134 in connection with a supposed breast lump.

12       565.  United paid $29,564 in connection with the
13  fraudulent billings for the surgeries on Ms. 134.

14  **Patients 135 through 139**

15       566.  As they did at Westwood, defendants Tavoussi and
16  Burres worked together to defraud insurers in connection with
17  surgeries at Mariners Bay.  In particular, Burres supplied
18  Tavoussi with phony second opinions, phony endoscopy reports, and
19  phony diagnostic test results, all supporting the necessity of
20  septoplasties for patients on whom Tavoussi intended to perform,
21  or had performed, cosmetic surgeries.

22       567.  Patient 135 is a CIGNA insured from Santa Clara,
23  California.  On May 13, 1997, Tavoussi performed a cosmetic facial
24  surgery on Ms. 135 at Mariners Bay that he and Mariners Bay
25  fraudulently billed and documented as a septoplasty.

26       568.  The day before the surgery, May 12, 1997, Burres
27
28
144

1 fraudulently billed for an endoscopy, spirometry, and nasal
2 function studies on the patient, and issued a second opinion
3 recommending a septoplasty. In his second opinion, Burres stated
4 that, on physical examination, he found that Ms. 135 had "septal
5 deviation-left" (emphasis added). However, defendant Tavoussi
6 issued his own endoscopy report the same day as Burres, May 12,
7 and in that report Tavoussi found that Ms. 135's septum showed
8 "gross deviation to the right" (emphasis added). Further, Ms. 135
9 supposedly had already had a septoplasty 18 months earlier, on
10 December 21, 1995, by defendant Po at Advanced Laser.

11       569. Burres also billed for a phony endoscopy and phony
12 nasal function studies on December 13, 1996 on Patient 136, a
13 Prudential insured also from Santa Clara, California. That same
14 day, defendant Tavoussi performed a cosmetic surgery on Ms. 136 at
15 Mariners Bay that he and Mariners Bay fraudulently billed as a
16 septoplasty.

17       570. CIGNA and Prudential paid a total of $45,887 in
18 connection with the fraudulent surgeries on Ms. 135 and Ms. 136.

19       571. Tavoussi was perfectly capable of preparing and
20 submitting fraudulent bills and documents without Burres' help,
21 and did so for many surgeries at Mariners Bay. Tavoussi
22 fraudulently billed many cosmetic surgeries at Mariners Bay as
23 septoplasties, including United insured Patient 137 (April 8,
24 1997), Prudential insured Patient 138 (December 28, 1996) and
25 Aetna insured Patient 139 (June 24, 1997). In the case of
26 Patients 137 and 138, defendant Hoffman provided phony

27

28
                         145

1  radiological support before the surgeries.

2  **Patient 140**

3          572.    Patient 140 is a Humana insured from Huntington
4  Park, California.  In 1997, she had at least 3 fraudulent cosmetic
5  surgeries performed by defendants.

6          573.    The first was by defendant Montazeri at a non-
7  defendant clinic on January 13, 1997.  Montazeri fraudulently
8  billed and documented that cosmetic surgery as a hysteroscopy.

9          574.    Ms. 140 then responded to a radio ad on station
10  K-LOVE for cosmetic surgery at BHOSC.  On March 21, 1997, she had
11  a breast implant procedure at BHOSC that was fraudulently billed
12  and documented as a breast biopsy.

13          575.    On September 29, 1997, defendant Tavoussi sent
14  Ms. 140 to defendant Hoffman for a phony nasal CT scan.  That
15  done, Tavoussi performed a cosmetic surgery on Ms. 140 on October
16  1, 1997 at Mariners Bay.  Tavoussi and Mariners Bay fraudulently
17  billed and documented that surgery as a septoplasty.

18          576.    Humana paid a total of $34,792 in connection with
19  Ms. 140's cosmetic surgeries.

20  **Patients 141 and 142**

21          577.    Some Mariners Bay patients had multiple cosmetic
22  surgeries at Mariners Bay while others had only one of their
23  multiple surgeries at Mariners Bay.

24          578.    Patient 141, for example, an Aetna insured from
25  Costa Mesa, California, had cosmetic surgeries at Mariners Bay on
26  three different dates in less than 6 months, all by defendant

27

28

146

1 Montazeri. On January 20, 1998, Montazeri and Mariners Bay
2 fraudulently billed for a hysteroscopy; on June 20, 1998 for a
3 hernia repair and a breast cyst excision; and on July 1, 1998 for
4 another hernia repair. Ms. 141's three trips to Mariners Bay cost
5 Aetna $24,516.

6          579.   On the other hand, Patient 142, an Aetna insured
7 from Bell, California, had 4 cosmetic surgeries at 4 different
8 clinics, including 1 at Mariners Bay. On May 23, 1996, defendant
9 Bahna fraudulently billed for a septoplasty on Ms. 142 at Wilshire
10 West. Defendant Arnazzi followed by fraudulently billing for a
11 colporrhaphy at BHOSC on January 2, 1997. Then, defendant Amir-
12 Jahed fraudulently billed for a hernia repair at Mariners Bay on
13 December 1, 1997 and for another hernia repair on May 21, 1998.
14 All told, Aetna paid $50,286 for Ms. 142's 4 surgeries.

15
16          **J.   The Providence Ambulatory Surgical Center
                   Branch of the Scam**

17          580.   The doctors and staff at Providence committed the
18 same fraud in the same way as their counterparts at the other
19 clinics, but sometimes less carefully.

20          581.   As shown in several patient examples below, the
21 staff at Providence responsible for removing the true records --
22 i.e., the cosmetic surgery records -- from the phony records
23 destined for insurers, sometimes failed to do a thorough job. As
24 a result, one or more of the plaintiffs received a number of sets
25 of Providence records that contain both true and phony records.
26 That lack of fraud quality control provides an open window into

27
28                                 147

1 how this scheme works.

2 **1.   Ownership, Doctors and Surgeries**

3         582.   Providence is owned by a cosmetic surgeon,
4 defendant Harrell Robinson.  Robinson performs primarily cosmetic
5 facial and breast surgeries that he dresses up as, and
6 fraudulently bills as, medically necessary nose and breast
7 surgeries.  Defendant Amir-Jahed has performed cosmetic surgeries
8 at Providence that he fraudulently billed as colporrhaphies,
9 hernia repairs and breast procedures.

10         583.   The principal anesthesiologists at Providence are
11 Kevin Tehrani and Sharam Taheri.  Both have also worked at BHOSC.

12         584.   Because Providence and Robinson use the same
13 recruiters as other clinics, they draw the same heavily Vietnamese
14 patient population that other clinics do, including patients from
15 northern California and states like Texas.

16 **The Scam In Operation:   Illustrative**
   **Examples of Particular Fraudulent Acts**
17
         585.   The impact of the scheme described above is
18
   illustrated by the following examples:
19
   **Patient 143**
20
         586.   Patient 143 is a Humana insured who lives in
21
   Houston, Texas.
22
         587.   In September 1997, Ms. 143 was interested in
23
   having cosmetic surgery and was referred to Providence by a
24
   patient recruiter named Tia Lee.  On September 22, 1997, an agent
25
   of Providence asked Ms. 143 a series of pretextual medical
26
   questions to help Providence decide which cover diagnosis and
27
                                148
28

1 surgery to use in Ms. 143's case.  Those questions included:

2
3                Do you have a hernia?

4                Do you have bladder trouble?

5                Do you have sinus trouble?

6                Do you have a lump in your breast?

7                Do you have sinus headaches?

8                Do you have difficulty breathing through your nose?

9         588.   The agent filled out the interview form to
10 indicate that Ms. 143 had a hernia.  The answer to all the other
11 questions was "no."  The agent then indicated on the form that Ms.
12 143 was requesting hernia surgery.

13        589.   On October 6, 1997, Ms. 143 had a pre-op
14 consultation with defendant Harrell Robinson.  Before the
15 consultation, Ms. 143 again told a nurse that she had never had a
16 problem with nasal airway obstruction.  Despite that, and despite
17 the prior indications that Ms. 143 had never had sinus trouble,
18 sinus headaches, or trouble breathing through her nose, Robinson
19 wrote an initial consultation report indicating that Ms. 143 had
20 all of those problems.

21        590.   Defendant Robinson also indicated on his initial
22 consultation report that Ms. 143's septum was deviated to the <u>left</u>
23 and that she had severely enlarged turbinates.  However, on the
24 same day, Robinson sent Ms. 143 to a radiologist (not defendants
25 Grusd or Hoffman) for a nasal CT scan.  The radiologist reported
26 that Ms. 143 had only a "mild degree" of septal deviation to the

27

28                              149

1 right, and made no mention of any enlargement of her turbinates.
2 Nonetheless, Robinson's report indicated that his "plan" was to
3 schedule Ms. 143 for a septoplasty and a turbinectomy.

4      591.  On October 9, 1997, Robinson performed multiple
5 cosmetic surgeries on Ms. 143, including a breast augmentation and
6 chin implants.  Robinson and Providence then fraudulently
7 submitted bills to Humana totaling almost $29,000, representing
8 that the surgeries performed were a septoplasty and a
9 turbinectomy.

10     592.  The only operative report they submitted with the
11 bills, or in response to later written requests, was for a
12 septoplasty and a turbinectomy.  However, other documents were
13 included by mistake that briefly mentioned the breast augmentation
14 and the chin implants.  Later, Humana obtained copies of operative
15 and anesthesia reports for the breast augmentation and the chin
16 implants, by sending a copying service directly to Providence.

17 **Patients 144 and 145**

18     593.  Sometimes, the cosmetic procedures that defendants
19 performed involved replacing one cosmetic implant (nasal or
20 breast) with another.  In those cases, defendants often pretended
21 that they had only removed the old implant, without disclosing
22 that they had inserted a new implant.  That deception is
23 illustrated by the cases of two patients from Texas.

24     594.  Patient 144 is a CIGNA insured from Garland,
25 Texas.  Providence and Robinson fraudulently submitted more than
26 $11,000 in bills to CIGNA for a breast procedure that Robinson

27

28

150

1 ‖performed on February 24, 1998.

2 ‖        595.    With the bills, Providence and Robinson sent an
3 ‖operative report indicating that Robinson had removed infected
4 ‖breast implants and hardened tissue around them. The report states
5 ‖that, after those implants were removed, the incisions were closed
6 ‖and the procedure was concluded.   In fact, the procedure did not
7 ‖end there.

8 ‖        596.    The truth is found in another operative report by
9 ‖Robinson that he dictated the same day.   The second report is
10 ‖essentially the same as the first except for one salient fact.
11 ‖The second report discloses that, after each of the old implants
12 ‖was removed, a new, considerably larger, implant was inserted in
13 ‖its place.  Providence and Robinson had intended that CIGNA would
14 ‖receive only the first report and not the second, but someone at
15 ‖Providence let the truth get out.

16 ‖        597.    Patient 145 is a CIGNA insured from Carrollton,
17 ‖Texas.   Providence fraudulently submitted a bill for more than
18 ‖$16,000 for a nasal surgery that defendant Robinson performed on
19 ‖Ms. 145 on July 29, 1998.

20 ‖        598.    In addition to a supposed septoplasty and a
21 ‖turbinectomy, the bill is for the removal of a "foreign body" from
22 ‖Ms. 145's nose.   Robinson's operative report and notes indicate
23 ‖that the "foreign body" was a silicone nasal implant that Ms. 145
24 ‖had received 10 years before in Vietnam, and which was causing
25 ‖inflammation of the nose.   The operative report indicates that the
26 ‖nasal implant was removed using a laser.   It says nothing about a

27

151

28

1 ‖replacement.

2 ‖          599.   However, in another medical record, filled out by
3 ‖a nurse rather than a doctor, there is a description of a new
4 ‖nasal implant that was inserted in place of the old one.   CIGNA
5 ‖was not supposed to know about the new implant, which is not
6 ‖mentioned in any of the other records released to CIGNA, but
7 ‖again, the truth slipped out.

8 ‖**Patients 146 through 149**

9 ‖          600.   In the Spring of 1997, defendant Amir-Jahed found
10 ‖time in his busy schedule of performing fraudulent surgeries at
11 ‖other clinics to perform some at Providence.

12 ‖          601.   For example, Amir-Jahed fraudulently billed and
13 ‖documented a colporrhaphy that he claimed to have performed at
14 ‖Providence on May 3, 1997 on Patient 146, an Aetna insured from
15 ‖San Jose.   He did the same in connection with a May 6, 1997
16 ‖surgery on a Humana patient from Texas, Patient 147.   On May 9,
17 ‖1997, Amir-Jahed performed a cosmetic breast surgery at Providence
18 ‖on a CIGNA insured from Michigan, Patient 148, which he later
19 ‖billed and documented as the excision of a breast cyst.   And on
20 ‖May 29, 1997, Amir-Jahed disguised a Providence cosmetic surgery
21 ‖as a hernia repair for a Prudential insured from Santa Ana,
22 ‖Patient 149.

23 ‖          602.   Total payments by the affected plaintiffs for
24 ‖these surgeries were $43,194.

25

26

27

28

152

1 **Patient 150**

2　　　　603.　Defendant Robinson sometimes combined a cosmetic
3 nasal surgery with a surgery to alleviate snoring.  Because
4 neither of those surgeries is covered by insurance, Robinson
5 needed to manufacture a more serious condition, such as the ever-
6 popular deviated septum with enlarged turbinates and airway
7 blockage. He did so with Patient 150.

8　　　　604.　Patient 150 was a CIGNA insured from Garden Grove,
9 California.  On November 21, 1997, Robinson performed a cosmetic
10 surgery on Mr. 150 along with other procedures to address Mr.
11 150's snoring problem.  He prepared an operative report that
12 described Mr. 150 as suffering from a deviated septum and
13 hypertrophic turbinates, among other problems.  Later, in a letter
14 to CIGNA dated February 10, 1998 seeking payment for the surgery,
15 he stated that Mr. 150 had "a deviated septum leftward with about
16 85-90% airway obstruction and deviation of at least 4-5mm from
17 midline and [severe] compensatory hypertrophy of the turbinates."

18　　　　605.　However, before performing the surgery, Robinson
19 had sent Mr. 150 for a CT scan by a radiologist other than
20 defendants Grusd or Hoffman.  His report stated:  "There is no
21 evidence of a deviation of the nasal septum. . . .There is no
22 evidence of a thickening of the nasal turbinates."

23　　　　606.　Providence fraudulently billed more than $10,000
24 for this surgery, Robinson billed more than $16,000, and
25 anesthesiologist Sharam Taheri billed another $1,825. A few days
26 later, on December 1, 1997, Providence and Robinson billed another

27

28

1 $7,000 after Robinson had to perform an emergency surgery to stop
2 Mr. 150's postoperative bleeding.  CIGNA paid $24,997.

3 **Patients 151 and 152**

4      607.  When defendants Providence and Robinson used one
5 of the insider radiologists, defendant Hoffman, Hoffman performed
6 the same role that he did at the other clinics, providing
7 fraudulent radiology reports to lend a veneer of legitimacy to the
8 phony surgeries that Robinson and Providence claimed to have
9 performed.

10      608.  For example, Hoffman fraudulently billed for
11 radiology that he claimed to have performed on two out-of-state
12 patients on May 16, 1997 -- Patient 151, an Aetna insured from
13 Houston, Texas, and Patient 152, a Prudential insured from
14 Norcross, Georgia.  Aetna paid $24,095 in connection with Patient
15 151's surgery and Prudential paid $13,932 in connection with
16 Patient 152's surgery.

17 **Patient 153**

18      609.  Patient 153 is an Aetna insured from Santa Ana,
19 California.  Ms. 153 had three cosmetic surgeries performed by
20 defendant Robinson at Providence.

21      610.  The first, on November 12, 1997, was fraudulently
22 billed as a septoplasty.  The second surgery was on July 27, 1998
23 and was fraudulently billed as a breast procedure.  The third, on
24 August 26, 1998, was fraudulently billed as another septoplasty.

25      611.  Aetna paid a total of $18,728 on those three
26 surgeries.

27

28

154

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Violation of 18 U.S.C. § 1962(c)
by Defendants New Images of Beverly
Hills, Inc., Advanced Professional
Imaging Inc., The Oaks Diagnostics, Inc.,
Amir-Jahed, Arnazzi, Ermshar, Fernando,
Golden, Grusd, Hoffman, Jorgensen,
Koh, Newman, Po, and Zilka**

**(BHOSC As Enterprise)**

612. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 611 above as if set forth here in their entirety.

613. In executing their fraudulent scheme, defendants New Images of Beverly Hills, Inc., the other defendants associated with BHOSC, and their agents, made extensive use of the United States mails, including by mailing fraudulent claims, fraudulent medical records, and fraudulent correspondence to plaintiffs and by receiving via the mails fraudulently procured benefits from plaintiffs. Those defendants and their agents also used interstate wires during interstate phone calls with prospective patients and recruiters as part of the patient recruitment process, and with plaintiffs in their fraudulent attempts to obtain pre-authorization for surgeries and to collect benefits after the surgeries.

614. Each such use of the mails and each interstate wire communication in furtherance of defendants' fraudulent scheme

155

1 violated the federal mail fraud and federal wire fraud statutes,

2 18 U.S.C. §§ 1341 and 1343.

3          615.  Each of those violations constitutes "racketeering
4 activity" within the meaning of 18 U.S.C. § 1961(1).
5 Collectively, those violations, carried out over an extended
6 period of time, constitute a "pattern of racketeering activity"
7 within the meaning of 18 U.S.C. § 1961(5).

8          616.  BHOSC constitutes an enterprise within the meaning
9 of 18 U.S.C. § 1961(4) that engages in or affects interstate
10 commerce.

11         617.  Defendants New Images of Beverly Hills, Inc.,
12 Advanced Professional Imaging, Inc., The Oaks Diagnostics, Inc.,
13 Amir-Jahed, Arnazzi, Ermshar, Fernando, Golden, Grusd, Hoffman,
14 Jorgensen, Koh, Newman, Po, and Zilka are "persons" within the
15 meaning of 18 U.S.C. § 1961(3) who conducted, participated in,
16 operated, managed and/or controlled the affairs of BHOSC through a
17 pattern of racketeering activity, in violation of 18 U.S.C. §
18 1962(c).

19         618.  Plaintiffs have been injured in their business and
20 property as a proximate result of this violation of 18 U.S.C. §
21 1962(c), in that they have paid substantial sums in health
22 insurance benefits to defendants and others in reliance on the
23 fraudulent bills, medical records, and other documents submitted
24 to them by defendants.

25         619.  By reason of this violation of 18 U.S.C. §
26 1962(c), defendants are jointly and severally liable to plaintiffs

27

28
                                   156

1  for three times the damages plaintiffs have sustained, plus
2  plaintiffs' costs in this suit, including reasonable attorneys'
3  fees.

4

## SECOND CLAIM FOR RELIEF

5

**Violation of 18 U.S.C. § 1962(c)**
6  **by Defendants Willow Glen Enterprises, Inc.,**
   **Advanced Professional Imaging, Inc., The Oaks**
7  **Diagnostics, Inc., Alter, Bohn, Fernando,**
   **Grusd, Hoffman, Koh, Newman, Po, and Zilka**
8

**(Moreno Valley As Enterprise)**
9

10        620.   Plaintiffs repeat and reallege each and every
11  allegation contained in paragraphs 1 through 611 above as if set
12  forth here in their entirety.

13        621.   In executing their fraudulent scheme, defendants
14  Willow Glen Enterprises, Inc., the other defendants associated
15  with Moreno Valley, and their agents, made extensive use of the
16  United States mails, including by mailing fraudulent claims,
17  fraudulent medical records, and fraudulent correspondence to
18  plaintiffs and by receiving via the mails fraudulently procured
19  benefits from plaintiffs.  Those defendants and their agents also
20  used interstate wires during interstate phone calls with
21  prospective patients and recruiters as part of the patient
22  recruitment process, and with plaintiffs in their fraudulent
23  attempts to obtain pre-authorization for surgeries and to collect
24  benefits after the surgeries.

25        622.   Each such use of the mails and each interstate
26  wire communication in furtherance of defendants' fraudulent scheme

27

28

157

1 violated the federal mail fraud and federal wire fraud statutes,
2 18 U.S.C. §§ 1341 and 1343.

3          623.  Each of those violations constitutes "racketeering
4 activity" within the meaning of 18 U.S.C. § 1961(1).
5 Collectively, those violations, carried out over an extended
6 period of time, constitute a "pattern of racketeering activity"
7 within the meaning of 18 U.S.C. § 1961(5).

8          624.  Moreno Valley constitutes an enterprise within the
9 meaning of 18 U.S.C. § 1961(4) that engages in or affects
10 interstate commerce.

11          625.  Defendants Moreno Valley, Advanced Professional
12 Imaging, Inc., The Oaks Diagnostics, Inc., Alter, Bohn,
13 Fernando, Grusd, Hoffman, Koh, Newman, Po, and Zilka are "persons"
14 within the meaning of 18 U.S.C. § 1961(3) who conducted,
15 participated in, operated, managed and/or controlled the affairs
16 of Moreno Valley through a pattern of racketeering activity, in
17 violation of 18 U.S.C. § 1962(c).

18          626.  Plaintiffs have been injured in their business and
19 property as a proximate result of this violation of 18 U.S.C. §
20 1962(c), in that they have paid substantial sums in health
21 insurance benefits to defendants and others in reliance on the
22 fraudulent bills, medical records, and other documents submitted
23 to them by defendants.

24          627.  By reason of this violation of 18 U.S.C. §
25 1962(c), defendants are jointly and severally liable to plaintiffs
26 for three times the damages plaintiffs have sustained, plus

27
28
                                    158

1 plaintiffs' costs in this suit, including reasonable attorneys'
2 fees.

3

4 ### THIRD CLAIM FOR RELIEF

5 **Violation of 18 U.S.C. § 1962(c)**
**by Defendants Advanced Laser Surgical Center, Inc.,**
**Advanced Laser Surgical Medical Group, Inc., Advanced**
6 **Professional Imaging, Inc., Amir-Jahed, Burres,**
**Hoffman, Pham, Po, Sadighi, Shadjareh and Tavoussi**

7
**(Advanced Laser As Enterprise)**
8

9       628.   Plaintiffs repeat and reallege each and every
10 allegation contained in paragraphs 1 through 611 above as if set
11 forth here in their entirety.

12       629.   In executing their fraudulent scheme, defendants
13 Advanced Laser Surgical Center, Inc., Advanced Laser Surgical
14 Medical Group, Inc., the other defendants associated with Advanced
15 Laser, and their agents, made extensive use of the United States
16 mails, including by mailing fraudulent claims, fraudulent medical
17 records, and fraudulent correspondence to plaintiffs and by
18 receiving via the mails fraudulently procured benefits from
19 plaintiffs.   Those defendants and their agents also used
20 interstate wires during interstate phone calls with prospective
21 patients and recruiters as part of the patient recruitment
22 process, and with plaintiffs in their fraudulent attempts to
23 obtain pre-authorization for surgeries and to collect benefits
24 after the surgeries.

25       630.   Each such use of the mails and each interstate
26 wire communication in furtherance of defendants' fraudulent scheme

27
159
28

1 violated the federal mail fraud and federal wire fraud statutes,
2 18 U.S.C. §§ 1341 and 1343.

3       631.   Each of those violations constitutes "racketeering
4 activity" within the meaning of 18 U.S.C. § 1961(1).
5 Collectively, those violations, carried out over an extended
6 period of time, constitute a "pattern of racketeering activity"
7 within the meaning of 18 U.S.C. § 1961(5).

8       632.   Advanced Laser constitutes an enterprise within
9 the meaning of 18 U.S.C. § 1961(4) that engages in or affects
10 interstate commerce.

11       633.   Defendants Advanced Laser Surgical Center, Inc.,
12 Advanced Laser Surgical Medical Group, Inc., Advanced Professional
13 Imaging, Inc., Amir-Jahed, Burres, Hoffman, Pham, Po, Sadighi,
14 Shadjareh and Tavoussi are "persons" within the meaning of 18
15 U.S.C. § 1961(3) who conducted, participated in, operated, managed
16 and/or controlled the affairs of Advanced Laser through a pattern
17 of racketeering activity, in violation of 18 U.S.C. § 1962(c).

18       634.   Plaintiffs have been injured in their business and
19 property as a proximate result of this violation of 18 U.S.C. §
20 1962(c), in that they have paid substantial sums in health
21 insurance benefits to defendants and others in reliance on the
22 fraudulent bills, medical records, and other documents submitted
23 to them by defendants.

24       635.   By reason of this violation of 18 U.S.C. §
25 1962(c), defendants are jointly and severally liable to plaintiffs
26 for three times the damages plaintiffs have sustained, plus

27

28

160

1  plaintiffs' costs in this suit, including reasonable attorneys'

2  fees.

### FOURTH CLAIM FOR RELIEF

**Violation of 18 U.S.C. § 1962(c)
by Defendants Cal-Surge, Inc.,
Advanced Professional Imaging,
Inc., The Oaks Diagnostics, Inc.,
Amir-Jahed, Arnazzi, Bahna, Burres, Grusd,
Hoffman, Hudson, Jorgensen, Koh, Tavoussi, Zilka and Cloud**

**(Westwood As Enterprise)**

636.    Plaintiffs repeat and reallege each and every

allegation contained in paragraphs 1 through 611 above as if set

forth here in their entirety.

637.    In executing their fraudulent scheme, defendants

Cal-Surge, Inc., the other defendants associated with Westwood,

and their agents, made extensive use of the United States mails,

including by mailing fraudulent claims, fraudulent medical

records, and fraudulent correspondence to plaintiffs and by

receiving via the mails fraudulently procured benefits from

plaintiffs.    Those defendants and their agents also used

interstate wires during interstate phone calls with prospective

patients and recruiters as part of the patient recruitment

process, and with plaintiffs in their fraudulent attempts to

obtain pre-authorization for surgeries and to collect benefits

after the surgeries.

638.    Each such use of the mails and each interstate

wire communication in furtherance of defendants' fraudulent scheme

violated the federal mail fraud and federal wire fraud statutes,

161

1 | 18 U.S.C. §§ 1341 and 1343.

2 | 639.  Each of those violations constitutes "racketeering
3 | activity" within the meaning of 18 U.S.C. § 1961(1).
4 | Collectively, those violations, carried out over an extended
5 | period of time, constitute a "pattern of racketeering activity"
6 | within the meaning of 18 U.S.C. § 1961(5).

7 | 640.  Westwood constitutes an enterprise within the
8 | meaning of 18 U.S.C. § 1961(4) that engages in or affects
9 | interstate commerce.

10 | 641.  Defendants Cal-Surge, Inc., Advanced Professional
11 | Imaging, Inc., The Oaks Diagnostics, Inc., Amir-Jahed, Arnazzi,
12 | Bahna, Burres, Cloud, Grusd, Hoffman, Hudson, Jorgensen, Koh,
13 | Tavoussi and Zilka are "persons" within the meaning of 18 U.S.C. §
14 | 1961(3) who conducted, participated in, operated, managed and/or
15 | controlled the affairs of Westwood through a pattern of
16 | racketeering activity, in violation of 18 U.S.C. § 1962(c).

17 | 642.  Plaintiffs have been injured in their business and
18 | property as a proximate result of this violation of 18 U.S.C. §
19 | 1962(c), in that they have paid substantial sums in health
20 | insurance benefits to defendants and others in reliance on the
21 | fraudulent bills, medical records, and other documents submitted
22 | to them by defendants.

23 | 643.  By reason of this violation of 18 U.S.C. §
24 | 1962(c), defendants are jointly and severally liable to plaintiffs
25 | for three times the damages plaintiffs have sustained, plus
26 | plaintiffs' costs in this suit, including reasonable attorneys'

27 |

28 |

1  fees.

2

### FIFTH CLAIM FOR RELIEF

3

4
Violation of 18 U.S.C. § 1962(c)
by Defendants West Olympic Surgery
Center and Laser Institute, Inc., Los

5
Angeles Surgical Medical Group,
Inc., Advanced Professional Imaging,

6
Inc., The Oaks Diagnostics, Inc.,
Amir-Jahed, Ermshar, Grusd, Hoffman,

7
Newman, Reiter, Strahan, and Zilka

8
(West Olympic As Enterprise)

9

10
644.   Plaintiffs repeat and reallege each and every

11
allegation contained in paragraphs 1 through 611 above as if set

forth here in their entirety.
12

645.   In executing their fraudulent scheme, defendants
13

14
West Olympic Surgery Center & Laser Institute, Inc., the other

15
defendants associated with West Olympic, and their agents, made

extensive use of the United States mails, including by mailing
16

17
fraudulent claims, fraudulent medical records, and fraudulent

18
correspondence to plaintiffs and by receiving via the mails

19
fraudulently procured benefits from plaintiffs.  Those defendants

and their agents also used interstate wires during interstate
20

21
phone calls with prospective patients and recruiters as part of

22
the patient recruitment process, and with plaintiffs in their

23
fraudulent attempts to obtain pre-authorization for surgeries and

to collect benefits after the surgeries.
24

25
646.   Each such use of the mails and each interstate

26
wire communication in furtherance of defendants' fraudulent scheme

27
violated the federal mail fraud and federal wire fraud statutes,

28
163

1 | 18 U.S.C. §§ 1341 and 1343.

2 |        647.  Each of those violations constitutes "racketeering
3 | activity" within the meaning of 18 U.S.C. § 1961(1).
4 | Collectively, those violations, carried out over an extended
5 | period of time, constitute a "pattern of racketeering activity"
6 | within the meaning of 18 U.S.C. § 1961(5).

7 |        648.  West Olympic constitutes an enterprise within the
8 | meaning of 18 U.S.C. § 1961(4) that engages in or affects
9 | interstate commerce.

10 |        649.  Defendants West Olympic Surgery Center & Laser
11 | Institute, Inc., Los Angeles Surgical Medical Group, Inc.,
12 | Advanced Professional Imaging, Inc., The Oaks Diagnostics, Inc.,
13 | Amir-Jahed, Ermshar, Grusd, Hoffman, Newman, Reiter, Strahan and
14 | Zilka are "persons" within the meaning of 18 U.S.C. § 1961(3) who
15 | conducted, participated in, operated, managed and/or controlled
16 | the affairs of West Olympic through a pattern of racketeering
17 | activity, in violation of 18 U.S.C. § 1962(c).

18 |        650.  Plaintiffs have been injured in their business and
19 | property as a proximate result of this violation of 18 U.S.C. §
20 | 1962(c), in that they have paid substantial sums in health
21 | insurance benefits to defendants and others in reliance on the
22 | fraudulent bills, medical records, and other documents submitted
23 | to them by defendants.

24 |        651.  By reason of this violation of 18 U.S.C. §
25 | 1962(c), defendants are jointly and severally liable to plaintiffs
26 | for three times the damages plaintiffs have sustained, plus

27 |

28 |                                164

1 plaintiffs' costs in this suit, including reasonable attorneys'
2 fees.

3

4 **SIXTH CLAIM FOR RELIEF**

5 **Violation of 18 U.S.C. § 1962(c)
by Defendants Wilshire Outpatient
Surgery Center, Inc., The Oaks**
6 **Diagnostics, Inc., Fernando, Jorgensen, Grusd, and Newman**

7 **(Wilshire Outpatient As Enterprise)**

8

9          652.    Plaintiffs repeat and reallege each and every

10 allegation contained in paragraphs 1 through 611 above as if set

11 forth here in their entirety.

12          653.    In executing their fraudulent scheme, defendants

13 Wilshire Outpatient Surgery Center, Inc., the other defendants

14 associated with Wilshire Outpatient, and their agents, made

15 extensive use of the United States mails, including by mailing

16 fraudulent claims, fraudulent medical records, and fraudulent

17 correspondence to plaintiffs and by receiving via the mails

18 fraudulently procured benefits from plaintiffs.  Those defendants

19 and their agents also used interstate wires during interstate

20 phone calls with prospective patients and recruiters as part of

21 the patient recruitment process, and with plaintiffs in their

22 fraudulent attempts to obtain pre-authorization for surgeries and

23 to collect benefits after the surgeries.

24          654.    Each such use of the mails and each interstate

25 wire communication in furtherance of defendants' fraudulent scheme

26 violated the federal mail fraud and federal wire fraud statutes,

27 18 U.S.C. §§ 1341 and 1343.

28                                    165

1          655.   Each of those violations constitutes "racketeering
2  activity" within the meaning of 18 U.S.C. § 1961(1).
3  Collectively, those violations, carried out over an extended
4  period of time, constitute a "pattern of racketeering activity"
5  within the meaning of 18 U.S.C. § 1961(5).

6          656.   Wilshire Outpatient constitutes an enterprise
7  within the meaning of 18 U.S.C. § 1961(4) that engages in or
8  affects interstate commerce.

9          657.   Defendants Wilshire Outpatient Surgery Center,
10  Inc., The Oaks Diagnostics, Inc., Fernando, Grusd, Jorgensen and
11  Newman are "persons" within the meaning of 18 U.S.C. § 1961(3) who
12  conducted, participated in, operated, managed and/or controlled
13  the affairs of Wilshire Outpatient through a pattern of
14  racketeering activity, in violation of 18 U.S.C. § 1962(c).

15          658.   Plaintiffs have been injured in their business and
16  property as a proximate result of this violation of 18 U.S.C. §
17  1962(c), in that they have paid substantial sums in health
18  insurance benefits to defendants and others in reliance on the
19  fraudulent bills, medical records, and other documents submitted
20  to them by defendants.

21          659.   By reason of this violation of 18 U.S.C. §
22  1962(c), defendants are jointly and severally liable to plaintiffs
23  for three times the damages plaintiffs have sustained, plus
24  plaintiffs' costs in this suit, including reasonable attorneys'
25  fees.

26

27
                                    166
28

1

## SEVENTH CLAIM FOR RELIEF

2

**Violation of 18 U.S.C. § 1962(c)**
**by Defendants Wilshire West Ambulatory**
**Surgery Center, Advanced Professional**
**Imaging, Inc., The Oaks Diagnostics, Inc.,**
**Bahna, Grusd, Hoffman, and Zilka**

3

4

5

**(Wilshire West As Enterprise)**

6

7

660.  Plaintiffs repeat and reallege each and every

8

allegation contained in paragraphs 1 through 611 above as if set

forth here in their entirety.

9

10

661.  In executing their fraudulent scheme, defendants

Wilshire West Ambulatory Surgery Center, the other defendants

11

associated with Wilshire West, and their agents, made extensive

12

use of the United States mails, including by mailing fraudulent

13

claims, fraudulent medical records, and fraudulent correspondence

14

to plaintiffs and by receiving via the mails fraudulently procured

15

benefits from plaintiffs.  Those defendants and their agents also

16

used interstate wires during interstate phone calls with

17

prospective patients and recruiters as part of the patient

18

recruitment process, and with plaintiffs in their fraudulent

19

attempts to obtain pre-authorization for surgeries and to collect

20

benefits after the surgeries.

21

662.  Each such use of the mails and each interstate

22

wire communication in furtherance of defendants' fraudulent scheme

23

violated the federal mail fraud and federal wire fraud statutes,

24

18 U.S.C. §§ 1341 and 1343.

25

663.  Each of those violations constitutes "racketeering

26

activity" within the meaning of 18 U.S.C. § 1961(1).

27

167

28

1 Collectively, those violations, carried out over an extended
2 period of time, constitute a "pattern of racketeering activity"
3 within the meaning of 18 U.S.C. § 1961(5).

4          664.  Wilshire West constitutes an enterprise within the
5 meaning of 18 U.S.C. § 1961(4) that engages in or affects
6 interstate commerce.

7          665.  Defendants Wilshire West Ambulatory Surgery
8 Center, Advanced Professional Imaging, Inc., The Oaks Diagnostics,
9 Inc., Bahna, Grusd, Hoffman, and Zilka are "persons" within the
10 meaning of 18 U.S.C. § 1961(3) who conducted, participated in,
11 operated, managed and/or controlled the affairs of Wilshire West
12 through a pattern of racketeering activity, in violation of 18
13 U.S.C. § 1962(c).

14          666.  Plaintiffs have been injured in their business and
15 property as a proximate result of this violation of 18 U.S.C. §
16 1962(c), in that they have paid substantial sums in health
17 insurance benefits to defendants and others in reliance on the
18 fraudulent bills, medical records, and other documents submitted
19 to them by defendants.

20          667.  By reason of this violation of 18 U.S.C. §
21 1962(c), defendants are jointly and severally liable to plaintiffs
22 for three times the damages plaintiffs have sustained, plus
23 plaintiffs' costs in this suit, including reasonable attorneys'
24 fees.

25
26
27
28

168

1

## EIGHTH CLAIM FOR RELIEF

2

**Violation of 18 U.S.C. § 1962(c)
by Defendants Monroe Family Medical
Group, Inc., Advanced Professional
Imaging, Inc., The Oaks Diagnostics, Inc.,
Grusd, Hoffman, Jorgensen, McMillan, and Zilka**

3

4

5

**(Monroe As Enterprise)**

6

7
8
9

668.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 611 above as if set forth here in their entirety.

10
11
12
13
14
15
16
17
18
19
20
21

669.   In executing their fraudulent scheme, defendants Monroe Family Medical Group Outpatient Surgery Center, Inc., the other defendants associated with Monroe, and their agents, made extensive use of the United States mails, including by mailing fraudulent claims, fraudulent medical records, and fraudulent correspondence to plaintiffs and by receiving via the mails fraudulently procured benefits from plaintiffs.  Those defendants and their agents also used interstate wires during interstate phone calls with prospective patients and recruiters as part of the patient recruitment process, and with plaintiffs in their fraudulent attempts to obtain pre-authorization for surgeries and to collect benefits after the surgeries.

22
23
24
25

670.   Each such use of the mails and each interstate wire communication in furtherance of defendants' fraudulent scheme violated the federal mail fraud and federal wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

26
27

671.   Each of those violations constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

28

169

1  Collectively, those violations, carried out over an extended
2  period of time, constitute a "pattern of racketeering activity"
3  within the meaning of 18 U.S.C. § 1961(5).

4          672.  Monroe constitutes an enterprise within the
5  meaning of 18 U.S.C. § 1961(4) that engages in or affects
6  interstate commerce.

7          673.  Defendants Monroe Family Medical Group Outpatient
8  Surgery Center, Inc., Advanced Professional Imaging, Inc., The
9  Oaks Diagnostics, Inc., Grusd, Hoffman, Jorgensen, McMillan, and
10  Zilka are "persons" within the meaning of 18 U.S.C. § 1961(3) who
11  conducted, participated in, operated, managed and/or controlled
12  the affairs of Wilshire West through a pattern of racketeering
13  activity, in violation of 18 U.S.C. § 1962(c).

14          674.  Plaintiffs have been injured in their business and
15  property as a proximate result of this violation of 18 U.S.C. §
16  1962(c), in that they have paid substantial sums in health
17  insurance benefits to defendants and others in reliance on the
18  fraudulent bills, medical records, and other documents submitted
19  to them by defendants.

20          675.  By reason of this violation of 18 U.S.C. §
21  1962(c), defendants are jointly and severally liable to plaintiffs
22  for three times the damages plaintiffs have sustained, plus
23  plaintiffs' costs in this suit, including reasonable attorneys'
24  fees.

25
26
27
28
                                170

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NINTH CLAIM FOR RELIEF**

**Violation of 18 U.S.C. § 1962(c)**
**by Defendants All-American Medical Group, Inc.,**
**Amir-Jahed, Burres, Hoffman, Montazeri, and Tavoussi**

**(Mariners Bay As Enterprise)**

676.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 611 above as if set forth here in their entirety.

677.   In executing their fraudulent scheme, defendants All-American Medical Group, Inc., the other defendants associated with Mariners Bay, and their agents, made extensive use of the United States mails, including by mailing fraudulent claims, fraudulent medical records, and fraudulent correspondence to plaintiffs and by receiving via the mails fraudulently procured benefits from plaintiffs.   Those defendants and their agents also used interstate wires during interstate phone calls with prospective patients and recruiters as part of the patient recruitment process, and with plaintiffs in their fraudulent attempts to obtain pre-authorization for surgeries and to collect benefits after the surgeries.

678.   Each such use of the mails and each interstate wire communication in furtherance of defendants' fraudulent scheme violated the federal mail fraud and federal wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

679.   Each of those violations constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, those violations, carried out over an extended

171

1 period of time, constitute a "pattern of racketeering activity"
2 within the meaning of 18 U.S.C. § 1961(5).

3        680.   Mariners Bay constitutes an enterprise within the
4 meaning of 18 U.S.C. § 1961(4) that engages in or affects
5 interstate commerce.

6        681.   Defendants All-American Medical Group, Inc., Amir-
7 Jahed, Burres, Hoffman, Montazeri, and Tavoussi are "persons"
8 within the meaning of 18 U.S.C. § 1961(3) who conducted,
9 participated in, operated, managed and/or controlled the affairs
10 of Wilshire West through a pattern of racketeering activity, in
11 violation of 18 U.S.C. § 1962(c).

12       682.   Plaintiffs have been injured in their business and
13 property as a proximate result of this violation of 18 U.S.C. §
14 1962(c), in that they have paid substantial sums in health
15 insurance benefits to defendants and others in reliance on the
16 fraudulent bills, medical records, and other documents submitted
17 to them by defendants.

18       683.   By reason of this violation of 18 U.S.C. §
19 1962(c), defendants are jointly and severally liable to plaintiffs
20 for three times the damages plaintiffs have sustained, plus
21 plaintiffs' costs in this suit, including reasonable attorneys'
22 fees.

23

24

25

26

27
                                    172
28

**TENTH CLAIM FOR RELIEF**

**Violation of 18 U.S.C. § 1962(c)
by Defendants Providence Ambulatory
Surgery Center, Inc., Advanced
Professional Imaging, Inc., Amir-Jahed,
Hoffman, and Robinson**

**(Providence As Enterprise)**

684.   Plaintiffs repeat and reallege each and every
allegation contained in paragraphs 1 through 611 above as if set
forth here in their entirety.

685.   In executing their fraudulent scheme, defendants
Providence Ambulatory Surgery Center, Inc., the other defendants
associated with Providence, and their agents, made extensive use
of the United States mails, including by mailing fraudulent
claims, fraudulent medical records, and fraudulent correspondence
to plaintiffs and by receiving via the mails fraudulently procured
benefits from plaintiffs.  Those defendants and their agents also
used interstate wires during interstate phone calls with
prospective patients and recruiters as part of the patient
recruitment process, and with plaintiffs in their fraudulent
attempts to obtain pre-authorization for surgeries and to collect
benefits after the surgeries.

686.   Each such use of the mails and each interstate
wire communication in furtherance of defendants' fraudulent scheme
violated the federal mail fraud and federal wire fraud statutes,
18 U.S.C. §§ 1341 and 1343.

687.   Each of those violations constitutes "racketeering
activity" within the meaning of 18 U.S.C. § 1961(1).

173

1 Collectively, those violations, carried out over an extended
2 period of time, constitute a "pattern of racketeering activity"
3 within the meaning of 18 U.S.C. § 1961(5).

4        688.  Providence constitutes an enterprise within the
5 meaning of 18 U.S.C. § 1961(4) that engages in or affects
6 interstate commerce.

7        689.  Defendants Providence Ambulatory Surgery Center,
8 Inc., Advanced Professional Imaging, Inc., Amir-Jahed, Hoffman,
9 and Robinson are "persons" within the meaning of 18 U.S.C. §
10 1961(3) who conducted, participated in, operated, managed and/or
11 controlled the affairs of Providence through a pattern of
12 racketeering activity, in violation of 18 U.S.C. § 1962(c).

13        690.  Plaintiffs have been injured in their business and
14 property as a proximate result of this violation of 18 U.S.C. §
15 1962(c), in that they have paid substantial sums in health
16 insurance benefits to defendants and others in reliance on the
17 fraudulent bills, medical records, and other documents submitted
18 to them by defendants.

19        691.  By reason of this violation of 18 U.S.C. §
20 1962(c), defendants are jointly and severally liable to plaintiffs
21 for three times the damages plaintiffs have sustained, plus
22 plaintiffs' costs in this suit, including reasonable attorneys'
23 fees.

24

25

26

27

28

174

1

### ELEVENTH CLAIM FOR RELIEF

2

**Violation of 18 U.S.C. § 1962(C)
by Defendants New Images of Beverly**

3

**Hills, Inc., Willow Glen Enterprises,
Inc., Advanced Laser Surgical Center,**

4

**Inc., Advanced Laser Surgical Medical
Group, Inc., All-American Medical Group, Inc.,**

5

**Cal-Surge, Inc., West Olympic Surgery Center and
Laser Institute, Inc., Los Angeles Surgical**

6

**Medical Group, Inc., Wilshire West Ambulatory
Surgery Center, Monroe Family Medical Group, Inc.,**

7

**Providence Ambulatory Surgery Center, Inc., Alter,
Amir-Jahed, Arnazzi, Bahna, Bohn, Burres, Cloud, Ermshar,**

8

**Fernando, Golden, Hoffman, Hudson, Jorgensen, Koh,
McMillan, Montazeri, Newman, Pham, Po, Reiter, Robinson,**

9

**Sadighi, Shadjareh, Strahan, Tavoussi and Zilka**

10

**(Advanced Professional Imaging, Inc. As Enterprise)**

11

12    692.    Plaintiffs repeat and reallege each and every

13   allegation contained in paragraphs 1 through 611 above as if set

14   forth here in their entirety.

15    693.    In executing their fraudulent scheme, the

16   defendants named in this claim and their agents, made extensive

17   use of the United States mails, including by mailing fraudulent

18   claims, fraudulent medical records, and fraudulent correspondence

19   to plaintiffs and by receiving via the mails fraudulently procured

20   benefits from plaintiffs.  Those defendants and their agents also

21   used interstate wires during interstate phone calls with

22   prospective patients and recruiters as part of the patient

23   recruitment process, and with plaintiffs in their fraudulent

24   attempts to obtain pre-authorization for surgeries and to collect

25   benefits after the surgeries.

26    694.    Each such use of the mails and each interstate

27

28

175

1 wire communication in furtherance of defendants' fraudulent scheme
2 violated the federal mail fraud and federal wire fraud statutes,
3 18 U.S.C. §§ 1341 and 1342.

4            695.  Each of those violations constitutes "racketeering
5 activity" within the meaning of 18 U.S.C. § 1961(1).
6 Collectively, those violations, carried out over an extended
7 period of time, constitute a "pattern of racketeering activity"
8 within the meaning of 18 U.S.C. § 1961 (5).

9            696.  Advanced Professional Imaging, Inc. constitutes an
10 enterprise within the meaning of 18 U.S.C. § 1961(4) that engages
11 in or affects interstate commerce.

12            697.  The defendants named in this claim are "persons"
13 within the meaning of 18 U.S.C. § 1961(3) who conducted,
14 participated in, operated, managed and/or controlled the affairs
15 of Advanced Professional Imaging, Inc. through a pattern of
16 racketeering activity in violation of 18 U.S.C. § 1962(c).

17            698.  Plaintiffs have been injured in their business and
18 property as a proximate result of this violation of 18 U.S.C. §
19 1962(c), in that they have paid substantial sums in health
20 insurance benefits to defendants and others in reliance on the
21 fraudulent bills, medical records, and other documents submitted
22 to them by defendants.

23            699.  By reason of this violation of 18 U.S.C. §
24 1962(c), defendants are jointly and severally liable to plaintiffs
25 for three times the damages plaintiffs have sustained, plus
26 plaintiffs' costs in this suit, including reasonable attorneys'
27

28                                    176

1   fees.

2

### TWELFTH CLAIM FOR RELIEF

3

Violation of 18 U.S.C. § 1962(c)
4       by Defendants New Images of Beverly
Hills, Inc., Willow Glen Enterprises,
5       Inc., Cal-Surge, Inc., West Olympic
Surgery Center and Laser Institute, Inc.,
6       Los Angeles Surgical Medical Group, Inc.,
Wilshire Outpatient Surgery Center, Inc.,
7   Wilshire West Ambulatory Surgery Center, Monroe
Family Medical Group, Inc., Alter, Amir-Jahed,
8       Arnazzi, Bahna, Bohn, Burres, Cloud,
Ermshar, Fernando, Golden, Grusd, Hudson,
9       Jorgensen, Koh, McMillan, Newman, Pham, Po,
Reiter, Shadjareh, Strahan, Tavoussi and Zilka
10
(The Oaks Diagnostics, Inc., As Enterprise)
11

12
700.   Plaintiffs repeat and reallege each and every
13
allegation contained in paragraphs 1 through 611 above as if set
14
forth here in their entirety.
15
701.   In executing their fraudulent scheme, the
16
defendants named in this claim and their agents, made extensive
17
use of the United States mails, including by mailing fraudulent
18
claims, fraudulent medical records, and fraudulent correspondence
19
to plaintiffs and by receiving via the mails fraudulently procured
20
benefits from plaintiffs.  Those defendants and their agents also
21
used interstate wires during interstate phone calls with
22
prospective patients and recruiters as part of the patient
23
recruitment process, and with plaintiffs in their fraudulent
24
attempts to obtain pre-authorization for surgeries and to collect
25
benefits after the surgeries.
26
702.   Each such use of the mails and each interstate
27
177
28

1  wire communication in furtherance of defendants' fraudulent scheme
2  violated the federal mail fraud and federal wire fraud statutes,
3  18 U.S.C. §§ 1341 and 1342.

4        703.  Each of those violations constitutes "racketeering
5  activity" within the meaning of 18 U.S.C. § 1961(1).
6  Collectively, those violations, carried out over an extended
7  period of time, constitute a "pattern of racketeering activity"
8  within the meaning of 18 U.S.C. § 1961 (5).

9        704.  The Oaks Diagnostics, Inc. constitutes an
10  enterprise within the meaning of 18 U.S.C. § 1961(4) that engages
11  in or affects interstate commerce.

12        705.  The defendants named in this claim are "persons"
13  within the meaning of 18 U.S.C. § 1961(3) who conducted,
14  participated in, operated, managed and/or controlled the affairs
15  of Advanced Radiology of Beverly Hills through a pattern of
16  racketeering activity in violation of 18 U.S.C. § 1962(c).

17        706.  Plaintiffs have been injured in their business and
18  property as a proximate result of this violation of 18 U.S.C. §
19  1962(c), in that they have paid substantial sums in health
20  insurance benefits to defendants and others in reliance on the
21  fraudulent bills, medical records, and other documents submitted
22  to them by defendants.

23        707.  By reason of this violation of 18 U.S.C. §
24  1962(c), defendants are jointly and severally liable to plaintiffs
25  for three times the damages plaintiffs have sustained, plus
26  plaintiffs' costs in this suit, including reasonable attorneys'
27

28                                 178

1  fees.

2

3  ### THIRTEENTH CLAIM FOR RELIEF

4  Common Law Fraud By Defendants Advanced
   Laser Surgical Center, Inc., Advanced Laser
5  Surgical Medical Group, Inc.,
   All-American Medical Group, Inc.,
6  Cal Surge, Inc., Los Angeles Surgical
   Medical Group, Inc., Monroe Family
7  Medical Group Outpatient Surgery Center,
   Inc., New Images of Beverly Hills, Inc.,
8  Providence Ambulatory Surgical Center, Inc.,
   West Olympic Surgical Center & Laser
9  Institute, Inc., Willow Glen Enterprises, Inc.,
   Wilshire Outpatient Surgery Center, Inc.,
10  Wilshire West Ambulatory Surgery Center,
   Advanced Professional Imaging, Inc., The Oaks
11  Diagnostics, Inc., Amir-Jahed, Arnazzi, Alter,
   Bahna, Bohn, Burres, Cloud, Ermshar, Fernando,
12  Golden, Grusd, Hoffman, Hudson, Jorgensen, Koh,
   McMillan, Montazeri, Newman, Pham, Po, Reiter, Robinson,
13  Sadighi, Shadjareh, Strahan, Tavoussi, and Zilka

14
15  708.   Plaintiffs repeat and reallege each and every

16  allegation contained in paragraphs 1 through 611 above as if set

17  forth here in their entirety.

18  709.   Over the course of their fraudulent schemes, and

19  in furtherance thereof, the defendants named in this claim

20  knowingly made, directed others to make, and/or aided and abetted

21  the making of, false representations to plaintiffs concerning,

22  among other things, patients' medical conditions, symptoms,

23  histories, and diagnoses, patients' need for surgery, and the

24  surgical procedures performed on patients.  Defendants made,

25  directed others to make, and/or aided and abetted the making of,

26  such false representations with the intent and effect of inducing

27  plaintiffs to rely thereon, and to pay health benefits to

28

179

1 | defendants and others that plaintiffs were not obligated to pay
2 | and that plaintiffs would not have paid if not for the
3 | misrepresentations.  Plaintiffs reasonably and justifiably relied
4 | on those knowingly false representations, and suffered damages as
5 | a result.

6 |          710.   Defendants' conduct was fraudulent, oppressive,
7 | intentional, wanton, willful, malicious and in disregard of
8 | plaintiffs' rights.

9 |          711.   By reason of defendants' fraud, defendants are
10 | jointly and severally liable to plaintiffs for the damages
11 | plaintiffs have sustained, plus punitive damages in an amount to
12 | be determined at trial.

180

1

## FOURTEENTH CLAIM FOR RELIEF

2
Unjust Enrichment/Restitution Against
Defendants Advanced Laser Surgical Center, Inc.,

3
Advanced Laser Surgical Medical Group, Inc.,
All-American Medical Group, Inc., Cal Surge,

4
Inc., Los Angeles Surgical Medical Group, Inc.,
Monroe Family Medical Group Outpatient Surgery

5
Center, Inc., New Images of Beverly Hills, Inc.,
Providence Ambulatory Surgical Center, Inc.,

6
West Olympic Surgical Center & Laser Institute,
Willow Glen Enterprises, Inc., Wilshire

7
Outpatient Surgery Center, Inc., Wilshire West
Ambulatory Surgery Center, Advanced Professional

8
Imaging, Inc., The Oaks Diagnostics, Inc.,
Amir-Jahed, Arnazzi, Alter, Bahna, Bohn,

9
Burres, Cloud, Ermshar, Fernando, Golden,
Golden Trust, Grusd, Hoffman, Hudson,

10
Jorgensen, Koh, McMillan, Montazeri,
Newman, Pham, Po, Reiter, Robinson, Sadighi,

11
Shadjareh, Strahan, Tavoussi and Zilka

12

13
712.   Plaintiffs repeat and reallege each and every

14
allegation contained in paragraphs 1 through 611 above as if set

15
forth here in their entirety.

16
713.   By reason of their wrongdoing as alleged above,

17
defendants named in this claim have been unjustly enriched, in

18
that they have received monies from plaintiffs that in equity and

19
good conscience they should not be permitted to keep.

20
714.   Plaintiffs are entitled to restitution from

21
defendants under state and/or federal common law in the amount by

22
which defendants have been unjustly enriched.

23

24

25

26

27

28

181

1

## FIFTEENTH CLAIM FOR RELIEF

2

Negligent Misrepresentation By Defendants
Advanced Laser Surgical Center, Advanced

3

Laser Surgical Medical Group, Inc.,
All-American Medical Group, Inc., Cal Surge,

4

Inc., Los Angeles Surgical Medical Group, Inc.,
Monroe Family Medical Group Outpatient Surgery

5

Center, Inc., New Images of Beverly Hills, Inc.,
Providence Ambulatory Surgical Center, Inc., West

6

Olympic Surgical Center & Laser Institute,
Willow Glen Enterprises, Inc., Wilshire Outpatient

7

Surgery Center, Inc., Wilshire West Ambulatory
Surgery Center, Advanced Professional Imaging, Inc.,

8

The Oaks Diagnostics, Inc., Amir-Jahed, Arnazzi,
Alter, Bahna, Bohn, Burres, Cloud, Ermshar, Fernando,

9

Golden, Grusd, Hoffman, Hudson, Jorgensen, Koh,
McMillan, Montazeri, Newman, Po, Reiter,

10

Robinson, Sadighi, Strahan, Tavoussi, and Zilka

11

715. Plaintiffs repeat and reallege each and every

12

allegation contained in paragraphs 1 through 611 above as if set

13

forth here in their entirety.

14

716. In submitting claims, medical records, and other

15

materials to plaintiffs, defendants named in this claim made, or

16

caused to be made, materially false representations to plaintiffs

17

with no reasonable ground for believing them to be true, and

18

omitted, or caused to be omitted, material information that they

19

had a duty to disclose. If any of those material

20

misrepresentations or omissions were made without knowledge or a

21

conscious intent to deceive, then, at a minimum, such

22

misrepresentations or omissions were made negligently and/or

23

recklessly and without regard to their truth or falsity or their

24

likelihood to mislead.

25

717. Plaintiffs justifiably relied on defendants'

26

material misrepresentations and omissions, which proximately

27

182

28

1 │ caused damage to plaintiffs.

2 │     718. Defendants are jointly and severally liable to

3 │ plaintiffs for the damages plaintiffs sustained as a result of

4 │ those material misrepresentations and omissions.

### SIXTEENTH CLAIM FOR RELIEF

**Tortious Interference With Contract Against
Defendants Advanced Laser Surgical Center,
Advanced Laser Surgical Medical Group, Inc.,
All-American Medical Group, Inc., Cal Surge,
Inc., Los Angeles Surgical Medical Group, Inc.,
Monroe Family Medical Group Outpatient Surgery
Center, Inc., New Images of Beverly Hills, Inc.,
Providence Ambulatory Surgical Center, Inc.,
West Olympic Surgical Center & Laser Institute,
Willow Glen Enterprises, Inc., Wilshire Outpatient
Surgery Center, Inc., Wilshire West Ambulatory
Surgery Center, Amir-Jahed, Arnazzi, Alter,
Bahna, Bohn, Burres, Cloud, Ermshar, Fernando,
Golden, Hudson, Jorgensen, Koh, McMillan,
Montazeri, Newman, Po, Reiter, Robinson,
Sadighi, Shadjareh, Strahan, Tavoussi, and Zilka**

    719. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 611 above as if set forth here in their entirety.

    720. Plaintiffs are parties to valid contracts between plaintiffs, on the one hand, and individual insureds, their employers or their employee benefit plans, on the other. Plaintiffs made payments to defendants pursuant to those contracts, including payments on behalf of Patients 1 through 153.

    721. Under the terms of those contracts, insureds and plan participants and beneficiaries are obligated to make certain payments, including deductible amounts and co-payments, to health

183

1 care providers in connection with medical services they receive.

2          722.   Defendants were aware of their patients'
3 contractual obligations to pay a portion of the cost of medical
4 services they receive.

5          723.   Defendants named in this claim induced patients to
6 breach those contractual obligations by offering patients
7 surgeries for which patients would pay nothing, and by offering to
8 accept whatever benefits plaintiffs would pay as full payment for
9 defendants' services.  By doing so, defendants intentionally and
10 tortiously interfered with plaintiffs' contractual rights and
11 relations.

12          724.   As a result of the defendants' tortious
13 interference with plaintiffs' contractual relations, plaintiffs
14 have suffered damages for which defendants are liable.

15

16

17

18

19

20

21

22

23

24

25

26

27
                                184
28

1

## SEVENTEENTH CLAIM FOR RELIEF

2

**Imposition of a Constructive Trust on
Assets of Defendants Advanced Laser
Surgical Center, Inc., Advanced Laser Surgical
Medical Group, Inc., All-American Medical
Group, Inc., Cal Surge, Inc., Los Angeles
Surgical Medical Group, Inc., Monroe Family
Medical Group Outpatient Surgery Center, Inc.,
New Images of Beverly Hills, Inc., Providence
Ambulatory Surgical Center, Inc., West Olympic
Surgical Center & Laser Institute, Inc., Willow
Glen Enterprises, Inc., Wilshire Outpatient
Surgery Center, Inc., Wilshire West Ambulatory
Surgery Center, Advanced Professional Imaging,
Inc., The Oaks Diagnostics, Inc., Amir-Jahed,
Arnazzi, Alter, Bahna, Bohn, Burres, Cloud,
Ermshar, Fernando, Golden, Golden Trust, Grusd,
Hoffman, Hudson, Jorgensen, Koh, McMillan,
Montazeri, Newman, Pham, Po, Reiter, Robinson,
Sadighi, Shadjareh, Strahan, Tavoussi, and Zilka**

3

4

5

6

7

8

9

10

11

12

13

725. Plaintiffs repeat and reallege each and every

14

allegation contained in paragraphs 1 through 611 above as if set

15

forth here in their entirety.

16

726. Each of the defendants received monies, whether

17

directly from plaintiffs, as distributions from corporations, or

18

otherwise, which were obtained through fraudulent benefit claims

19

submitted to plaintiffs, represented the proceeds of fraudulent

20

benefit claims submitted to plaintiffs, or were traceable or

21

attributable to fraudulent benefit claims submitted to plaintiffs.

22

727. Defendants named in this claim received those

23

monies with actual knowledge or with actual or constructive notice

24

that the monies were obtained through fraudulent benefit claims,

25

represented the proceeds of fraudulent benefit claims, or were

26

traceable or attributable to fraudulent benefit claims.

27

728. Under the common law of California, defendants

28

185

1  received those monies as constructive trustees for plaintiffs, and
2  a constructive trust is imposed on defendants' assets to the full
3  extent of those monies.

**EIGHTEENTH CLAIM FOR RELIEF**

**Violation of California Business & Professions
Code §§ 17200 et seq. Against Defendants
Advanced Laser Surgical Center, Inc., Advanced
Laser Surgical Medical Group, Inc., All-American
Medical Group, Inc., Cal Surge, Inc., Los
Angeles Surgical Medical Group, Inc., Monroe
Family Medical Group Outpatient Surgery Center,
Inc., New Images of Beverly Hills, Inc.,
Providence Ambulatory Surgical Center, Inc., West
Olympic Surgical Center & Laser Institute, Inc.,
Willow Glen Enterprises, Inc., Wilshire
Outpatient Surgery Center, Inc., Wilshire West
Ambulatory Surgery Center, Advanced Professional
Imaging, Inc., The Oaks Diagnostics, Inc.,
Amir-Jahed, Arnazzi, Alter, Bahna, Bohn, Burres,
Cloud, Ermshar, Fernando, Golden, Grusd, Hoffman,
Hudson, Jorgensen, Koh, McMillan, Montazeri,
Newman, Pham, Po, Reiter, Robinson, Sadighi,
Shadjareh, Strahan, Tavoussi, and Zilka**

16         729.   Plaintiffs repeat and reallege each and every
17  allegation contained in paragraphs 1 through 611 above as if set
18  forth here in their entirety.

19         730.   Defendants named in this claim have engaged in
20  unfair competition, within the meaning of Section 17200 of the
21  California Business & Professions Code, by committing, directing,
22  and facilitating violations of civil and criminal statutes.

23         731.   First, California Business and Professions Code §
24  650 makes it unlawful for any health care provider to offer or pay
25  a commission or any other consideration "as compensation or
26  inducement for referring patients."  Similarly, California

186

1 Insurance Code § 750 prohibits anyone who regularly presents
2 insurance claims from paying any commission or other consideration
3 "as compensation or inducement . . .for the referral or
4 procurement of . . . patients." Violations of both of these
5 statutes are punishable by fine or imprisonment or both.

6         732.  Defendants have made violations of these statutes
7 a daily business practice.  Defendants have regularly paid
8 bounties to numerous recruiters, both inside and outside the State
9 of California, for delivering patients to them who want cosmetic
10 surgery.  Defendants Grusd and Hoffman and their corporate
11 vehicles have also regularly paid illegal kickbacks to surgeons
12 and clinics for referring patients to them for bogus CAT scans, x-
13 rays and mammograms.

14        733.  Second, California Penal Code § 471.5 makes it a
15 crime to "create[] any false medical record" "with fraudulent
16 intent."  Similarly, California Business & Professions Code § 2262
17 authorizes the State Division of Medical Quality to impose a
18 disciplinary penalty and a fine on any doctor who "creat[es] any
19 false medical record."

20        734.  Defendants have created false operative reports,
21 and other false medical records, for hundreds of patients drawn
22 into their scheme, and they have done so for the sole purpose of
23 defrauding insurance companies into paying for non-covered
24 cosmetic surgeries.

25        735.  Third, California Business & Professions Code  §
26 651 prohibits doctors from advertising in any way that is "false,
27

28
                                  187

1 fraudulent, misleading or deceptive..." Advertising violates that
2 prohibition if it is "likely to mislead or deceive because of a
3 failure to disclose material facts." That is exactly what
4 defendants' advertising does.

5       736. Advertisements like the ones described above are
6 deceptive because they fail to alert patients that they are being
7 invited into a web of deceit. Prospective patients are not told
8 that their medical records will be falsified, or that they will be
9 asked to lie to their insurers about their reasons for having
10 surgery or about what kinds of surgeries they actually had. Of
11 course, defendants could hardly be expected to disclose their
12 criminal conduct in an advertisement. But that does not make the
13 advertising any less deceptive.

14       737. Defendants' statutory violations and acts of unfair
15 competition have injured, and continue to injure, plaintiffs,
16 because they have created a medical sub-industry that is
17 predicated entirely on deceiving insurers; because medical records
18 are what insurers must rely on in making benefit decisions, but in
19 this case those records have been completely falsified; because
20 those falsifications have been calculated to create the appearance
21 of a covered procedure when the actual procedure is most
22 definitely not covered; and because all of this lying has caused
23 plaintiffs to pay defendants millions of dollars that plaintiffs
24 would not have paid if they had been told the truth.

25       738. Defendants' statutory violations and unfair
26 competition have injured, and continue to injure, plaintiffs'

27

28                                         188

1  insureds and defendants' patients generally, because they have
2  created a market in which patients are bartered and exploited for
3  their insurance benefits; because defendants are too busy trying
4  to scam insurers to give patients the type of care and attention
5  they are entitled to; because they have burdened countless
6  patients with false medical and surgical histories that could
7  haunt patients later on; and because some patients find themselves
8  in dire financial straits when defendants demand that they bear
9  some or all of the cost of very expensive surgeries that they
10  previously were told would be free or at little cost to them.

11          739.  The aforesaid violations continue and pose a
12  threat to the general public.

13          740.  Pursuant to Section 17203 of the California
14  Business & Professions Code, these facts require that defendants
15  and their agents be:

16          (a) enjoined from paying any monies or
17  giving any other consideration to patient recruiters, doctors, or
18  any other person in exchange for patient referrals;

19          (b) enjoined from creating any false or misleading
20  medical record or from withholding any true medical record from
21  any insurer;

22          (c) enjoined from submitting any bill to an insurer, or
23  from requesting payment on any previously submitted bill, unless
24  the bill and associated medical records each fully and accurately
25  reflect all medical procedures actually performed on the patient;

26          (d) enjoined from disseminating any advertising or any
27

28
                                  189

1 marketing material in any medium whatsoever unless that
2 advertising and marketing material fully and prominently informs
3 prospective patients that cosmetic surgery is not covered by
4 insurance and that patients will have to bear the cost of such
5 surgery themselves.

6         741.   Pursuant to Section 17203 of the California
7 Business & Professions Code, the foregoing facts also require that
8 defendants be ordered to restore to plaintiffs, and otherwise
9 disgorge, any money that has been acquired from plaintiffs by
10 means of the foregoing acts of unfair competition.

11         WHEREFORE, plaintiffs demand judgment against the
12 defendants named in each Claim for Relief, jointly and severally,
13 as follows:

14         1.   On the first through twelfth Claims for Relief under
15 RICO, three times the damages plaintiffs have sustained as a
16 result of the fraudulent conduct complained of, such amount to be
17 determined at trial, plus plaintiffs' costs in this action,
18 including reasonable attorneys' fees;

19         2.   On the thirteenth Claim for Relief for fraud, the
20 damages sustained by plaintiffs, plus punitive damages, such
21 amounts to be determined at trial;

22         3.   On the fourteenth Claim for Relief for unjust
23 enrichment, the amount by which defendants have been unjustly
24 enriched, such amounts to be determined at trial;

25         4.   On the fifteenth Claim for Relief for negligent
26 misrepresentation, the damages plaintiffs sustained as a result of
27
28                              190

1 those misrepresentations and/or omissions, such amounts to be
2 determined at trial;

3      5. On the sixteenth Claim for Relief for tortious
4 interference with contract, the damages plaintiffs sustained as a
5 result of defendants' conduct, such amount to be determined at
6 trial;

7      6. On the seventeenth Claim for imposition of a
8 constructive trust, the imposition of a trust on defendants'
9 assets on behalf of plaintiffs, to the full extent of plaintiffs'
10 payments procured by defendants' wrongful acts, such amounts to be
11 determined at trial;

12      7. On the eighteenth Claim for statutory unfair
13 competition:

14      (a) Permanently enjoining defendants from paying any
15 monies or giving any other consideration to patient recruiters,
16 doctors, or any other person in exchange for patient referrals;

17      (b) Permanently enjoining defendants from creating any
18 false or misleading medical record or from withholding any true
19 medical record from any insurer;

20      (c) Permanently enjoining defendants from submitting any
21 bill to an insurer, or from requesting payment on any previously
22 submitted bill, unless the bill and associated medical records
23 each fully and accurately reflect all medical procedures actually
24 performed on the patient;

25      (d) Permanently enjoining defendants from disseminating
26 any advertising or any marketing material in any medium whatsoever

27

28

191

1  unless that advertising and marketing material  fully and
2  prominently informs prospective patients that cosmetic surgery is
3  not covered by insurance and that patients will have to bear the
4  cost of such surgery themselves.

5       (e) Requiring defendants to restore to plaintiffs, and
6  otherwise to disgorge, any money that has been acquired from
7  plaintiffs by means of defendants' acts of unfair competition.

8       8.   Permanently enjoining defendants from engaging in
9  any of the fraudulent acts or practices identified herein, and
10  from submitting to plaintiffs any fraudulent or otherwise improper
11  claim or request for payment, together with any other appropriate
12  injunctive relief;

13       9. Awarding plaintiffs interest and costs, including
14  attorneys' fees; and

192

1          10. Awarding plaintiffs such other and further relief as

2  the Court deems just and proper.

3

Dated: August 12, 1999

4

                              KORNSTEIN VEISZ & WEXLER, LLP
5

6                              By:_____
                                   Marvin Wexler
7

                              757 Third Avenue
8                              New York, New York 10017
                              (212) 418-8600
9

                                   -and-
10

                              KENDIG & ROSS
11

12                             By:_____
                                   Dennis A. Kendig
13

                              1875 Century Park East
14                             Suite 2150
                              Los Angeles, California 90067
15                             (310) 556-8100

16                             Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28                                    193

1

## DEMAND FOR JURY TRIAL

2

3         Plaintiffs Aetna, CIGNA, Humana and United hereby demand

4    a trial by jury.

     Dated: August 12, 1999

5

6

7                                KORNSTEIN VEISZ & WEXLER, LLP

8                                By:_____
                                       Marvin Wexler
9

10                               757 Third Avenue
                                 New York, New York 10017
11                               (212) 418-8600

12                                      -and-

13                               KENDIG & ROSS

14                               By:_____
                                       Dennis A. Kendig
15

16                               1875 Century Park East
                                 Suite 2150
17                               Los Angeles, California 90067
                                 (310) 556-8100

18                               Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

27
                                      194
28